**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND OF METROPOLITAN CHICAGO, ANN BRASH, MAUREEN HENEGHAN, and RAY CAMPBELL, on behalf of themselves and all others similarly situated, <br><br>       Plaintiffs, <br><br> -against- <br><br> CITY OF CHICAGO, CHICAGO DEPARTMENT OF TRANSPORTATION, LORI LIGHTFOOT, in her official capacity as Mayor of the City of Chicago, and THOMAS CARNEY, in his official capacity as Acting Commissioner of the Chicago Department of Transportation, <br><br>       Defendants. | **Case No. 19-cv-6322** <br><br> **COMPLAINT** |

## INTRODUCTION

1.  This class action lawsuit challenges the City of Chicago's ("Chicago" or the "City") practice of systemically discriminating against blind[1] residents and visitors by failing to equip signalized street intersections with accessible pedestrian signals ("APSs").

2.  APSs convey traffic and warning information (*i.e.*, "Walk" and "Don't Walk") by making sounds and vibrating a tactile button. By listening for the sounds generated by the APS, blind pedestrians receive the same information about traffic safety that sighted pedestrians can obtain by looking at the pedestrian signals.

---

[1] Plaintiffs use the terms "blind" and "deaf-blind" to describe individuals who have low or no use of vision , as well as low or no use of hearing alongside vision. For purposes of this complaint, the term "blind" should be understood to include people who are either legally or completely blind.

3.      Yet Chicago regularly installs and upgrades pedestrian traffic signals without including an APS device, thereby denying blind pedestrians access to information that is provided to sighted pedestrians to promote their safety.

4.      Indeed, abysmally few of Chicago's signalized intersections have pedestrian signals that are usable by blind pedestrians:  Out of about 2,672 signalized traffic intersections in Chicago, *only 11*—less than half of one percent—offer signals that convey any information at all to people with vision-related disabilities.  Such systemic failure dangerously diminishes blind pedestrians' ability to navigate street crossings safely and independently.

5.      To cope with the chronic lack of APS devices, which are missing even at noisy, busy, or complex street intersections, blind pedestrians are forced to resort to a number of workarounds that are demeaning and potentially unsafe.  Some of these workarounds include seeking assistance from complete strangers and attempting to follow sighted pedestrians, who may cross against lights.  At times, blind pedestrians must wait alone at an intersection for several cycles until another pedestrian appears to help them navigate the crossing.  In a worst-case scenario, a blind pedestrian risks being hit by a car because they are forced to cross the street without knowing whether it is safe for them to do so.

6.      If a blind pedestrian accidentally crosses against the light, sighted pedestrians, when present, will often grab or shout at them, an experience that is frightening and humiliating.

7.      The difficulties of crossing noisy, busy, or complex streets without APSs are indeed so severe that some blind pedestirans attempt to avoid risky intersections altogether by using indirect, longer routes, or by taking paratransit, even though parantransit must be arranged for twenty-four hours in advance.

2

8. These challenges are additionally compounded by Chicago's high vehicle and population density. Chicago has approximately 11,000 inhabitants per square mile, making it one of the most population-dense cities in the entire country. High levels of background noise—such as construction, garbage collection, street music, or passing subways on elevated tracks—make safe and independent navigation of street crossings that much more challenging for blind pedestrians who, in the absence of accessible pedestrian signalling, often must rely on the ear alone to know when to cross streets.

9. Collectively, these obstacles severely compromise blind pedestrians' ability to move about the City like their sighted counterparts do: Safely, independently, expeditiously, and without fear. The exclusion of APSs from Chicago's pedestrian signal program is thus severly harmful to Plaintiffs and members of the class.

10. The City's long-standing systemic failure to ensure that its pedestrian signals are accessible to blind pedestrians constitutes a violation of both Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

11. Plaintiffs sue on behalf of themselves and all people with vision-related disabilities who use, or seek to use, pedestrian signals in Chicago. Because Defendants have imposed on these individuals unnecessary risks to their safety and independence each time they navigate signalized intersections without APS devices, swift and comprehensive injunctive relief is warranted.

## **JURISDICTION**

12. This is an action for declaratory and injunctive relief, brought pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504.

