IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN COUNCIL OF THE BLIND )
OF METROPOLITAN CHICAGO et al., )
                                )
        Plaintiffs,             )
                                )
                                )
    v.                          )  No. 19 C 6322
                                )
                                )
THE CITY OF CHICAGO             )
                                )
        Defendant.              )
                                )

Memorandum Opinion and Order

In this action, the American Council of the Blind of Metropolitan Chicago and several of its members seek declaratory and injunctive relief under Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act to remedy the City of Chicago's failure to make its system of pedestrian traffic signals meaningfully accessible to blind and low-vision individuals through the installation of Accessible Pedestrian Signals ("APS").[1] The United States (or sometimes herein, "the Government"), which is authorized through the Department of Justice to enforce the ADA and the Rehabilitation act, intervened on the side of plaintiffs. The following motions are currently pending: plaintiffs' and the

_____

[1] For ease of exposition, I use the term "blind" to denote collectively both blind and low-vision individuals.

Government's separate motions for partial summary judgment on the issue of the City's liability; the City's motion for partial judgment on the pleadings and partial summary judgment; and plaintiffs' and the Government's joint motion to exclude the opinions of the City's expert, Peter Koonce. These motions are resolved as set forth below.

**I.**

The City of Chicago prides itself on being "one of the most walkable cities in the world." Chicago Pedestrian Plan, ECF 192-1 at 7.[2] Nevertheless, the City acknowledged in 2012 that it had "double the national average for hit and run pedestrian fatalities," and recognized that to remain "a world-class walkable city," it "must address the daily challenges and obstacles that still discourage people from travelling by foot or wheelchair." *Id*. The Pedestrian Plan described its "primary goal" as eliminating pedestrian fatalities entirely by 2022. *Id*. at 38. The City noted in its Pedestrian Plan that "about half of pedestrians struck at intersections with traffic signals were crossing with the signal," and it committed to improving safety at signalized intersections" through a number of means. *Id*. at 40, 24.

Individuals with vision difficulties—who number over 65,000 in Chicago and over 111,000 in Cook County according to recent census

---

[2] The Pedestrian Plan is also available at https://www.chicago.gov/content/dam/city/depts/cdot/supp_info/ChicagoPedestrianPlan.pdf (last accessed 3/27/2023).

reports[3]—face unique challenges when it comes to navigating the City's busy sidewalks and streets safely as pedestrians. *See generally*, Pls.' Decls., ECF 96-2 through ECF 96-10. In particular, because blind pedestrians cannot rely on the visual cues provided by traditional (i.e., non-APS) traffic signals and crosswalks, they have greater difficulty than sighted pedestrians with the essential street-crossing tasks of locating the street and the crosswalk area at their approach corner (i.e., the corner where they begin their crossing); aligning themselves to face their destination corner; identifying the time at which it is legal and safe to begin crossing; and maintaining the appropriate direction during the crossing.[4] The Expert Report of Linda Myers, a Certified Orientation and Mobility Specialist who has instructed people with vision disabilities for over forty years, explains the adaptive techniques blind pedestrians use in the absence of APS to complete these tasks. For example, to locate the approach corner, a blind pedestrian typically continues straight along his or her current line of travel, using a white cane

---

[3] *See* U.S. Census Bureau, Disability Characteristics, 2020: American Community Survey 5-Year Estimates Subject Tables, https://data.census.gov/cedsci/table?g=1600000US1714000&tid=ACSST5Y2020.S1810 (last visited on 03/27/2023); U.S. Census Bureau, Cook County, IL, Disability Characteristics, 2019, https://data.census.gov/cedsci/table?g=S18&g=0500000US17031&d=ACS%201-Year%20Estimates%20Subject%20Tables&tid=ACSST1Y2019.S1810 (last visited on 03/27/2023).

[4] The City raises niggling objections to the Government's description of these tasks, but common sense and experience suffice to appreciate that these are indeed the essential elements of a safe crossing.

to detect a curb, curb ramp, or a detectable warning surface with raised bumps, then assumes the crosswalk begins at that location. The pedestrian may try to confirm this assumption by listening for traffic on the streets and then repositioning on the corner. This approach is imperfect, however, due to the difficulty of accurately hearing vehicular traffic and of recognizing complicated designs on the corner, such as where curb ramps and detectable warning surfaces do not align with the crosswalk, among other reasons. Myers Rep., ECF 188-2 at 9-10. *See also* United States Department of Transportation's 2009 Manual on Uniform Traffic Control Devices, ECF 188-3 at 4E.09.02 (without APS, the "existing environment is often not sufficient to provide the information that pedestrians who have visual disabilities need to cross a roadway at a signalized location").

With respect to the second task—orienting oneself toward the destination corner—a blind pedestrian must make assumptions about the shape of the intersection and listen for the sound of parallel and perpendicular traffic. But traffic sounds may be misinterpreted; some intersections are skewed at angles other than 90 degrees; and curb ramps sometimes slope towards the middle of the intersection. For these and other reasons, traditional techniques based on audio cues are imperfect. *See* Myers Report, ECF 188-2 at 10-11. *See also* 2009 MUTCD, at 4E.09.02 (without APS, the "existing environment is often not sufficient to provide the information that pedestrians who

4

have visual disabilities need to cross a roadway at a signalized location").

