## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND OF METROPOLITAN CHICAGO, et al., | |
| Plaintiff, | |
| UNITED STATES OF AMERICA, | Case No. 19 C 6322 |
| Plaintiff-Intervenor, | Hon. LaShonda A. Hunt |
| v. | |
| THE CITY OF CHICAGO, | |
| Defendant. | |

### [PROPOSED] REMEDIAL PLAN ORDER

This matter is before the Court on the parties' respective motions for entry of a remedial plan. (Dkts. 279, 285, 292). The parties' motions are resolved as follows.

### I. Background

#### A. Complaint

On September 23, 2019, Plaintiffs American Council of the Blind of Metropolitan Chicago ("ACBMC"), Ann Brash, Maureen Heneghan, and Ray Campbell, on behalf of themselves and all others similarly situated, commenced this action against Defendant City of Chicago[1] by filing a Complaint alleging, among other things, that City of Chicago violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-34, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, by failing to equip signalized street intersections with accessible pedestrian signals ("APS"). (Dkt. 1). On April 14, 2021, the Court entered an order granting Plaintiff-Intervenor United States of America's unopposed motion to intervene as a plaintiff. (Dkt. 77).

---

[1] The Complaint also named Chicago Department of Transportation ("CDOT"), Lori Lightfoot, in her official capacity as Mayor of the City of Chicago, and Thomas Carney, in his official capacity as Acting Commissioner of the Chicago Department of Transportation, as Defendants. (Dkt. 1). On March 9, 2020, the Court entered a Memorandum Opinion and Order granting in part Defendant's partial motion to dismiss terminating CDOT, Lightfoot, and Carney as parties. (Dkt. 43).

### B.   Liability Order

On March 31, 2023, the Court[2] entered a Memorandum Opinion and Order, among other things, finding City of Chicago liable for violating the ADA and Rehabilitation Act by failing to provide meaningful access to its network of pedestrian signals. (Dkt. 248).

### C.   Remedial Phase

Between July 2023 and February 2024, the parties engaged in supplemental discovery and briefing regarding the appropriate remedy. (Dkt. 256). On November 7, 2024, the Court held a status hearing during which the parties stated their respective positions concerning whether the Court would need to hold an evidentiary hearing to determine the appropriate remedy. (Dkt. 344). After considering the partes' positions, briefs, evidence, and applicable law, the Court found an evidentiary hearing unnecessary and issued a proposed remedial plan order. Having reviewed the parties' joint statement, (Dkt. [____]), and held a hearing to resolve any remaining issues, meet with the recommended independent monitor, and finalize the remedial plan, (Dkt. [____]), the Court orders as follows:

## II.   General Provisions

### A.   Governing Law

This Remedial Plan Order is governed by all applicable law, rules, and regulations, including Title II of the ADA, 42 U.S.C. §§ 12131-34, as amended, Section 504, 29 U.S.C. § 794, 28 C.F.R. Part 35, and 49 C.F.R. Part 27.

### B.   Applicable Standards

City of Chicago shall install and maintain APS in compliance with the then-current Manual on Uniform Traffic Control Devices ("MUTCD"), including all APS installed and maintained by third-party contractors.

### C.   Scope

Subject to the yearly minimum requirements set forth below, City of Chicago shall install APS at a minimum of approximately 71% of signalized intersections by December 31, 2035 ("Phase I"), and at the remaining signalized intersections without APS by December 31, 2040 ("Phase II"). Upon the completion of Phase I, City of Chicago may file a motion to eliminate or extend Phase II based on a showing that meaningful access has been achieved.

---

[2] This case was reassigned from Judge Bucklo to Judge Hunt on June 2, 2023. (Dkt. 251).

D.    **Priority**

City of Chicago shall prioritize the installation of APS at certain categories of signalized intersections, as set forth below.

E.    **Discretion**

City of Chicago shall have to right to use reasonable and good faith discretion in implementing the terms of this Remedial Plan Order, including to (i) create efficiencies in the design, approval, bidding, and construction of APS installations, (ii) respond to material and/or labor shortages, (iii) group similar intersections when placing projects for bid; (iv) re-prioritize intersections for construction to respond to delays arising from approvals issues, underground utility review issues, redesign issues, and a lack of acceptable bids; and (v) exercise engineering judgment and discretion in designing and installing APS to the extent permitted by the MUTCD.