## VENUE

14.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District.  The Defendants are located within this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

15.     Plaintiff Ann Brash is blind and has used a white cane to navigate since 1971. She has worked in Chicago since 1975 and travels on city streets each weekday.  She is a member of the American Council of the Blind of Metropolitan Chicago ("ACBMC"). Accordingly, Ms. Brash is a qualified individual with a disability within the meaning of all applicable statutes.

16.     Plaintiff Maureen Heneghan is blind and uses a white cane to navigate the sidewalks.  She has lived in Chicago her entire life and travels across city streets every day.  She is a member of the ACBMC.  Accordingly, Ms. Heneghan is a qualified individual with a disability within the meaning of all applicable statutes.

17.     Plaintiff Ray Campbell is blind and has used a white cane to navigate the sidewalks for over 40 years.  He has worked in Chicago in his current job since 2015 and travels on city streets each weekday.  He is the Second Vice President of the national American Council of the Blind.  Accordingly, Mr. Campbell is a qualified individual with a disability within the meaning of all applicable statutes.

18.     Plaintiff ACBMC is a consumer-based, non-profit independent organization that advocates on behalf of, and seeks to the improve the quality of life for, all blind and visually impaired residents in Chicago, Illinois.  It is an affiliate of the Illinois Council of the Blind,

which is a state affiliate of the national American Council of the Blind. ACBMC's officers and membership, around 38 people in total, overwhelmingly consist of people who are blind or low-vision.

19.     Full access to basic services enabling safe and independent street navigation for people with vision-related disabilities is a core component of ACBMC's mission. ACBMC has sent letters and feedback to the Mayor and various aldermen of Chicago, as well as attended meetings of the Department of Transportation and Mayor's Office for People with Disabilities, to advocate for the rights of blind pedestrians.

20.     In addition, ACBMC's officers and board members navigate City streets on a daily basis. The problems they have faced due to the systemic lack APSs have included being forced to rely on strangers, following other pedestrians who are crossing against lights, being grabbed without their consent by other pedestrians, and near-misses by cars when unwittingly attempting to cross streets in the face of oncoming traffic. Defendants' discriminatory actions and failures to act have thus created injuries, providing members with standing to bring a suit in their own right.

21.     In sum, the pervasive lack of APS devices is an issue of significant concern for ACBMC and its members. Unless the issue is remediated, ACBMC will continue to be forced to divert its resources away from the programs that seek to alleviate its constituents' numerous other needs into addressing this continued barrier to blind pedestrians' ability to move about safely and independently.

22.     Defendant City of Chicago is a "public entity" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104. Moreover,

this Defendant is also the recipient of federal funds, including funds from the federal Department of Transportation, and therefore subject to the accessibility requirements of Section 504.

23.     Defendant Chicago Department of Transportation is likewise a "public entity" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.   Moreover, this Defendant is also the recipient of federal funds, including funds from the federal Department of Transportation, and therefore subject to the accessibility requirements of Section 504.

24.     Defendant Lori Lightfoot, sued in her official capacity, is the Mayor of the City of Chicago.

25.     Defendant Thomas Carney, sued in his official capacity, is the Acting Commissioner of the Chicago Department of Transportation.

## FACTS COMMON TO ALL PLAINTIFFS

### A. APS Technology is Indispensable for Securing the Safety and Independence of Blind Pedestrians at Signalized Street Intersections.

26.     A modern APS device contains a pedestrian pushbutton with a raised arrow that points at the pedestrian street crossing about which it provides signaling information.  To signal its location to blind pedestrians, the device continuously emits a sound about once per second. Once a pedestrian presses the button to cross the street, this sound changes and the arrow vibrates to communicate that the button has been successfully activated.   When traffic has stopped and the walk signal begins, the sound and vibration change again to signal to blind pedestrians that the "walk" light is on.

27.     The first APS devices were marketed in the 1970s and consisted of just a chirping speaker.  An example of such an older device still in use in Chicago can be found at Roosevelt Road and South Wood Street.  This APS is located at the intersection immediately between the

Chicago Lighthouse for the Blind and the Illinois State Center for Rehabilitation and Education. Unlike a modern APS device, it does not have a vibrating button indicating to Deaf-blind pedestrians when to cross the street, even though nearby street signs warn of "BLIND AND DEAF" pedestrians in the area.