The third task—deciding when to begin crossing—requires blind pedestrians to listen for vehicular traffic and make several difficult determinations to decide when to cross. First, they must determine whether traffic at the intersection is controlled by stop sign (four-way or two-way), by traffic signal, or not at all. Then, if they determine that a given intersection is signalized, they must listen for a "near-lane parallel surge" indicating that parallel traffic has begun moving, in which case the visual pedestrian signal likely indicates "walk." But this method is complicated by a number of factors, including environmental noise, the quieter engines of electric and hybrid cars, and the increasing use of leading pedestrian intervals ("LPI"), a timing modality that gives pedestrians the "walk" signal several seconds before parallel traffic gets the green light, making pedestrians more visible to parallel cars that may be turning into the crosswalk. But LPI not only give blind pedestrians less time than sighted pedestrians to cross, but they also increase blind pedestrians' vulnerability to turning vehicles, which may not expect them to begin crossing after other pedestrians have already made their way into the crosswalk. *See id*. at 24-25. Myers cites studies showing that these techniques enable blind pedestrians to begin crossing within the crosswalk only about half of the time. Myers Rep., ECF 188-2 at 9-10. The Myers

Report goes on to discuss other traffic control and intersection design features that make crossing without APS especially hazardous to blind pedestrians, including protected turn signals (i.e., signals with left- or right-turn arrows), and complex intersection designs, *id.* at 25-26, but the foregoing observations suffice to illustrate the variety of challenges blind pedestrians face when crossing intersections signalized only with visual cues.

The United States Department of Transportation's 2009 Manual on Uniform Traffic Control Devices ("MUTCD"), which Illinois adopted in 2011, sets forth technical standards for APS. 2009 MUTCD, ECF 188-3 at 4E.[5] *See also* Intervenor's L.R. 56.1 Stmt., ECF 188 at ¶ 20; Myers Report, ECF 188-2 at 15. An example of a MUTCD-compliant APS is



pictured at left, as reproduced in the City's Pedestrian Plan. The Myers Report explains how the various features of APS enable blind pedestrians to complete the tasks described above safely. First, a locator tone emitted from the APS indicates to approaching pedestrians that the intersection is signalized. A raised

---

[5] *See also* Illinois Supplement to the MUTCD, noting Illinois' March 10, 2011, adoption of the 2009 MUTCD, available at: https://idot.illinois.gov/Assets/uploads/files/Transportation-System/Manuals-Guides-&-Handbooks/Highways/Operations/Illinois%20Supplement%20to%20MUTCD.pdf (last visited March 27, 2023).

arrow on the pushbutton aligns with the crosswalk to indicate the direction of travel. And a percussive audio cue distinct from the locator tone indicates the start and duration of the walk interval. *See id*. at 17-21. *See also* Intervenor's L.R. 56.1 Stmt., ECF 183 at ¶¶ 17-29. According to Myers, studies have shown that APS significantly increase the rate at which blind pedestrians cross within the "Walk" phase of the signal. ECF 188-2 at 19 (citing studies).

Both the Myers Report and the declarations of individual plaintiffs and class members describe the injuries and harms that blind pedestrians suffer when attempting to navigate the City as pedestrians in the absence of APS. These harms range from the inconvenience of having to wait through several signal cycles to be able to determine where and when it is safe to cross, *see*, e.g., Myers Rep., ECF 188-2 at 13, 17; Wunderlich Decl., ECF 188-2 at ¶ 8, to loss of independence, *see*, e.g., Campbell Dec., ECF 188-2 at ¶ 9; to the terror of a near-collision with a vehicle, *see,* e.g., Brash Decl., ECF 188-2 at ¶¶ 11-12; to serious injuries from an actual collision, *see*, e.g., Heneghan Decl., ECF 188-2 at ¶ 12.

Approximately 2,841 of the City's intersections are currently equipped with traffic signals to direct the flow of pedestrians and vehicles as efficiently and as safely as possible. Def.'s L.R. 56.1 Resp., ECF 215 at ¶¶ 7-9. Yet only a tiny portion of these signals have been equipped with APS. Def.'s L.R. 56.1 Stmt. ECF 183 at ¶ 16.

The City has been aware of the need for accessible pedestrian signaling since at least 2007, when the Mayor's Office for People with Disabilities began collaborating with the Chicago Department of Transportation on an initiative to install APS at City intersections. *Id*. at ¶ 50. The Commissioners of these agencies reported to the Mayor that they intended to begin installing APS at forty intersections in 2008. *See* MOPD and CDOT Commissioners' December 13, 2007, Memorandum to Mayor Daley, ECF 188-8.

The City's 2012 Pedestrian Plan identified a "milestone" of installing APS with all new traffic signals beginning in 2016. Intervenor's L.R. 56.1 Stmt., ECF 183 at ¶52, and the City received its first federal grant directed to APS in 2015. Def.'s L.R. 56.1 Stmt., ECF 183 at ¶ 17. But by 2019, when Mayor Lightfoot announced that the City would be adding up to 100 new APS, the City had installed new traffic signals at approximately thirty-nine intersections, and only one of these was equipped with APS. Def.'s L.R. 56.1 Resp., ECF 206 at ¶ 53. Additionally, five existing signals were equipped with APS during this time. *Id*. In total, despite fifteen years of planning, projections, assurances, and the receipt of federal funds, no more than thirty of the City's intersections had been equipped with APS by the time briefing on the pending motions had concluded.

## II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Generally, I must construe all facts in the light most favorable to the nonmovant and draw all reasonable and justifiable inferences in that party's favor. *Id*. at 255. The Seventh Circuit has explained that in the context of cross-motions for summary judgment, "we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co*., 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). Accordingly, judgment under Rule 12(c) is appropriate only when the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Congress enacted the Rehabilitation Act in 1973 "to ensure that members of the disabled community could live independently and fully participate in society." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1259 (D.C. Cir. 2008) (citing 29 U.S.C. § 701(b)(1)). The ADA, built upon the Rehabilitation Act, is intended to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2003).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To prevail under either statute, a plaintiff must show: 1) a qualified individual with a disability; 2) denial of the benefits of the services, programs, or activities of the City; and (3) that the denial was because, or on the basis of, their disability. *Lacy v. Cook Cnty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018). Additionally, liability under the Rehabilitation Act requires proof

that the defendant receives federal funds, *Wagoner v. Lemmon*, 778
F.3d 586, 592 (7th Cir. 2015).