F.    **Continuing Obligation**

To stay in compliance and avoid further violations of the ADA and Section 504, barring any changed circumstances, the policies set forth in this Remedial Plan Order shall remain in place after the completion of Phases I and II, as described below.

III.    **Implementation**

A.    **Priority**

Within six (6) months, City of Chicago, in consultation with Plaintiffs, United States, the Independent Monitor, and the APS Citizen Advisory Committee, shall establish a mechanism that utilizes criteria set forth in the National Cooperative Highway Research Program ("NCHRP"), Accessible Pedestrian Signals: A Guide to Best Practices for APS Location Selection, and considers the complexity of each intersection, to prioritize the installation of APS at signalized intersections consistent with the priority categories set forth below. However City of Chicago chooses to approach the mechanism for determining the priority of APS installations, such mechanism must be efficient, rigorous, sensitive to public input, and alert to important factors for determining priority. For all intersections that do not fall within these priority provisions, City of Chicago has discretion to select the order of APS installation to meet its minimum yearly requirements.

1.    **Newly Signalized Intersections**

City of Chicago shall install APS at all newly signalized intersections (i.e., any time that an intersection is provided with pedestrian signals that did not previously have pedestrian signals).

2.    **Existing Signalized Intersections**

City of Chicago shall install APS at all signalized intersections without APS based on the following priorities.

### a.    Public Requests

Within twelve (12) months, City of Chicago shall install APS at all intersections for which there is an outstanding public request to install APS. City of Chicago shall review and respond to public requests to install APS at an intersection received during the pendency of this Remedial Plan Order within six (6) months of receipt. If a request is found to be reasonable, then City of Chicago must install APS at the intersection within twelve (12) months of receipt of the request. If a request is found to be unreasonable, then City of Chicago must install APS at the intersection within twenty-four (24) months of receipt of the request. If City of Chicago receives more than fifteen (15) requests during a calendar year, it may file a motion seeking relief from the requirement to prioritize such requests in exceeding fifteen (15) per calendar year if such prioritization would result in inequity of disruption.

### b.    Alterations

City of Chicago shall install APS at all signalized intersections that undergo a traffic signal modernization ("TSM"). In addition, where City of Chicago performs work that makes it more efficient to install APS simultaneously as the work being performed (e.g., underground work at the intersection, replacing wiring, controllers, signal head, or adding exclusive pedestrian phases ("EPP"), leading pedestrian intervals ("LPI"), protected turn phases ("PTP"), City of Chicago shall install APS simultaneously as the work being performed unless such installation would defeat the purpose of increasing efficiency. If City of Chicago determines in good faith that such installation would defeat the purpose of increasing efficiency, it must be completed within twenty-four (24) months of the alteration.

### c.    Particularly Dangerous Conditions

By December 31, 2029, City of Chicago shall install APS at all signalized intersections that are particularly dangerous for people with visual disabilities, including those equipped with EPP, LPI, PTP, mid-block pedestrian crossings ("MPS"), T-shaped intersections ("TSI"), more than three distinct streets, and other complex geometry.

### d.    Public Transportation

City of Chicago shall prioritize signalized intersections within 1/8 mile of public transportation (e.g., CTA, Metra, and PACE) stations, transfer points, and elevated train lines.

### e.    Public Facilities

City of Chicago shall prioritize signalized intersections within 1/8 mile of public facilities such as hospitals, parks, schools, libraries, police stations, major pedestrian attractions (e.g., major shopping areas, major cultural venues, and educational campuses), organizations serving people with visual disabilities and seniors, and government buildings, including those facilities specifically listed in Appendix A.

4

### f.    <u>Community Intersections</u>

City of Chicago shall prioritize an additional two-hundred (200) signalized intersections determined by City of Chicago with input from the APS Citizen Advisory Committee.

### B.    <u>Phase I</u>

#### 1.    <u>Scope</u>

Subject to the yearly minimum requirements set forth below, City of Chicago shall install APS at a minimum of approximately 71% of signalized intersections by December 31, 2035. Signalized intersections at which APS is already installed shall count towards this requirement.

#### 2.    <u>Priority</u>

During Phase I, City of Chicago shall install APS pursuant to the Priority provisions of this Remedial Plan Order, specifically including intersections subject to public requests, alterations, and particularly dangerous conditions, and community intersections.