28.     Because of its importance to the safety and independence of blind pedestrians, installation of APS technology is recognized as a best practice in federal accessibility guidance. APS installation is indeed necessary to ensure that the City's pedestrian signal program is readily accessible to blind pedestrians.

**B. The City Has Expended Substantial Resources to Improve Pedestrian Safety Without Providing for APS Devices to Ensure that the Information Pedestrian Signals Convey is Accessible to Blind Pedestrians.**

29.     In recent years, the City has adopted several initiatives to improve pedestrian safety generally.  In its perhaps most ambitious effort, undertaken in 2012, the City committed to implementing over 250 recommendations aimed at eliminating pedestrian fatalities.  Those recommendations included traffic-calming measures like pedestrian islands, chicanes, and midblock curb bumpouts; identification and remediation of no less than two high-collision corridors and four dangerous intersections annually; implementation of tougher safety mandates for taxi drivers; and a variety of street infrastructure treatments such as road diets, roundabouts, speed humps and pedestrian scrambles.

30.     Further, under Defendant CDOT's Chicago Pedestrian Plan, the City has ostensibly committed to investing in a variety of projects aimed at reducing serious pedestrian injuries by 50 percent every five years.  Some of these projects include development of a Zero in Ten pedestrian crash program; implementation of the so-called Safety Zone, which aims to bring about citywide crosswalk policy and safety improvements for seniors; development of neighborhood streets for slow, local traffic; improvement of crash data collection and sharing;

7

modification of driver education programs; and incentives to encourage taxi drivers to drive more safely.

31.     Yet none of these ambitious commitments encompasses a serious effort to equip signalized intersections with signals accessible to blind pedestrians.

32.     Instead, Defendants have suggested that they will install up to 100 APSs in the next two years and 15-25 APSs per year after that.  At that rate, Chicago's street crossings will not be accessible for another hundred years.

33.     Further compounding the problem, it is at best unclear whether the City will actually follow through even on this modest promise since it has reneged on similar promises in the past.  For instance, in 2015, Chicago applied for and received a grant from the Chicago Regional Transit Authority to install APSs at Clinton Street, Canal Street, Washington Street, and Madison Street in the Loop.  These APSs have not yet been installed, and the timeline for their installation remains unclear.

34.     Collectively, these investments demonstrate that the City of Chicago has the financial capacity to equip its signalized intersections with APS devices and simply chooses not to do so.

**C. Making Matters Worse:  Leading Pedestrian Intervals Further Aggravate Problems Caused by the Systemic Lack of APS Devices.**

35.     The City has attempted to increase traffic safety for sighted pedestrians by introducing pedestrian "signal phases" which instruct pedestrians to enter an intersection at a different time than vehicular traffic.  However, due to its failure to include APS devices at these intersections, the City's efforts have paradoxically made the streets even less safe for blind pedestrians.

36.     One such signal phase is a "leading pedestrian interval" ("LPI").  In an LPI, the pedestrian traffic signal instructs pedestrians to enter the intersection three to ten seconds before the traffic signal that directs vehicular traffic heading in the same direction does the same.  This permits pedestrians to have a head start getting across the intersection against turning vehicular traffic, and is a proven safety measure for sighted individuals.

37.     However, if a traffic signal uses an LPI but has no APS, it does not inform blind pedestrians when they should start crossing.  At best, blind pedestrians lose the benefit of the LPI because they are listening and waiting for the cue of vehicular traffic noises to know when to cross, and thus simply wait through the LPI without receiving the benefit of the extra time to cross the street.  In fact, they may be left without adequate time to cross the street.  At worst, an LPI without an APS causes blind pedestrians to start crossing just as vehicular traffic starts turning into their path, when drivers do not expect them.