### Plaintiffs' and Intervenor's Summary Judgment Motions

At the outset, all agree that plaintiffs and the United States
satisfy two of the elements they must prove to prevail on their
claims: that plaintiffs and the class members are "qualified
individual[s] with a disability," and that the City receives federal
funding. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015);
*Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012).
Indeed, the only element on which they disagree is whether plaintiffs
and the class were denied "the benefits of the services, programs,
or activities" of the City. Specifically, the parties clash over the
threshold question of whether the City's network of pedestrian
signals amounts to a public service or program.

### A. Pedestrian Signals as a Service, Program, or Activity

"Although the ADA does not explicitly define 'services,
programs, or activities,' the regulations promulgated pursuant to
the act state that 'title II applies to anything a public entity
does.'" *Oconomowoc Residential Programs v. City of Milwaukee*, 300
F.3d 775, 782 (7th Cir. 2002) (quoting 28 C.F.R. pt. 35, app. A). In
plaintiffs' and the Government's view, this broad definition easily
encompasses the City's installation and maintenance of pedestrian
signals. Indeed, two courts have held so expressly. *See Am. Council
of Blind of New York, Inc. v. City of New York*, 495 F. Supp. 3d 211,

232 (S.D.N.Y. 2020) ("[t]he City's maintenance of signalized intersections and the pedestrian grid plainly constitutes a service, program, or activity of a public entity.") ("*ACBNY*"); *Scharff v. Cnty. of Nassau*, No. 10 CV 4208 DRH AKT, 2014 WL 2454639, at *7 (E.D.N.Y. June 2, 2014) (same, noting that "[t]he act of installing and maintaining pedestrian crossing signals at crosswalks is a normal function of the County, and therefore falls within the scope of Title II and the Rehabilitation Act.").

But in the City's view, while each pedestrian signal is a "facility"—a point on which all parties agree—the City's network of traffic signals is not a program or service. By these lights, plaintiffs and the United States can prevail only by showing that the absence of APS at any particular "facility," i.e., any specific pedestrian signal, was a barrier to access to some *other* City program or service. *See* Def.'s Mem. ISO SJ, ECF 214 at 2 (noting that plaintiffs "do not complain that they were denied access to, for example, the courthouse or city hall where actual City programs may take place."). The City's dichotomic view does not survive scrutiny on the facts here. Indeed, as the United States observes, the City fails to explain how its thousands of traffic signals could exist and function without being part of a City program or service—a point the City tacitly emphasizes by situating APS installation within its "traffic signal modernization *programs*." Def.'s Mem. ISO SJ, ECF 184 at 7 (emphasis added).

None of the City's arguments or authorities offers a compelling basis for departing from the courts' well-reasoned and apposite conclusion on this point in *ACBNY* and *Scharff*.[6] *ACBNY,* in particular, is on all fours with this case. There, the American Council of the Blind of New York and several individuals sued the City of New York under Title II of the ADA and Section 504 of the Rehabilitation Act, claiming that "the paucity of APS in New York City denies those with vision impairments 'meaningful access' to the City's crosswalks and sidewalks," and that the city violated these statutes "each time it has upgraded crosswalks or pedestrian crossing signals, or installed new traffic signals, without also installing APS." *ACBNY*, 495 F. Supp. 3d at 229. The court began its analysis of these claims with what it called the "threshold methodological point" of whether the city's maintenance of signalized intersections and the pedestrian grid amounted to a public program or service. It concluded that the parties' "debate" on the point was "easily resolved." *Id*. at 231. The court noted that the Second Circuit—like the Seventh—construes

---

[6] For example, the City cites *Babcock v. Michigan*, 812 F.3d 531, 538 (6th Cir. 2016), observing that in that case, the Sixth Circuit "ruled that a singular building was a 'facility,' and not a service or program." Def.'s Resp., ECF 214 at 4. But these facts are far afield of those here, and the City articulates no basis for applying the Sixth Circuit's characterization of an individual building to the network of pedestrian signals at issue here. Although some of the City's citations, such as *Liberty Res., Inc. v. City of Philadelphia*, No. CV 19-3846, 2020 WL 3642484, at *1, 4 (E.D. Pa. July 6, 2020), and *New Jersey Prot. & Advoc., Inc. v. Twp. of Riverside*, No. CIV.04-5914, 2006 WL 2226332, at *1-3 (D.N.J. Aug. 2, 2006), hit closer to the mark factually, none of them is as well-reasoned or persuasive on this issue as *ACBNY* or *Scharff*.

"services, programs, or activities" broadly to include any "normal function of a governmental entity." *Id*. at 230 (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir. 1997), *superseded on other grounds as recognized in Zervos v. Verizon N.Y., Inc*., 252 F.3d 163, 171 (2d Cir. 2001), and citing *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (holding that Title II covers "anything a public entity does," and collecting circuit cases holding similarly)).

Given the sweeping breadth of the phrase "services, programs, or activities," I agree with the *ACBNY* court that the City "is required to ensure that it operates its signalized intersections and the pedestrian grid in a manner that, 'when viewed in [their] entirety, [are] readily accessible to and usable by individuals with disabilities.'" *Id*. at 232 (quoting 28 C.F.R. § 35.150(a)) (alterations in *ACBNY*). From there, it is a short leap to conclude that plaintiffs and the United States are entitled to judgment on each of the theories set forth in their motions.