#### 3.    <u>Yearly Minimum Requirements</u>

During Phase I, City of Chicago shall install APS on at least the following number of signalized intersections to the maximum extent possible each year. To the extent that City of Chicago fails to meet a given year's total despite having acted in good faith, any underperformance shall be made up in the subsequent year. APS installations at newly signalized intersection shall be counted in calculating the APS installations for any given year.

| | |
|---|---|
| 2025 – Year 1: | 75 Intersections |
| 2026 – Year 2: | 110 Intersections |
| 2027 – Year 3: | 110 Intersections |
| 2028 – Year 4: | 150 Intersections |
| 2029 – Year 5: | 150 Intersections |
| 2030 – Year 6: | 195 Intersections |
| 2031 – Year 7: | 220 Intersections |
| 2032 – Year 8: | 240 Intersections |
| 2033 – Year 9: | 240 Intersections |
| 2034 – Year 10: | 240 Intersections |

#### 4.    <u>Meaningful Access</u>

At the completion of Phase I, City of Chicago may file a motion to eliminate or extend Phase II based on a showing of meaningful access.

C.    **Phase II**

     1.    **Scope**

Subject to the yearly minimum requirements set forth below, City of Chicago shall install APS at all remaining signalized intersections without APS by December 31, 2040, unless that deadline has been eliminated or extended based on a showing of meaningful access.

     2.    **Prioritization**

During Phase II, City of Chicago shall install APS pursuant to the Priority provisions of this Remedial Plan Order, specifically including intersections subject to public requests and alterations, intersections near public transportation and public facilities, and community intersections.

     3.    **Yearly Minimum Requirements**

During Phase II, City of Chicago shall install APS at signalized intersections at a rate sufficient to ensure that, when installed at a consistent rate over five years, City of Chicago will have equipped all signalized intersections with APS by the end of Phase II.

IV.    **Compliance**

To ensure that all APS are installed and maintained in compliance with MUTCD standards, City of Chicago shall promptly establish and implement an APS compliance program that proves effective at ensuring that APS are installed and maintained in compliance with the MUTCD and any succeeding standards, regulations, or changes in the law setting forth the required specifications. An effective compliance program in this context is one that contains at least the following material elements:

     i.    An effective, on-site inspection system to assess, at the time of installation, whether each APS unit has been installed and programmed in compliance with the MUTCD;

     ii.    A periodic, post-installation inspection program that is effective to identify maintenance and programming issues that arise post-installation and confirm continued compliance with the MUTCD;

     iii.    An effective system to solicit, compile, analyze, and generate reports on complaints and repair requests made by members of the public with regard to existing APS installations; and

     iv.    An effective system to promptly repair and correct the maintenance and compliance issues identified by members of the public and City of Chicago's own inspectors.

## V.    Maintenance

### A.    Routine Maintenance

City of Chicago shall routinely perform maintenance inspections of all APS to a degree and on a schedule not less than what is performed with respect to visually based pedestrian signals. City of Chicago shall repair or replace APS that are not functioning as intended within five (5) business days after inspection or another reasonable period thereafter if extenuating circumstances prevent the repair or replacement from being completed.

### B.    Requests for Maintenance or Repair

City of Chicago shall establish a centralized system for members of the public or City of Chicago officials or employees to submit a request for maintenance or repair of an APS device. City of Chicago shall ensure that requests are logged and accessible to the public through the APS website. City of Chicago shall repair or replace APS that are not functioning as intended within five (5) business days after a request is submitted or another reasonable period thereafter if extenuating circumstances prevent the repair or replacement from being completed.

## VI.    Communication

City of Chicago shall regularly maintain and update an accessible APS website listing intersections with APS, providing contact information of City of Chicago official(s) to contact regarding APS, and permitting community members to make public requests for APS installation, maintenance, or repair and track the progress of such requests.

## VII.    Community Involvement

### A.    APS Citizen Advisory Committee

City of Chicago shall create and regularly communicate with an APS Citizen Advisory Committee. The Committee shall include representatives from CDOT (those responsible for implementing the remedial plan), the Mayor's Office for People with Disabilities, and Chicago's blind community, including organizations that serve the blind community. The Committee should meet quarterly and provide feedback to City of Chicago on all issues relating to the remedial plan.

### B.    Community Requests

City of Chicago shall maintain a program to install APS at up to ten (10) signalized intersections per year in response to "Community Requests," with APS installation to occur not more than twenty-four (24) months after a request is made.

## VIII. Oversight, Monitoring, and Reporting

### A. City of Chicago

#### 1. Personnel

City of Chicago must appoint and maintain (1) a single point person within CDOT responsible for overseeing implementation of the Remedial Plan Order, and (2) a single point person within CDOT responsible for assuring City of Chicago's comprehensive pursuit of funding to support installation of APS. City of Chicago personnel appointed pursuant to this paragraph must regularly consult with the APS Advisory Committee.