38.     Today, the City has approximately 231 intersections that use LPIs but only 2 of those intersections have APS devices.  This scarcity appears to be the direct result of the fact that the City does not require even considering APS installation when incorporating LPIs even though both federal guidance and Chicago internal guidance recognize that such consideration is warranted whenever an intersection uses signal phasing.  Indeed, the City's most recent policy on the subject, issued in April 2019, explicitly provides that its engineers should not consider installing APSs when signal phases are being added, unless the pedestrian signal is being newly installed or completely replaced.  The City is thus consistently ignoring the needs of blind pedestrians even while taking actions to improve the safety of sighted pedestrians generally.

## INDIVIDUAL PLAINTIFFS' EXPERIENCES

**A.      Harm to Plaintiff Brash**

39.      Plaintiff Ann Brash is blind.  She lives in La Grange, Illinois and commutes to Chicago every weekday to her job.

40.      Ms. Brash uses Chicago street crossings virtually every weekday of her life. Among other things, she navigates them to commute to her job, to do errands in the area around her workplace, and to attend social appointments and organizational meetings.

41.      In 2017, Ms. Brash's office moved to a new location, and she sought six weeks of orientation and mobility training from Second Sense, a 70-year-old organization that provides services, including mobility training, to people with vision-related disabilities, in order to ensure that she could navigate safely and independently to the new location.  Nonetheless, in November 2017, on her way home from one of her first few days on the job, she was nearly hit by a bus at the intersection of West Madison Street and North Jefferson Street.  As she was stepping off the curb, a bus passed through the intersection in front of her.  A fellow pedestrian grabbed her back to keep her from moving forward, and her cane was split apart by the bus.  She still crosses at this intersection twice every work day, even though she does not feel safe navigating it, since its location makes it virtually impossible to avoid.

42.      The intersection is exceptionally challenging because West Madison Street is a one-way street with parking lanes, a right-hand turn lane, and two traffic lanes, while North Jefferson Street is one-way with parking on one side and three lanes of traffic.  The complexity of the configuration makes it difficult for Ms. Brash to know where she should expect traffic sounds to come from.

43.      Many other intersections in Chicago are similarly noisy and complex in their design, featuring multiple traffic lanes and directions.   Ms. Brash must deal with such

intersections throughout Chicago without the aid of APSs when going to various daily destinations.

44.     In order to cross noisy, busy, or complex streets safely without APSs, Ms. Brash relies on a number of methods, all of which are time-consuming and inconvenient.  Sometimes she waits for other pedestrians to appear so that she can cross with them.  She also sometimes walks several blocks out of her way in order to avoid intersections that are confusing and unsafe.  Ms. Brash even avoids leaving her office for lunch so that she does not have to deal with street crossings.  The lack of APSs thus constrains Ms. Brash from moving about Chicago safely and independently in a number of ways that affect her every single day, denying her equal opportunity to participate in, and enjoy the benefits of, City resources to the same extent as her sighted counterparts.

45.     Taken together, these experiences attest to Ms. Brash's longstanding struggle with access barriers resulting from the systemic lack of APS devices in the City.  Because Ms. Brash will continue to require APSs at noisy, busy, or complex intersections in order to navigate the City safely and independently, the lack of them will keep affecting her in her daily life.

**B.     Harm to Plaintiff Heneghan**

46.     Plaintiff Heneghan lives in the Edison Park neighborhood of Chicago and is legally blind.

47.     As a City resident, Ms. Heneghan uses Chicago street crossings virtually every day of her life.  Among other things, Ms. Heneghan navigates them to commute to her volunteer commitments, to do errands, to attend medical appointments, and to socialize with friends and family.

48.     In the course of all these activities, Ms. Heneghan regularly struggles with the lack of APSs.  In particular:

a) Ms. Heneghan volunteers weekly at Second Sense. Second Sense has been located at 65 East Wacker Place, between North Wabash Avenue and North Michigan Avenue, for the past seven years. Despite the high volume of blind people who travel to Second Sense, and who receive mobility training there, and despite the huge intersections nearby, there are currently no APSs in the immediate vicinity of the organizaiton's office. Ms. Heneghan is thus forced to navigate a number of highly busy intersections—including Clark/Lake, Lake/Dearborn, Lake/State, Wabash/Lake and Wabash/Wacker Place—after getting off the Blue Line without the benefit of the information that the pedestrian crossing signals convey to sighted pedestrians. While each of these intersections poses a significant challenge due to complex traffic patterns and noise, Ms. Heneghan is especially frustrated by the Clark/Lake intersection because the noise of the trains passing through the station directly above makes it difficult for her to hear oncoming vehicular traffic and figure out when it is safe to cross.