The Government's motion articulates two distinct theories of liability: 1) that the City has violated the ADA and the Rehabilitation Act by failing to make its existing pedestrian signal program meaningfully accessible to blind individuals; and 2) that the City has violated the ADA and the Rehabilitation Act by failing to make its newly installed and totally modernized pedestrian signals accessible. Plaintiffs' motion frames the issues somewhat

14

differently, arguing that by systematically failing to provide APS at its signalized intersections, the City violates its duties: 1) to provide a necessary accommodation to ensure that blind pedestrians have meaningful access to its network of traffic signals; and 2) to ensure that it communicates with blind pedestrians as effectively as its communicates with sighted pedestrians by furnishing an appropriate auxiliary aid.

## B. Meaningful Access

The core purpose of the Rehabilitation Act is to ensure that disabled individuals have "meaningful access" to public benefits. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985). The ADA similarly requires meaningful access to public programs and services. *Segal v. Metro. Council*, 29 F.4th 399, 404 (8th Cir. 2022). In this context, the term "meaningful access" has its common and ordinary understanding, signifying access to services that is substantially equal to the services provided to non-disabled persons." *Id*. at 406. In other words, public entities must give "evenhanded treatment" to individuals with and without disabilities. *See, e.g., Henrietta D. v. Bloomberg*, 331 F.3d 261, 273-74, 276 (2d Cir. 2003). Although cases applying this principle "are necessarily fact-specific," they reflect "a general pattern: Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the

program or benefit." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1259 (D.C. Cir. 2008).

The facts relevant to the meaningful access inquiry are essentially undisputed. While the parties split hairs over whether it is twenty, twenty-six, or thirty of the City's roughly 2,800 signalized intersections that are equipped with APS, none of these numbers represents more than a miniscule portion of the whole. Indeed, the City sensibly omits any argument that its provision of APS at around one percent of its pedestrian signals affords plaintiffs and the class members meaningful access to its network of traffic signals. *Cf. ACBNY*, 495 F. Supp. 3d at 236 ("[t]ellingly, the City does not anywhere, in its brief or at argument, contend that the provision of APS at 3.4% of its signalized intersections affords the blind meaningful access to the pedestrian grid."). All but admitting that the present distribution of APS across its signalized intersections fails to afford blind pedestrians meaningful access to its traffic signaling network, the City emphasizes its plans for future APS installations. *See* Def.'s L.R. 56.1 Stmt., ECF 183 at ¶ 33-35, 38-45. But even assuming that the City's current projections—unlike those it has made in the past[7]—

---

[7] To be clear, it is not the City's unfulfilled promises to install APS that give rise to its liability, but rather its failure to satisfy the program accessibility standards for either existing or new construction (as the United States argues) and its failure to make reasonable accommodations to ensure that blind pedestrians have meaningful access to its pedestrian signaling services and to ensure evenhanded treatment of blind pedestrians in its traffic

come to fruition in the manner the City describes, a plan is merely "a start, it is not evidence that creates a dispute of material fact regarding current accessibility of the programs and services" the City offers. *ACBNY*, 495 F. Supp. 3d at 236 (quoting *Disabled in Action v. City of New York*, 437 F. Supp. 3d 298, 311 (S.D.N.Y. 2020)).

Nor does evidence that plaintiffs and the class declarants have developed "workarounds and alternate means of traversing the City's pedestrian crossings," or that they have "summoned the fortitude to cross busy sections in spite of the risks presented" does not satisfy the requirement of "meaningful access." *Id*. at 235. To the City's argument that the individual plaintiffs' and class declarants' testimony prove that they "successfully get to work, lunch, entertainment, and other social events," *see* Def.'s Mem. ISO SJ, ECF 214 at 2, the United States wryly responds, "[m]ost people do not consider a commute to work or a walk to lunch to be successful if they are hit or nearly hit by a car or bus." Intervenor's Reply, ECF

communications (as plaintiffs argue). Nevertheless, the undisputed record leaves no doubt that the City did, in fact, fail to deliver on its assurances. For example, the City quibbles over trivial matters such as whether the December 2007 memorandum to Mayor Daley from the commissioners of CDOT and MOPD stating their intent to install APS at forty intersections beginning in 2008 as part of a pilot project amounts to an "announcement" of the pilot project, *see* Def.'s L.R. 56.1 Resp., ECF 206 at ¶ 50, but it does not dispute that a decade and a half later, and despite several subsequent announcements touting plans for even greater numbers of APS, *see* Mayor's 2019 press release, ECF 188-8 (announcing that "up to 100 intersections" would be equipped with APS "in the next two years"), it still has not equipped even forty intersections.

231 at 16. Indeed, courts have explained that "conditioning access upon arduous or costly 'coping mechanisms' and on the assistance of strangers is 'anathema to the stated purpose of the Rehabilitation Act' and the ADA." *Id.* (quoting *Paulson*, 525 F.3d at 1269). *See also Disabled in Action*, 752 F.3d at 200 ("[T]he purpose of the Rehabilitation Act is 'to empower individuals with disabilities to maximize employment, economic self-sufficiency, *independence*, and inclusion and integration into society.'" (quoting 29 U.S.C. § 701(b)(1) (emphasis in *Disabled in Action*)); *id.* (access to public services "should not be contingent on the happenstance that others are available to help")).

Finally, the City's insistence that "meaningful access does not require perfection" does not shield it from liability. As the *ACBNY* court explained:

> [T]he City's observation that the ADA and Rehabilitation Act may not require the installation of APS at each of its 13,200 signalized intersections does nothing to defend the status quo. Whatever the point would be at which the number (and dispersal) of APS at such crossings would afford blind and visually impaired persons meaningful access to the pedestrian grid within the meaning of these statutes, that standard is clearly not met today, with more than 95% of such crossings containing signals accessible only to sighted persons.

> At the liability stage, the Court does not have occasion—and the nature of the summary judgment record would not enable it—to resolve the number and placement of additional APS that would bring the City into compliance with its statutory duty to provide meaningful access to blind pedestrians. Plaintiffs' partial summary judgment motion on liability alone does not present that question, which the Court will take up at the ensuing remedy stage.