City of Chicago must also engage a Certified Orientation and Mobility Specialist ("COMS") who has demonstrated experience with and knowledge of the technical standards for APS, and who ideally is familiar with Chicago, to provide expertise on installation and maintenance of APS.

#### 2. Reporting

City of Chicago must submit regular reports at least every six (6) months (or another period agreeable to the parties) addressing compliance with this Remedial Plan Order to counsel for Plaintiffs and United States, the COMS, and the Independent Monitor. Upon request of the Independent Monitor for relevant documents or information, City of Chicago shall promptly provide such documents and information regarding its compliance with this Remedial Plan Order.

### B. Independent Monitor

#### 1. Selection and Appointment

Plaintiffs, United States, and City of Chicago shall jointly select and recommend and the Court shall appoint an Independent Monitor to oversee City of Chicago's compliance with this Remedial Plan Order.

#### 2. Authority

The Monitor shall have the power and right to retain consultants, consult with City personnel, and inspect APS installations. The Independent Monitor shall have access to City records and information about City of Chicago's APS program. The Independent Monitor may identify any deficiencies and attempt to resolve them in consultation with the parties, including by recommending corrective action. The Independent Monitor shall report to the Court, City of Chicago, the Plaintiffs, and the United States to the extent that they identify material issues with City of Chicago's performance under this Remedial Plan Order.

#### 3. Communication

The Independent Monitor may communicate *ex parte* with any party.

4. **Duties**

   a. **Oversight**

The Independent Monitor shall proceed with all reasonable diligence to oversee City of Chicago's compliance with this Remedial Plan order.

   b. **Reporting**

The Monitor shall file annual written reports regarding City of Chicago's performance under this Remedial Plan Order. Such reports, at a minimum, must include the following information:

   i. The number of APS installations conducted in the prior twelve (12) months;

   ii. Whether those installations complied with the MUTCD;

   iii. Whether installations complied with the prioritization required under the Remedial Plan Order;

   iv. Whether City of Chicago complied with the Communication, Community Involvement, and Maintenance provisions of this Remedial Plan Order; and

   v. Recommendations for improving implementation of the Remedial Plan Order.

   c. **Meetings**

The Independent Monitor shall meet semiannually with the APS Advisory Committee, CDOT personnel, and COMS.

5. **Fees and Expenses**

Independent Monitor shall submit annual budgets and applications for fees and expenses for approval. City of Chicago shall pay the Independent Monitor's reasonable fees and expenses. Within thirty (30) days, counsel for Plaintiffs, the United States, and City of Chicago shall submit a joint proposed order setting forth procedures for approval of the Independent Monitor's budgets, fees, and expenses.

6. **Term**

The Independent Monitor shall serve for at term of five (5) years, subject to requests for extension, replacement, or termination.

IX. **Modification**

City of Chicago, Plaintiffs, and the United States may seek modification of this Remedial Plan Order on any grounds specified in this Remedial Plan Order, as well as to address unforeseen circumstances, changing standards governing APS and/or pedestrian signals, new technology, and impossibility.

## X. <u>Dispute Resolution</u>

If Plaintiffs or the United States believe that City of Chicago has not complied in any material respect with this Remedial Plan Order, they shall provide written notice to all parties and the Independent Monitor outlining the ways they believe City of Chicago is in non-compliance. Following notice of potential non-compliance, the parties must confer in good faith for a period of up to 30 days to resolve the dispute, with assistance from the Independent Monitor. If the parties are unable to resolve a dispute, any Party may make a motion to the Court to enforce the Remedial Plan Order.

## XI. <u>Attorney's Fees and Costs</u>

Plaintiffs are deemed to be prevailing parties in this litigation and are thus entitled to reasonable attorneys' fees, costs and expenses for work performed in connection with this litigation, including those incurred monitoring or enforcing City of Chicago's implementation obligations under the Remedial Plan Order. If Plaintiffs' counsel and City of Chicago are unable to negotiate a mutually agreeable resolution as to attorneys' fees, costs and expenses within thirty (30) days, Plaintiffs' counsel may move or apply to the Court for an award of attorneys' fees, costs and expenses for the work performed in connection with this litigation or monitoring.