b) In 2004, Ms. Heneghan was hit by a car at the intersection of North Milwaukee Avenue and North Austin Avenue, near North Ardmore Avenue. Because North Ardmore Avenue is a side street from which cars pour onto busy Milwaukee Avenue, crossing it against the lights is exceptionally dangerous. In the absence of an APS, Ms. Heneghan inadvertently did just that, and was hit by a car. In the aftermath of the accident, Ms. Heneghan was forced to get eight staples in the back of her head and needed weeks to fully recover.

49. Many other intersections in Chicago are similarly noisy and complex in their design, featuring multiple traffic lanes and directions. Ms. Heneghan must deal with such

intersections throughout Chicago without the aid of APSs when navigating her way to various daily destinations.

50.     In order to cross noisy, busy, or complex streets safely without APSs, Ms.Heneghan relies on a number of methods, none of which she is comfortable or happy with. These methods include crossing in packs of people, a strategy that can require waiting on other pedestrians to show up; getting off buses and subways one or two stops early or late in order to avoid unsafe intersections; taking paratransit, even though it must be arranged 24 hours in advance; and asking other pedestrians for help.

51.     Requesting help from pedestrians in particular can be tricky and result in additional difficulties.  On one occasion, two pedestrians offered to help Ms. Heneghan cross, and Ms. Heneghan asked them to tell her when the light changed.  Instead, they physically pulled her into the street when she was not expecting it.  Her cane got stuck in a gap in the street, and she lost her balance and fell.  Ms. Heneghan was sore for days after the incident.

52.     Taken together, these experiences attest to Ms.Heneghan's longstanding struggle with access barriers resulting from the systemic lack of APS devices in the City.  Because Ms. Heneghan will continue to require APSs in order to navigate the City safely and independently, this lack is bound to keep affecting her in her daily life.

## C.     Harm to Plaintiff Campbell

53.     Plaintiff Ray Campbell is blind.  He has worked in Chicago's Inner Loop since 2015.

54.     Because he works in Chicago, Mr. Campbell uses its street crossings every weekday.  Among other things, Mr. Campbell navigates them to commute to his job, to go to lunch in the area around his workplace, to socialize with friends, and to attend meetings and other events.

55.     In the course of all these activities, the lack of APSs causes difficulties for Mr. Campbell.  These difficulties are particularly aggravated at specific intersections near his office, including:

a) Clark and Lake.  The elevated train runs above this intersection, and because the station there is a major transfer point, it is difficult to hear oncoming traffic to figure out when it is safe to cross.  Discerning oncoming traffic is additionally made challenging by the fact that the traffic pattern is complex; Clark Street has three lanes heading in one direction, including a turn lane, while Lake Street has parking on both sides, two active straight lanes, and a turn lane.  The use of an LPI on both streets tops off these difficulties.  Just recently, Mr. Campbell struggled to cross this intersection when an Orange Line train got held up at the station right above the intersection.  Unable to hear the vehicular traffic thanks to the noise from the train, he was forced to wait through numerous light cycles until another pedestrian eventually approached and offered to help.  Mr. Campbell found the experience equally frustrating and terrifying, especially given that he cannot feasibly avoid the intersection on his daily commute.

b) North Clark Street and West Washington Street.  Clark Street has three lanes in one direction including a turn lane, while Washington has a bike lane, a bus lane, a car lane, and a turn lane.  There is also an LPI on Clark Street.  The many different-use lanes make it difficult for Mr. Campbell to know where to listen for vehicular traffic or to know when he has finished crossing the street; additionally, the LPI makes it difficult to know when he should start trying to cross the street.

Because of all these difficulties, Mr. Campbell finds the intersection confusing and dangerous, and avoids it whenever possible.

c) Madison and Wells. Like the intersection at North Clark and East Lake, this crossing is challenging due to the El trains running directly overhead, making it difficult for Mr. Campbell to figure out when the traffic is coming. Indeed, just recently Mr. Campbell nearly got hit by a bus at this intersection because he was unable to hear the traffic due to the high volume of street noise. At the last minute, a sighted pedestrian told Mr. Campbell he should wait.