18

*ACBNY*, 495 F. Supp. 3d at 237 (S.D.N.Y. 2020). I agree in full measure with the court's reasoning and conclusion on these points.

The City observes correctly that while the federal Architectural and Transportation Barriers Compliance Board ("Access Board") published a notice of proposed rulemaking concerning Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way ("PROWAG") that would have required the inclusion of APS at signalized intersections under certain circumstances, PROWAG has not formally been adopted. Def.'s L.R. 56.1 Stmt., ECF 183 at ¶¶ 6-7. In the City's view, the fact that no regulation explicitly requires APS means that it cannot be liable under the ADA or the Rehabilitation Act for its failure to provide APS at more than an insignificant number of its signalized intersections. The *Scharff* court explicitly rejected this argument, 2014 WL 2454639 at *12 ("that the Access Board drafted proposed guidelines regarding APS does not mean that APS are not presently required by the ADA or the Attorney General's regulations implementing the ADA."), and indeed, it is at odds with the broad reach of the statutes at issue. *See, e.g., Fortyune v. City of Lomita*, 766 F.3d 1098, 1102 (9th Cir. 2014) ("Recognizing the broad reach of the ADA, we have held that Title II requires public entities to maintain accessible public sidewalks, notwithstanding the fact that no implementing regulations specifically addressed sidewalks" and noting that "the lack of specific regulations cannot eliminate a statutory obligation").

19

In sum, sufficient unto the day is the conclusion that the City's current APS distribution does not provide plaintiffs and the class "meaningful access" to its network of pedestrian signals in violation of the ADA and the Rehabilitation Act. The question of what steps the City must take to remedy its non-compliance is one for another day.

### C. New Construction

The City offers no serious response to the United States' argument that the City violated the ADA and the Rehabilitation Act each time it newly constructed or fully modernized an intersection's pedestrian signals but failed to make the signals accessible. The Department of Justice's structural accessibility standards for newly constructed or altered facilities provide that beginning on January 27, 1992, "[e]ach facility or part of a facility constructed by" a public entity must be "designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)(1). Although the parties dispute whether APS were installed at three out of sixty intersections the City equipped with pedestrian signals for the first time in 2011 or later, or rather seven out of sixty-six such intersections this dispute is immaterial. By even the City's count, roughly *ninety percent* of the signals installed at intersections that were not signalized before 2011 lack APS. Whatever the precise numbers, the City's undisputed failure to equip the vast

majority of newly constructed pedestrian signals with APS falls short of the structural accessibility requirements of the ADA and the Rehabilitation Act.[8]

### D. Reasonable Accommodations

"Title II of the ADA requires affirmative, proactive accommodations necessary to ensure meaningful access to public services and programs, not accommodation upon request." *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1068 (N.D. Ill. 2016). Although the Rehabilitation Act does not contain explicit accommodation provisions, its "promise of 'meaningful access' to state benefits...means that reasonable accommodations in the grantee's program or benefit may have to be made." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir. 2006) (citation and internal quotation marks omitted). And the implementing regulations of Title II provide explicitly that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of a disability." 28 C.F.R. § 35.130(b)(7). *Holmes v. Godinez*, 311 F.R.D. 177, 225 (N.D. Ill. 2015).

---

[8] The parties raise a similarly trivial dispute concerning the number of APS installed in the course of what the City calls "Traffic Signal Modernization" projects. *See* Pls.'s L.R. 56.1 Resp., ECF 207 at ¶ 14. This dispute does not alter the analysis.

Plaintiffs contend that the undisputed facts establish that blind pedestrians require an accommodation to ensure meaningful access to the City's pedestrian signaling network, and they argue that by failing to equip the vast majority of its pedestrian signals with APS, the City has neglected its affirmative duty to provide such accommodations. The City does not genuinely dispute plaintiffs' facts concerning their need for APS as an accommodation required for meaningful access, nor does it confront their legal argument. In fact, the City agrees, as it must, that plaintiffs are entitled to meaningful access to its pedestrian signals, and it acknowledges that "[a] public entity discriminates against a qualified individual in violation of the ADA and Section 504 when it fails to provide "meaningful access" by "failing to modify existing facilities and practices." Def.'s Opp., ECF 214 at 11 (quoting *Am. Council of the Blind of New York, Inc. v. City of New York*, 579 F. Supp. 3d 539, 566 (S.D.N.Y. 2021) ("*ACBNY II*"). The City then rehashes the uncontroversial argument that "meaningful access" does not mean perfection, but it does not explain how its failure to furnish appropriate modifications to the overwhelming majority of its traffic signals in the form of APS satisfies its affirmative duty make its network of traffic signals meaningful accessible.

### E. Effective Communication

The City's lead argument in response to plaintiffs' claim that it failed to ensure its communications with blind pedestrians are as

22

effective as its communications with sighted pedestrians is that "the ADA's effective communications rule does not apply to pedestrian signals" because "pedestrian signals are not a service, program, or activity." Def.'s Opp., ECF 214 at 14. That argument lacks merit for reasons explained above and does not require further discussion.

The City goes on to argue that "the effective communications rules cannot be used to compel the City to retrofit or alter the physical traffic signal equipment at thousands of intersections to install APS devices," citing *Payan v. Los Angeles Community College District*, No. 2:17-CV-01697-SVW-SK, 2019 WL 9047062, *2 (C.D. Cal. Apr. 23, 2019). ECF 214 at 15. But that is not what *Payan* holds. *Payan* concluded that the structural accessibility regulations of Title II of the ADA did not apply to the plaintiffs' claim that educational materials such as "handouts, textbooks, assignments, and educational software programs" were not meaningfully accessible to blind students, noting that the plaintiffs "[did] not seek to hold [the defendant] responsible to retrofit or otherwise renovate any physical structures or facilities to allow Plaintiffs' to access the programs offered by [the defendant]." 2019 WL 9047062, at *2. But nothing about that observation suggests that where, as here, a public program or service is delivered through a physical structure whose essential function is to deliver information necessary to ensure safe pedestrian crossing, the ADA's effective communication regulations do not apply.