**DATED**: April [__], 2025                    **ENTERED**:

_____

LaShonda A. Hunt
United States District Judge

10

## APPENDIX A

**Centers for People with Visual Disabilities**: (i) The Chicago Lighthouse at 1850 W Roosevelt Road, (ii) Second Sense at 65 E Wacker Place, (iii) Friedman Place at 5527 N Maplewood Avenue, (iv) Access Living at 115 W Chicago Avenue, (v) Equip for Equality at 20 North Michigan Avenue, (vi) Blind Service Association at 17 N State Street, (vii) Harold Washington Library Assistive Resources and Talking Book Center at 400 S State Street, (viii) Illinois Center for Rehabilitation and Education-Wood at 1950 W Roosevelt Road, (ix) National Federation of the Blind Illinois at 5128 N Oak Park Avenue, (x) JVS Chicago - Disability Services at 216 W Jackson Boulevard, (xi) JVS Chicago - Disability Services at 909 W Wilson Avenue, (xii) JVS Chicago – Disability Services at 6639 N Kedzie Avenue, and (xiii) UIC Institute on Disability and Human Development (IDHD) at 1640 W Roosevelt Road.

**Senior Centers**: (i) Central West Center at 2102 W. Ogden Avenue, (ii) Northeast (Levy) Senior Center at 2019 W. Lawrence Avenue, (iii) Northwest (Copernicus) Senior Center at 3160 N. Milwaukee Avenue, (iv) Renaissance Court at 78 E. Washington, (v) Southeast (Atlas) Senior Center at 1767 E. 79th Street, (vi) Southwest Center at 6117 S. Kedzie Avenue, (vii) Abbott Park Satellite Senior Center at 49 East 95th Street, (viii) Auburn Gresham Satellite Senior Center at 1040 West 79th Street, (ix) Austin Satellite Senior Center at 5071 W. Congress Parkway, (x) Chatham Satellite Senior Center at 8300 S. Cottage Grove, (xi) Edgewater Satellite Senior Center at 5917 N. Broadway, (xii) Englewood Satellite Senior Center at 653-657 West 63rd Street, (xiii) Garfield Ridge Satellite Senior Center at 5674B South Archer Avenue, (xiv) Kelvyn Park Satellite Senior Center at 2715 N. Cicero Avenue, (xv) North Center Senior Satellite at 4040 N. Oakley, (xvi) Norwood Park Senior Satellite at 5801 N. Natoma, (xvii) Pilsen Satellite Senior Center at 2021 South Morgan, (xviii) Portage Park Satellite Senior Center at 4100 North Long, (xix) Roseland Satellite Senior Center at 10426 South Michigan Avenue, (xx) South Chicago Satellite Center at 9233 South Burley, and (xxi) West Town/Logan Square Satellite Senior Center at 1615 West Chicago Avenue.

**Other**: (i) the intersection of E Lower Wacker Drive, N Lakeshore Drive, N Breakwater Access, and N Lake Front Drive, (ii) the intersection of E Lake Street and N Columbus Drive, (iii) the intersection of S Indiana Avenue and E Roosevelt Road, (iv) the intersection of W Jackson Street and S Jefferson Street, (v) the intersection of W Jackson Street and S Desplaines Street, (vi) the intersection of W Adams Street and S Desplaines Street, (vii) the intersection of W Monroe Stret and S Jefferson Street, (viii) the intersection of W Monroe Street and S Desplaines Street, (ix) the intersection of W Monroe Street and S Halsted Street, (x) the intersection of W Madison Street and S Jefferson Street, (xi) the intersection of N Halsted Street and W Erie Street, (xii) the intersection of W Division Street and N Clybourn Avenue, (xiii) the intersection of W Division Street and N Wells Street, (xiv) the intersection of E Division Street and N Lakeshore Drive, (xv) the intersection of E Cedar Street, N Rush Street, and N State Street, (xvi) the intersection of N Rush Street and E Bellevue Place, (xvii) the intersection of N Rush Street and E Oak Street, (xviii) the intersection of N Rush Street and E Walton Place, (xix) the intersection of Kinzie Street and N State Street, (xx) the intersection of W Wrightwood Avenue and N Clark Street, (xxi) the intersection of N Clark Street and W Wellington Avenue, (xxii) the intersection of N Clark Street

and N Southport Avenue, (xxiii) the intersection of N Ashland Avenue and W Berteau Avenue, (xxiv) the intersection of N Clark Street and W Albion Avenue, and (xxv) the intersection of N Clark Street and W North Shore Avenue.