56. Many other intersections in Chicago are similarly noisy and complex in their design, featuring multiple traffic lanes and directions. Mr. Campbell must deal with such intersections throughout downtown Chicago without the aid of APSs. Since Mr. Campbell is an extremely savvy and safe white cane user, the fact that he has difficulty at many Chicago intersections is not indicative of any lack of travel ability, but rather illustrates the negative impact of the systemic lack of APSs on blind pedestrians.

57. In order to cross noisy, busy, or complex intersections safely and independently without APSs, Mr. Campbell generally relies on a number of methods, none of which he is comfortable or happy with. These methods include listening for traffic, a strategy made difficult by the background noise, especially the trains; waiting for other pedestrians, an approach that can require waiting on other pedestrians to show up for as long as ten minutes at a time; and avoiding certain streets and intersections altogether, a method that can require him to take circuitous routes in order to arrive at his destination.

58. Taken together, the systemic lack of APS devices in the City presents a daily challenge for Mr. Campbell. Because Mr. Campbell will continue to require APSs at noisy,

busy, or complex intersections in order to navigate the City safely and independently, this lack will keep affecting him in his daily life.

## CLASS ALLEGATIONS

59.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action, for injunctive and declaratory relief purposes only, on their own behalf and on behalf of all persons similarly situated.  The class that Plaintiffs seek to represent consists of all persons with vision-related disabilities who use, or seek to use, pedestrian signals in the City of Chicago. The claims asserted herein are solely for injunctive and declaratory relief for the class; Plaintiffs seek no money damages.

60.     The persons in the class are so numerous that joinder of all such persons is impracticable.  In particular, over 60,000 Chicago residents have visual disabilities, and many more people with visual disabilities visit or commute into the City annually.  The disposition of their claims in a class action is accordingly a benefit to the parties and to the Court.

61.     Proposed class members share a well-defined community of interest with respect to both questions of law and fact involved because they are all being denied, or will be denied, access to the City's pedestrian signals and thereby their right to navigate Chicago's street crossings safely and independently, on equivalent terms with their sighted counterparts.

62.     One of the key common questions of law and fact involves Plaintiffs' allegations that Defendants have violated the ADA and the Rehabilitation Act by failing to provide access to their pedestrian signals to persons with vision-related disabilities.  Common questions also include whether failure to include APS devices during replacement and upgrade activities violates those laws, as well as which remedial scheme is appropriate to rectify the current lack of access.  Each of these questions is capable of class-wide resolution.

63.     Plaintiffs' claims are typical of the claims of the class as a whole because all Plaintiffs are similarly affected by Defendants' failure to safeguard access to their pedestrian signals program for pedestrians with vision-related disabilities.

64.     Plaintiffs are adequate class representatives because they, or the persons they serve, are directly impacted by Defendants' failure to provide access to their pedestrian signals. Moreover, Plaintiffs' claims are typical of the claims of the class as a whole because Plaintiffs are similarly affected by the systemic lack of APSs.

65.     Plaintiffs' interests are not antagonistic to, or in conflict with, the interests of the class as a whole. The attorneys representing the class are highly trained, duly qualified, and very experienced in civil rights class actions for injunctive relief, including actions challenging barriers to access involving pedestrian rights-of-way.

66.     By failing to secure accessibility of its pedestrian signals consistent with federal disability access laws, Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole. Accordingly, an award of appropriate declaratory and injunctive relief with respect to the class as a whole is warranted in this case.

67.     References to Plaintiffs shall include each Plaintiff and each member of the class, unless otherwise indicated.

## CAUSES OF ACTION

### Count I
### Discrimination in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

68.     Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

69.     Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in, or otherwise

benefitting from, a program of the public entity, or otherwise discriminating against a person on the basis of disability: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

70.     The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). Further, a " 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

71.     Because they have impairments which substantially limit the major life activity of seeing, each individual Plaintiff and members of the organizational Plaintiff are qualified individuals within the meaning of 42 U.S.C. §§ 12102 and 12131; *see also* 28 C.F.R. § 35.104. Additionally, they are qualified in that they are located, or work, in Chicago and therefore continuously navigate its street crossings, an activity that requires access to pedestrian signals to ensure safety and independence.