The City's remaining argument—that the effective communications regulations do not apply to the "type of information conveyed by APS" but instead "covers things like communications in a courtroom or communications from police officers, in other words, substantive communications that involve a public entity"—articulates no reasoned basis for the distinction the City purports to draw and is not supported by its cited authorities.

### F. Conclusion

For the foregoing reasons, plaintiffs and the United States are entitled to summary judgment on the issue of the City's liability under Title II of the ADA and Section 504 of the Rehabilitation Act.

### Defendant's Motion

Defendant's cross-motion seeks judgment in its favor based on a wide range of conclusions it claims are supported by the undisputed factual record. Specifically, it seeks:

> an order declaring that: 1) pedestrian signals are facilities under the ADA and Section 504 and accordingly, meaningful access is required, 2) "meaningful access" does not require the City to install APS at every signalized intersection, 3) adopts a standard for determining when a modification to a facility qualifies as an alteration for purposes of the ADA and Section 504 that is consistent with the *Roberts v. Royal Atlantic Corp*. factors, 4) LPI and EPP do not qualify as alterations that give rise to a duty to install APS, 5) the City's policies since at least 2019 regarding the use of APS in newly constructed intersections and traffic signal modernizations are reasonable and appropriate and meet the requirements of the ADA and Section 504, 6) Illinois' two-year statute of limitations bars any claim related to activity that occurred before September 23, 2017, and 7) the USA's request for injunctive relief requiring the addition of APS to every signalized intersection in Chicago equipped

> with visual pedestrian signals constitutes an
> unenforceable illegal rule.

Several of these issues are resolved, either explicitly or implicitly, by the foregoing discussion. Others need not and should not be resolved on the present record. And some simply lack merit. In any event, with one exception concerning a narrow application of the statute of limitations, none entitles the City to judgment at this stage.

The first two issues the City identifies are not disputed, but they do not support judgment in the City's favor. All agree that pedestrian signals are facilities, but that does not mean that the City's network of signals cannot also be a program or service, which it is for reasons I explained above. And no one contends that compliance with the ADA and Rehabilitation Act requires that APS be installed at 100% of the City's intersections. Compliance requires "meaningful access," which the City has failed to provide for reasons also explained in previous sections.

The third and fourth issues on which the City seeks a declaration—whether LPI and another timing modification called Exclusive Pedestrian Phasing ("EPP") are alterations under 28 C.F.R. § 35.151, and the standard that applies to determine when a modification qualifies as an alteration—are not susceptible to resolution on the record before me. The cited regulation requires that any facility altered in a way that "affects or could affect the usability of the facility or part of the facility" shall, "to the

maximum extent feasible," be made "readily accessible" and "usable"
by "individuals with disabilities, if the alteration was commenced
after January 26, 1992." 28 C.F.R. § 35.151(b)(1). The City asks me
to declare, as a matter of law, that LPI and EPP fall outside the
scope of this regulation, but their L.R. 56.1 Statement offers just
a single paragraph devoted to these technologies. It states, in its
entirety: "Because the cost of software-only modifications like
leading pedestrian intervals (LPI) or exclusive pedestrian phasing
(EPP) is so low, the cost of adding APS to an existing signalized
intersection alongside LPI or EPP is almost as much as adding APS
without performing other signal improvements at the same time." ECF
183 at ¶ 52. Setting aside that plaintiffs and the United States
dispute this statement, the cost of a modification is just one among
many factors that courts must determine whether it amounts to an
alteration. Indeed, the City's related request that I adopt the
multi-factor *Roberts* standard underscores that a more nuanced
analysis than the City's sweeping (and disputed) assertion about the
"low" cost of LPI and EPP is required to determine whether these
modifications amount to an alteration under 28 C.F.R. § 35.151.

At all events, I agree with the United States that there is no
need to determine whether LPI or EPP are "alterations" or to
articulate the standard that governs that analysis at this stage.
Unlike in *ACBNY*, where the plaintiffs sought summary judgment on
"the claim that the implementation of LPIs and EPPs constitute

26

alterations to an intersection requiring the simultaneous installation of APS," *ACBNY*, 495 F. Supp. at 255, neither plaintiffs nor the United States seeks summary judgment on that basis.[9] For this additional reason, I decline to issue the declaration the City seeks on these issues.

The City offers no authority to support its request that I declare its "policies since at least 2019 regarding the use of APS in newly constructed intersections and traffic signal modernizations...reasonable and appropriate and meet the requirements of the ADA and Section 504," and I decline to issue such a declaration. At the outset, "reasonable and appropriate" is not a standard that is relevant to new construction under the ADA. Moreover, the City's argument relies primarily on its projections about future APS installations, yet if the undisputed record establishes anything, it is that the City's plans in this area have not come to fruition. The City's liability in this case is neither dependent upon nor offset by its forward-looking policies. Instead, its liability is based on its past and present failure to provide "meaningful access" to its network of existing facilities and to

---

[9] Also, the City's assertion that the ACBNY court "ruled as a matter of law that Leading Pedestrian Intervals (LPI) and Exclusive Pedestrian Phasing (EPP) did not qualify as alterations" is incorrect. Def.'s Mem. ISO SJ, ECF 184 at 18. The court noted that the *Roberts* factors "disfavor" the conclusion that the implementation of these technologies amounted to an alteration, the court declined to decide the issue in the plaintiffs' favor on summary judgment. *ACBNY*, 495 F. Supp. at 254-55.

ensure that newly constructed signals are designed and constructed in such a manner as to be "readily accessible" by blind individuals.