72.     A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1). Because they constitute units of local government, Defendants are public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

73.     As part of their non-discrimination duties, public entities like the City and Department must operate each of their programs, services or activities "so that, when viewed in its entirety, [that program, service or activity] is readily accessible to and useable by individuals

18

with disabilities." *See* 42 U.S.C. § 12134; 28 C.F.R. § 35.150; *see also* 28 C.F.R. §§ 35.149 & 35.151. There is no doubt that Defendants' management of their pedestrian street crossing signals constitutes a program, service or activity under Title II. *See* 28 C.F.R. § 35.149 (requiring that a "service, program, or activity" of a public entity must be "readily accessible to and usable by individuals with disabilities"); 28 C.F.R. § 35.151 (requiring that any newly constructed or altered "facility or part of a facility" be "readily accessible to and usable by individuals with disabilities"); 28 C.F.R. § 35.104 (defining "facility" to include "all or any portion of [...] structures, […] equipment, rolling stock, or other conveyances, roads, walks, passageways, […] including the site where the building, property, structure, or equipment is located.") Defendants therefore have an obligation under the ADA to ensure that their pedestrian signals are readily accessible to and usable by people with disabilities.

74. The pervasiveness of the inaccessible pedestrian signals, as demonstrated by the shockingly low percentage of corners equipped with APS devices, shows that Defendants have failed in their duty to operate this program in a non-discriminatory manner, consistent with the above-cited provisions. In particular, they have failed to ensure that the pedestrian signals program is readily accessible and usable by pedestrians with vision-related disabilities when viewed in its entirety.

75. Defendants additionally violate a number of provisions of the implementing regulations of Title II, which were promulgated by the Department of Justice ("DOJ") to implement Title II's prohibition against discrimination. *See* 42 U.S.C. § 12134; 28 C.F.R. § 35.101 *et seq*.

76. First, Defendants violate their duty to design and construct all new facilities (dating from 1992 onward) in such a way as to ensure that "[e]ach [such] facility or part of a

facility . . . is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)(1). Pedestrian signals constitute facilities. *See Scharff v. Cnty. of Nassau*, No. 10 CV 4208, 2014 WL 2454639 (E.D.N.Y. June 2, 2014). Defendants thus have a duty to ensure that all newly installed pedestrian signals are readily accessible to and usable by people with disabilities to the maximum extent feasible. The inaccessibility of any signals installed after 1992 runs afoul of Defendants' duties under 28 C.F.R. § 35.151(a)(1).

77. Second, Defendants violate their obligations with respect to alterations of any existing facilities that are conducted in a manner that affects or could affect the usability of that facility. In particular, by failing to install APS devices each time they replace or rehabilitate existing pedestrian signals, Defendants fail to ensure that such alterations are accomplished "to the maximum extent feasible . . . in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(b)(1).

78. Third, Defendants' actions deny qualified individuals with disabilities the opportunity to participate in or benefit from pedestrian signals; deprives those individuals of an opportunity to participate in the benefits offered by the signals on the same terms as sighted pedestrians; and/or provides individuals with disabilities with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result or to gain the same benefit from the information pedestrian signals convey as that provided to others. All these omissions and failures to act violate 28 C.F.R. § 35.130(b)(1)(i)–(iii).

79. Fourth, Defendants, directly and/or through contractual or other arrangements, utilize criteria and/or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of their disability and defeat or

substantially impair the accomplishment of the objectives of their pedestrian signals program with respect to individuals with disabilities, in violation of 28 C.F.R. § 35.130(b)(3)(i)–(ii).

80.     Fifth, Defendants have failed to make reasonable modifications in their policies, practices, or procedures necessary to avoid discrimination on the basis of disability, in violation of 28 C.F.R. § 35.130(b)(7).