The City's request for a declaration that the USA's request for injunctive relief requiring the addition of APS to every signalized intersection with a visual pedestrian signal throughout Chicago constitutes "an illegal and unenforceable rule" is without merit. The relief the United States seeks in its complaint is "an injunction requiring the defendant to provide individuals who are blind equal access to pedestrian signal safety information." Intervenor's Compl., ECF 78 at 12. In response to the City's interrogatory requesting the "specific acts" the United States seeks to enjoin, the United States "call[ed] for" the installation of MUTCD-compliant APS at every signalized intersection in the City. The City complains that "[d]iscovery is not the proper vehicle for DOJ to announce an implementing rule," Def.'s Mem. ISO SJ, ECF 184 at 25, but it does not explain how the United States' view regarding the appropriate remedy constitutes an "implementing rule," much less one that is illegal and unenforceable.

Nothing in the City's argument persuades me that the Government's ability to enact rules through a process governed by the Administrative Procedure Act and to adopt guidelines proposed by the Access Board ties its hands with respect to the relief it may seek for violations it establishes of Title II of the ADA and Section 504 of the Rehabilitation Act. As noted above, the absence of any

rule or regulation explicitly requiring APS under any circumstances does not obviate the City's obligation to meet the requirements of these statutes. The extent and pace at which the City must retrofit the signals its existing pedestrian signaling network to achieve compliance with the governing statutory and regulatory scheme is an issue that must await the remedial phase of these proceedings.[10] In the meantime, there is nothing "illegal" or "unenforceable" about the Government's request for injunctive relief.

This leaves only the City's invocation of Illinois's two-year statute of limitations as a bar to all claims arising out of activity that occurred before September 23, 2017, which it frames as a motion for judgment on the pleadings. The City argues that all of the claims in this action—whether asserted by plaintiffs or by the Government— are subject to a two-year statute of limitations, citing *Winfrey v. City of Chicago*, 957 F. Supp. 1014, 1023 (N.D. Ill. 1997) (applying Illinois' two year personal injury statute of limitations to claims under Title II of the ADA and the Rehabilitation Act) (citing *Cheeney v. Highland Community College*, 15 F.3d 79, 81–82 (7th Cir. 1994)). But the issue is more nuanced and must be analyzed separately with respect to each of the parties opposing it.

---

[10] In its Reply, the City characterizes the Government's request for injunctive relief as seeking "to impose a much more draconian rule [of citywide APS installation] in Chicago 'immediately and completely.'" Reply, ECF 229 at 17. Although the City puts the phrase "immediately and completely" in quotes, the United States does not use this language in its request.

The Government argues broadly that "no statute of limitations applies to claims for declaratory or equitable relief by the United States under Title II and Section 504," citing, *inter alia*, *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997) ("absent a clear expression of Congress to the contrary[,] a statute of limitation does not apply to claims brought by the federal government in its sovereign capacity"), and *United States v. AMC Ent., Inc*., 232 F. Supp. 2d 1092, 1117 (C.D. Cal. 2002) ("The United States is not subject to any state statute of limitations and is subject to a limitations period only when Congress expressly creates one by federal statute. There is no federal statute that imposes a limitations period for an enforcement action by the Government under the ADA.") (internal citations omitted), *rev'd on other grounds*, 549 F.3d 760 (9th Cir. 2008)). Intervenor's Resp., ECF 211 at 22. The City insists in reply that the Government's cited authorities do not represent the law of this Circuit, and it points to *United States v. Midwest Generation, LLC*, 720 F.3d 644, 646 (7th Cir. 2013), as controlling contrary authority. But the statute of limitations at issue in *Midwest Generation* was a not a state statute but an explicit limitations period contained in the federal statute under which the Government's claims arose. It does not support application of Illinois' two-year statute of limitations to the Government's claims for declaratory and equitable relief. In short, the Government is

30

correct: its declaratory and equitable claims are not barred by any statute of limitations.

The United States concedes that its claim for compensatory damages is subject to a three-year limitations period running from the date that the Department of Justice knew or reasonably could have known the facts material to the right of action. *See* 28 U.S.C. § 2415(b). But it argues that this claim is timely because the Government first learned the facts material to this action when plaintiffs filed suit in September of 2019, and it intervened in the suit within three years of that date. But that argument—which lacks reasoned analysis or supporting authority—is at odds with both the Government's allegations and common sense and experience. As the City observes, the Government's complaint references the City's 2012 Pedestrian Plan and other publicly available information concerning the state of the City's plans to install APS that predate the three-year window preceding plaintiffs' complaint. And indeed, the very scarcity of APS that the Government decries in this action was conspicuous evidence of the City's failure to provide meaningful access to its traffic signaling network to blind pedestrians long before plaintiffs filed this action.

It is plausible that the United States may not have known the specifics of the individual plaintiffs' and class declarants' frustrating and harrowing experiences navigating City intersections. But the bulk of the Government's allegations concern not these

specifics but rather published data about the number of blind residents of Cook County and the inherent difficulty of relying on one's hearing to determine where and when to cross City intersections, given City features such as the "thunderous" sound of the "L" and the prevalence of "complex, six-way intersections." Intervenor's Compl., at ¶¶ 17, 24-27. These are not facts of which the Government was unaware until plaintiffs filed their complaint. Accordingly, its claims for compensatory damages, insofar as they relate to discrete acts in violation of the ADA and the Rehabilitation Act—specifically, the construction of a new or the alteration of an existing traffic signal without including APS—are limited to those arising out of the City's conduct on or after April 15, 2018. What this means in terms of fashioning an appropriate remedy is an issue for another day.