81.     Finally, Defendants have failed to make their communications via their pedestrian signals as effective for people with sensory disabilities as they have for others, and have failed to provide necessary auxiliary aids and services to enable blind pedestrians an equal opportunity to participate in, and enjoy the benefits of, their pedestrian signals program.  In doing so, Defendants have violated 28 C.F.R. § 35.160.

82.     As a direct and proximate result of the aforementioned acts, Plaintiffs have been and continue to be injured.

83.     Defendants' conduct constitutes an ongoing and continuous violation of Title II of the ADA.  Accordingly, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs.

**Count II**
**Discrimination in Violation of Section 504 of the Rehabilitation Act**

84.     Plaintiffs re-allege and incorporate all previously alleged paragraphs.

85.     Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

86.     An "individual with a disability" is defined, in pertinent part, as an "individual who has a physical or mental impairment that substantially limits one or more major life

activities of such individual." 29 U.S.C. § 705(2)(B) (referencing 42 U.S.C. § 12102). In addition, a "qualified" person with a disability is a person who meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity. 28 C.F.R. § 39.103.

87. The individual Plaintiffs, the board members and constituents of the organizational Plaintiff, and the class are all qualified individuals with disabilities under the above-described definition in that they have disabilities which substantially limit one or more major life activities, such as seeing. They are also qualified in that they have sought, and will continue to seek, to navigate pedestrian crossings and therefore require access to pedestrian street crossing signals to do so safely and independently at noisy, busy, or complex intersections. *See* 29 U.S.C. § 705(2)(B) (referencing 42 U.S.C. § 12102); *see also* 28 C.F.R. § 39.103.

88. Defendants are recipients of federal financial assistance sufficient to invoke the coverage of Section 504. Moreover, Defendants have received such federal financial assistance at all times relevant to the claims asserted in this Complaint.

89. Defendants and their agents and employees have violated, and continue to violate, Section 504 and the regulations promulgated thereunder by excluding Plaintiffs from participation in, denying Plaintiffs the benefits of, and subjecting Plaintiffs based solely by reason of their disabilities, to discrimination in access to the pedestrian signals that they otherwise make available for sighted residents of the City.

90. Defendants' acts and omissions described herein violate the equal access and nondiscrimination provisions of Section 504 and the regulations promulgated thereunder, and have resulted in injury to Plaintiffs.

91.     This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

92.     Plaintiffs are thus entitled to injunctive relief and reasonable attorneys' fees, expenses, and costs, pursuant to 29 U.S.C § 794(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

93.     Declare that the actions and inactions described herein violate the rights of Plaintiffs under the ADA and Section 504.

94.     Issue an order requiring that Defendants take the necessary steps to remedy the City's pedestrian signals so that street crossings are equipped with APS devices to ensure systemic accessibility for people who are blind consistent with the ADA and Section 504;

95.     Issue an order enjoining Defendants from continuing to engage in the unlawful conduct of installing and/or altering pedestrian signals without providing for APS technology;

96.     Issue an order requiring that Defendants maintain any existing APS devices at the signalized intersections where they were previously installed;

97.     Award reasonable attorneys' fees and costs; and

98.     Grant such other and further relief as the court deems just and proper.

Dated: September 23, 2019
Chicago, Illinois

Respectfully submitted,

*Yelena Kolic*

JELENA KOLIC
DISABILITY RIGHTS ADVOCATES
10 South LaSalle Street, 18th Floor
Chicago, IL 60613
Phone: (312) 559-4600
Fax: (212) 644-8636
jkolic@dralegal.org

Nigel F. Telman
Edward C. Young
Holly R. Morris
PROSKAUER ROSE LLP
70 West Madison
Suite 3800
Chicago, Illinois 60602
Phone: (312) 962-3550
Fax: (312) 962-3551
ntelman@proskauer.com
eyoung@proskauer.com
hmorris@proskauer.com

Christina Brandt-Young (*pro hac vice* pending)
Michelle Caiola (*pro hac vice* pending)
DISABILITY RIGHTS ADVOCATES
655 Third Ave., 14th Floor
New York, NY 10017
Phone: (212) 644-8644
Fax: (212) 644-8636
cbrandt-young@dralegal.org
mcaiola@dralegal.org

*Attorneys for Plaintiffs*