Turning to the timeliness of plaintiffs' claims, plaintiffs argue that Illinois' two-year statute of limitations is inapplicable because they seek only injunctive relief. For this proposition, plaintiffs cite *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1075-76 (7th Cir. 2013), but *Scherr* involved an action under Title III of the ADA, which provides relief to "any person who *is being subjected to discrimination* on the basis of disability" or who has "reasonable grounds for believing that such person is *about to be subjected to discrimination*." 42 U.S.C. § 12188(a)(1) (emphasis added). Contrary to plaintiffs' argument that the relevant language in the two Titles

are "identical," the *Scherr* court's analysis focused on phrases that are exclusive to Title III and construed their forward-looking nature to mean that the mere threat of discrimination was actionable. Because the plaintiff's allegations suggested that the threat was ongoing, her claims were not barred by the statute of limitations. 703 F.3d at 1075-76. There is no parallel forward-looking language in Title II of the ADA or Section 504 of the Rehabilitation Act.

But as the Tenth Circuit explained in *Hamer v. City of Trinidad*, 924 F.3d 1093, 1103 (10th Cir. 2019), the Supreme Court bridges this "gap[]...in the statutory text" in *Tennessee v. Lane*, 541 U.S. 509 (2004), which held that public entities have an "affirmative obligation to accommodate persons with disabilities." *Id*. at 533. The court elaborated:

> This "duty to accommodate," *id*. at 532, 124 S.Ct. 1978, solidifies that Title II (and, by extension, section 504) clearly and unambiguously conveys that a non-compliant service, program, or activity gives rise to repeated violations. Failing to act in the face of an affirmative duty to do so axiomatically gives rise to liability. ... Further, if the actor under the affirmative duty keeps failing to act while the underlying problem remains unremedied, then every day's inaction amounts to a new violation. ... Thus, even though "adverse effects resulting from" a single, original violation do not trigger the repeated violations doctrine when they do not constitute violations in their own right, *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 628, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007), *overturned on other grounds by* The Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (2009), claims under Title II (and section 504 by extension) do not fit that rubric. Rather, a public entity does commit a "new violation" each day that it fails to remedy a non-compliant service, program, or activity. The affirmative, ongoing duty that Title II and section 504 place upon it mandates as much.

*Hamer v. City of Trinidad*, 924 F.3d 1093, 1105 (10th Cir. 2019). The court went on to explain that the "broader statutory context" of the ADA and the Rehabilitation act "bolsters its conclusion," that the repeated violations doctrine applies to claims under Title II and Section 504, emphasizing Congress's goals of "full participation, inclusion, and integration" of disabled individuals. *Id*. at 106. The court's reasoning is compelling, and I agree that application of the repeated violations doctrine is appropriate here.

Importantly, the *Hamer* court agreed with the defendant that "the repeated violations doctrine will manifest itself by keeping public entities on the hook for injunctive relief as the years go by." *Id.* at 1109. (10th Cir. 2019) ("if a court grants an injunction requiring a public entity to remedy a program, service, or activity, we have a difficult time seeing just how the court or public entity could divvy that injunction up in a way that limits it to injuries the plaintiff incurred within the limitations period."). That is how it should be. "By remaining on the hook for injunctive relief—as its affirmative obligation to accommodate requires—a public entity is incentivized to remedy non-compliant services, programs, or activities in a reasonable yet efficient manner to ensure that full participation." *Id. See also Frame v. City of Arlington*, 657 F.3d 215, 239 (5th Cir. 2011) (en banc) ("The City may avoid liability whenever it chooses simply by building sidewalks right the first time, or by fixing its original unlawful construction. In other

words, the City is not liable forever; it is responsible only for correcting its own mistakes.").

The Tenth Circuit's exhaustive and compelling analysis in *Hamer* persuades me to part ways on this issue with the *ACBNY* court, which, as the City observes, applied a three-year statute of limitations to the plaintiffs' claim for injunctive relief based on the theory that New York "violated the ADA and Rehabilitation Act when it installed new traffic signals and made alterations to existing street crossings without installing APS." 495 F. Supp. 3d at 241. Relying heavily on the analysis of a sister court, *Forsee v. Metropolitan Transportation Authority*, No. 19 Civ. 4406 (ER), 2020 WL 1547468, at *9 (S.D.N.Y. Mar. 31, 2020), the *ACBNY* court applied the "construction rule" to hold that this claim accrued when the construction or alteration was completed, reasoning that absent such a rule, a public entity "would never have 'the benefit of a statute of repose' as they could be dragged into the courts decades later for non-compliant alterations." *Id*. at 243 (quoting *Forsee*, 2020 WL 1547468, at *9). But as *Hamer* explained, that outcome is consistent with both the text and the larger goals of the ADA and the Rehabilitation Act, as well as with Supreme Court jurisprudence.

### Plaintiffs' *Daubert* Motion

Plaintiffs move to exclude the testimony of the City's proffered expert, Peter Koonce, under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993), on the grounds that he

35

has no specialized knowledge on the topic of accessibility for pedestrians with vision disabilities and is thus unqualified to testify on the issues about which opines, and that his opinions are not based on a reliable methodology. Because I did not rely on any of Koone's opinions in resolving the parties' cross-motions, I need not examine the merits of plaintiffs' arguments. The motion to exclude is denied as moot.

III.

For the foregoing reasons, plaintiffs' and the Government's motions for summary judgment on the issue of the City's liability under Title II of the ADA and Section 504 of the Rehabilitation Act are granted. The City's cross-motion for summary judgment is denied, and its motion for judgment on the pleadings is granted only to the extent it seeks to bar the Government from recovering compensatory damages for injuries arising out of conduct that occurred prior to April 15, 2018.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 31, 2023