**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

AMERICAN COUNCIL OF THE BLIND OF METROPOLITAN CHICAGO, ANN BRASH, MAUREEN HENEGHAN, and RAY CAMPBELL, on behalf of themselves and all others similarly situated,

                Plaintiffs,

-against-

CITY OF CHICAGO,

                Defendant.

_____

UNITED STATES OF AMERICA

                Plaintiff-Intervenor,

-against-

CITY OF CHICAGO,

                Defendant.

Civil No. 1:19-cv-06322

Judge LaShonda A. Hunt

**DEFENDANT CITY OF CHICAGO'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS**

**TABLE OF CONTENTS**

**Page**

I.      Introduction.................................................................................................... 1

II.     Factual and Procedural History....................................................................... 2

        A.      The City and DRA Prior to the Suit.................................................... 2

        B.      The Suit Before the United States Took the Lead. ............................. 3

        C.      From 2022 through 2024, Plaintiffs Followed the United States' Lead and
                Were Redundant.................................................................................. 3

        D.      Plaintiffs' Inflexible and Unachievable Demands Prevented Settlement. .............. 5

III.    Standard ......................................................................................................... 6

IV.     Argument ....................................................................................................... 7

        A.      DRA's Hourly Rates Are Unreasonably High, as No Client Pays Them, and
                DRA Routinely Settles for Much Lower Realized Rates. .................................... 7

                1.      DRA's Full Rates Are a Mirage, as it Routinely Settles for Low
                        Realized Rates..................................................................................... 7

                2.      DRA Settled for a Low Realized Rate in the NYC APS Case. ................ 13

                3.      DRA Relies on Out-of-Market Sources to Justify its Rates. .................... 14

                4.      DRA's Chicago Market References Are Unhelpful and Irrelevant. ......... 15

                5.      The City's Outside Counsel Provides the Most Relevant Evidence of
                        Chicago Market Rates for this Type of Litigation. ................................... 18

        B.      Proskauer's Claimed Rates Are Unreasonably High, as they Are Based Out-
                of-State Authorities and Unrelated Practice Areas. ............................................ 19

        C.      Plaintiffs' Claimed Hours are Unreasonable. ....................................................... 21

                1.      Plaintiffs Unreasonably Billed Hours Arising From Their Two Law
                        Firms. ............................................................................................... 22

                2.      In 2023, 2023, and 2024, Plaintiffs Unreasonably Billed Hours
                        Redundant of the United States' Work. .................................................. 22

i

3.      Plaintiffs Prolonged the Litigation by Standing on Unachievable Demands and Refusing to Engage with APS Design, Engineering, and Construction. ...................................................................................... 24

D.      Plaintiffs' Counsel's Work in this Case Was Not Novel. .................................... 29

1.      Plaintiffs' Work Was Derivative of Decades of Other System-Wide ADA Cases Brought by DRA. .................................................................... 29

2.      Plaintiffs' Work Was Derivative of, and Followed Behind, the NYC APS Case. ........................................................................................... 30

V.      Conclusion. ................................................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam X. v. N.J. Dep't of Corr.*,
   No. 3:17-cv-00188-FLW- LHG, 2022 WL 621089 (D.N.J. Mar. 3, 2022)................10, 12, 14

*Barden v. City of Sacramento*,
   292 F.3d 1073 (9th Cir. 2002) ...................................................................................29

*Benson v. Giant Food Stores*,
   2011 WL 6747421 (E.D.Pa. Dec. 22, 2011)................................................................25

*Bloom v. City of San Diego*,
   No. 17-cv-02324, 2024 WL 4495512 (S.D. Cal. Oct. 14, 2024)..............................8, 9, 14, 20

*Community Resources for Independent Living v. Mobility Works of California, LLC*,
   No. 18-cv-06012-JSW, 2020 WL 10505223 (N.D. Cal. May 22, 2020)....................12, 13, 14

*Fields v. City of Chicago*,
   No. 10-C-1168, 2018 WL 253716 (N.D.Ill Jan. 1, 2018).........................................20

*First Midwest Bank v. City of Chicago*,
   337 F.Supp.3d 749 (N.D. Ill. 2018) .................................................................14, 20

*Harper v. City of Chicago Heights*,
   223 F.3d 593 (7th Cir. 2000) ......................................................................................7

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)...........................................................................................7, 21, 29

*Kurgan v. Chiro One Wellness Centers LLC*,
   No. 10–cv–1899, 2015 WL 1850599 (N.D.Ill. April 21, 2015) .............................20

*Estate of LaPorta v. City of Chicago*,
   988 F.3d 978 (7th Cir. 2021) ......................................................................................14

*Liberty Res., Inc. v. City of Philadelphia*,
   No. 2:19-cv-03846-HB, 2023 WL 3204018 (E.D. Pa. May 1, 2023)......................10, 12, 14

*Lohman v. Duryea Borough*,
   574 F.3d 163 (3d Cir. 2009).......................................................................................25

*McCullough v. Cal. Dep't of Developmental Servs.*,
   No. 3:20-cv-2958-SI (N.D. Cal. Sept. 18, 2023) .................................................9, 11, 12, 14

iii

*Metcalf v. Burke*,
No. 18-cv-3260-SEM (C.D. Ill. Feb. 19, 2024)........................................................15, 16

*Montanez v. Simon*,
755 F.3d 547 (7th Cir. 2014) .................................................................................15

*Navarro v. Mountain View*,
No. 5:21-cv-05381 (N.D. Cal. Feb. 28, 2023) .....................................10, 12, 14, 21

*Parallel Iron v. NetApp*,
84 F.Supp.3d 352 (D. Del. 2015)...........................................................................25

*Roque v. Seattle Hous. Auth.*,
No. 2:20-cv-00658-JRC, 2021 WL 9649847 (W.D. Wash. Sept. 28, 2021) ...............11, 13, 14

*Senior & Disability Action v. San Francisco Bay Area Rapid Transit Dist.*,
No. 3:17-cv-1876-LB (N.D. Cal. Apr. 18, 2024) .........................................9, 13, 14

*Spellan v. Board of Educ. for Dist. 111*,
59 F.3d 642 (7th Cir. 1995) ...................................................................................29

*T.G. v. Kern Cnty.*,
No. 1:18-cv-00257-JLT, 2020 WL 3035199 (E.D. Cal. June 5, 2020) ......................11, 13, 14

*Uphoff v. Elegant Bath, Ltd.*,
176 F.3d 399 (7th Cir. 1999) .......................................................................... *passim*

*Warfield v. City of Chicago*,
733 F.Supp.2d 950 (7th Cir. 2010) ...................................................................7, 21

*Zurich Am. Ins. Co. v. Watts Indus., Inc.*,
417 F.3d 682 (7th Cir. 2005) .................................................................................25

**Statutes**

Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ............................................... *passim*

**Other Authorities**

Black's Law Dictionary (12th ed. 2024)..................................................................................20

DRA Cases page, https://dralegal.org/cases/ (last visited Nov. 12, 2025) ....................................29

DRA "Staff and Leadership page, https://dralegal.org/staff-and-leadership/ (last
visited Nov. 11, 2025).....................................................................................................17

Fed. R. Evid. 408 ............................................................................................................25

iv

Federal Reserve Bank of Minneapolis, Inflation Calculator,
https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator....................18

June 26, 2025, April 28, 2023, March 17, 2022, and Sept. 26, 2019, *available at*
https://www.proskauerforgood.com/ (last visited Nov. 12, 2025)...........................................20

Local Rule 54.3 ................................................................................................................................18

Local Rule 54.3(e) .....................................................................................................................22, 24

Proskauer Website, Practices page, https://www.proskauer.com/services#practices
(last visited Nov. 12, 2025).....................................................................................................20

Proskauer Website, *Pro Bono* page, https://www.proskauer.com/for-good/pro-
bono (last visited Nov. 12, 2025).............................................................................................20

v

**DEFENDANT CITY OF CHICAGO'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS**

Defendant City of Chicago (the "City") submits its response in opposition ("Response") to Plaintiffs' Motion for Attorneys' Fees and Costs, and states as follows.

## I. Introduction

Plaintiffs are prevailing parties in their lawsuit against the City relating to accessible pedestrian signals ("APS") at signalized street intersections with pedestrian signals. Plaintiffs' counsel claim a vast sum of attorneys' fees, a total of $5,053,558, to be apportioned between Disability Rights Advocates ("DRA") and Proskauer Rose LLP ("Proskauer").[1] This sum is not supported by law or by Plaintiffs' submissions in support of their claim.

DRA's demand is based on billing rates that exist on paper only and that no client ever pays; the rates drastically exceed the realized rates DRA receives through prevailing party awards. Proskauer's claimed hourly rates are not based on municipal ADA class actions, with which Proskauer has little prior experience. Both firms' rates are demonstrably unreasonable in light of the best points of comparison: the actual realized rates that DRA regularly receives and the far lower rates the City paid its outside counsel in this litigation.

In addition to the inflated rates, the number of hours claimed is unreasonable for multiple reasons. First and foremost, from January of 2022 through January of 2025 their efforts were secondary to and largely redundant of those of Plaintiff-Intervenor the United States (the "United States"), who spearheaded much of the case during these years. Second, the United States and Plaintiffs unnecessarily prolonged this litigation beginning in early 2023 (i) by repeatedly insisting on remedies—including adding APS to 100% of the City's intersections in just 10 years—goals

---

[1] The City does not dispute Proskauer's claim to $247,159.77 in costs.

that were unachievable by the City and ultimately rejected by the Court, and (ii) by refusing to take seriously APS design, engineering, and construction difficulties raised by the City. As a result of Plaintiffs' refusal to grapple with these practical issues and their refusal to provide any feasibility study, this litigation was prolonged by two years, until the Court's May 2025 Remedial Plan Order (Dkt. 365), which bears many similarities to a February 2023 settlement offer made by the City and does not include Plaintiffs' maximalist demands.

Finally, Plaintiffs' work on this case was not novel. DRA lifted previous arguments and strategy from the case it filed in New York City, *American Council of the Blind of New York, Inc. et al. v. the City of New York et al.*, No. 18-CV-5792, in the Southern District of New York (the "NYC APS Case"), which addressed the same issues, and which ran two-to-three years ahead of this case.

For these reasons and others explained more fully below, the City respectfully requests that the Court award Plaintiffs a reasonable amount of attorneys' fees which, as explained below, should total $1,711,409.77, apportioned $878,889.50 to DRA and $832,520.27 to Proskauer, together with $247,159.77 in costs to Proskauer.

## II.     Factual and Procedural History

### A.     The City and DRA Prior to the Suit.



On ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Weisberg Decl. (Dkt. 385-1) at Ex. 6, ▮▮▮▮. Despite ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id*. at Ex. 6, line ▮▮▮▮▮▮▮▮▮▮. By the time ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, the City had already enacted in May of 2019 a policy to include APS with all newly signalized intersections with pedestrian signals and with all traffic signal modernizations. Decl. of David Gleason (Dkt. 183-1) at ¶¶ 28-31. In July of 2019, Mayor Lori Lightfoot publicly

announced the City's APS Pilot Project, a federally funded project to install APS at a number of intersections and develop the Chicago Department of Transportation's (CDOT) capabilities regarding APS. *Id*. at ¶¶ 17-22. In July of 2019, CDOT hosted a public "open house" meeting to announce the same to the blind community. *Id*. at ¶ 22. Nevertheless, Plaintiffs filed suit on September 23, 2019. Complaint (Dkt. 1).

### B. The Suit Before the United States Took the Lead.

Plaintiffs, without legal justification, named as defendants CDOT, Mayor Lightfoot, and Acting CDOT Commissioner Thomas Carney and claimed to represent a class of deaf-blind persons. The City moved to dismiss the non-City defendants and deaf-blind plaintiffs, and succeeded. Partial Motion to Dismiss First Amended Complaint at ¶¶ 2, 4 (Dkt. 36); Memorandum Opinion and Order at 8 (Dkt. 43). The parties engaged in fact discovery, including a number of depositions principally or entirely taken or defended by Plaintiffs' counsel. Three disputed discovery motions were filed by the parties, two by the City and one by Plaintiffs. Dkt. 98, 106, and 120. The City prevailed on two of these three discovery motions. Dkt. 114-15, 123-24, 127-28. On September 17, 2021, Plaintiffs moved for class certification. Dkt. 94. The City opposed this on the grounds that lead Plaintiff, ACBMC, was an inadequate class representative because it had minimal organizational capabilities, as well as on commonality grounds. Dkt. 105. The Court disagreed, and on March 4,2022, certified the class. Dkt. 150.

### C. From 2022 through 2024, Plaintiffs Followed the United States' Lead and Were Redundant.

On April 14, 2021, the United States intervened in the case, unopposed by the City. Dkt. 74. Through roughly the end of 2021, the United States' efforts were largely secondary to Plaintiffs', as described above. However, beginning on January 5, 2022, after briefing on class certification and fact discovery disputes had ended, the United States took the lead in prosecuting

the suit, a role that would continue through January 20, 2025.[2] During this period the United States took the deposition of all nine expert witness and remedial phase fact witness for the City.[3] Declaration of Matthew Scot Payne ("Payne Decl.") at ¶ 9, attached as Exhibit 1 hereto. Plaintiffs billed to fully prepare for each deposition even though they never asked more than a few minutes of follow-up questions.[4] Plaintiffs' Memo at 13. In this period, during both the liability and remedial briefing phases, the United States and Plaintiffs pursued materially the same legal theories, asserted the same facts, used shared expert witnesses, and submitted a joint proposed remedial plan. In each case, however, Plaintiffs filed separate briefs making largely duplicative arguments. *Compare* Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' MSJ Memo") (Dkt. 190) *with* United States' Memorandum in Support of Motion for Summary Judgment on Liability ("United States' MSJ Memo") (Dkt. 187); *see also* United States' and Plaintiffs' [Joint] Remedial Plan (Dkt. 281, 286); *compare also* Memorandum of Law in Support of Plaintiffs' Proposed Remedial Plan ("Plaintiffs' Remedial Memo") (Dkt. 283) *with* United States' Memorandum of Law in Support of its Remedial Plan ("United States' Remedial Memo") (Dkt. 289). The Court granted summary judgment on liability for Plaintiffs and the United States on March 31, 2023. Dkt. 248.

---

[2] For the Court's convenience when evaluating Plaintiffs' claims of leadership in their Memo, this time period covers docket entry nos. 137 through 348.

[3] Specifically, the United States conducted the main questioning of the depositions of (i) Peter Koonce on April 29, 2022, (ii) Grant Davis on December 6, 2023, (iii) Peter Koonce on December 7, 2023, (iv) Anne Zhang on December 14, 2023, (v) David Gleason on December 18, 2023, (vi) David Miller on December 19, 2023, (vii) Daniel Burke on January 3, 2024, (viii) Robert Wall Emerson on January 4, 2024, and (ix) Abraham Emmanuel on January 4, 2024. Ex. 1, Payne Decl. at ¶ 9.

[4] The largest number of transcript pages taken up by Plaintiffs' secondary questioning during this period was fourteen pages, and on three occasions Plaintiffs asked no questions at all. Ex. 1, Payne Decl. at ¶ 11.

### D. Plaintiffs' Inflexible and Unachievable Demands Prevented Settlement.

As early as June of 2022, Plaintiffs and the United States orally communicated a demand that APS be added to 100% of the City's intersections in ten years—a demand from which they never wavered—but they did not provide any written settlement proposal. Declaration of John L. Hendricks ("Hendricks Decl.") at ¶¶ 9-11, attached as Exhibit 2 hereto. On February 23, 2023, the City sent a written Settlement Proposal to Plaintiffs and the United States, proposing, without limitation, (i) to establish a dedicated APS Program, (ii) to include APS with 70% of the City's signalized intersections within fifteen years, and (iii) setting annual installation targets for the first ten years that are remarkably similar to those in the Court's Remedial Plan Order.[5] *Id*. ¶¶ 12-14.

On March 21, 2023, the parties met for a lengthy settlement negotiation, largely to discuss the City's proposal. Ex. 2, Hendricks Decl. at ¶ 15. CDOT's Managing Deputy Commissioner and Chief Engineer, Daniel Burke, and First Deputy Commissioner of CDOT, Thomas Carney, appeared to explain the basis for the City's proposal, including the design and construction challenges that make it difficult and often impossible to install APS quickly. *Id*. at ¶ 16.

On May 12, 2023, the United States, backed by Plaintiffs, sent a proposed Consent Order to the City, requiring installation of APS at 100% of the City's signalized intersections in only ten

---

[5] Specifically,

| Plan Year | APS Targets in the City's February 2023 Settlement Proposal | APS Annual Requirements in the Court's Remedial Plan Order (Dkt. 365, § III.B.3.) |
|---|---|---|
| 1 | 70 | 70 |
| 2 | 100 | 110 |
| 3 | 125 | 135 |
| 4 | 150 | 154 |
| 5 | 175 | 185 |
| 6 | 200 | 220 |
| 7 | 200 | 235 |
| 8 | 220 | 245 |
| 9 | 220 | 245 |
| 10 | 220 | 245 |

Ex. 2, Hendricks Decl. at ¶ 14.

5

years, and listing annual requirements peaking at 375 intersections per year. Ex. 2, Hendricks Decl. at ¶ 17. They also demanded that APS be added contemporaneously with basic, unrelated, and technically simple upgrades like leading pedestrian intervals, and that APS be added during many basic repairs that made no engineering sense. *Id*. at ¶ 18. They also unreasonably demanded that unlimited APS be added in response to community requests in 90 days or less. *Id*. at ¶ 19.

On June 6, 2023, the parties, again joined by CDOT's Mr. Burke and Mr. Carney, met to discuss settlement, focusing on the proposed Consent Order. Ex. 2, Hendricks Decl., at ¶ 20. Mr. Burke and Mr. Carney explained that many elements of the proposed Consent Order were infeasible. *Id*. at ¶ 21. The discussion grew contentious when Plaintiffs and the United States refused to disclose what steps, if any, they had taken to ensure that the terms of proposed Consent Order were capable of being met by the City. *Id*. at ¶ 22. A representative of the United States claimed that it was not up to Plaintiffs and the United States to consider feasibility. *Id*. at ¶ 23.

### III. <u>Standard</u>

In the Seventh Circuit,

> Generally, when calculating attorney's fees, a district court will determine a lodestar amount by multiplying the reasonable number of hours worked by the market rate. The market rate is the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question. The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate. If the district court is unable to determine the attorney's actual billing rate because, for example, the attorney has no fee-paying clients, then the district court should look to the next best evidence. The next best evidence of an attorney's market rate includes evidence of rates other attorneys in the area charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases. The burden of proving the market rate is on the party seeking the fee award. However, once an attorney provides evidence establishing his market rate, the opposing party has the burden of demonstrating why a lower rate should be awarded.

*Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 407 (7th Cir. 1999) (internal citations and quotations omitted). In courts of the Seventh Circuit, the hours for which a prevailing party may be compensated are limited:

> The Supreme Court has directed that "[c]ounsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, **redundant**, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." Accordingly, a district court should exclude from the fee calculation "hours that were not 'reasonably expended.'"

*Warfield v. City of Chicago*, 733 F.Supp.2d 950, 959 (7th Cir. 2010) (internal citations omitted), *quoting Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

## IV.    <u>Argument</u>

### A.    DRA's Hourly Rates Are Unreasonably High, as No Client Pays Them, and DRA Routinely Settles for Much Lower Realized Rates.

DRA does not collect fees from its clients. Plaintiffs' Memorandum of Law in Support of their Motion for Attorneys' Fees and Costs (Dkt. 384) ("Plaintiffs' Memo") at 8. As such, its claimed hourly rates are not presumptively reasonable. *Uphoff*, 176 F.3d at 407. Moreover, "self-serving affidavit[s,]" like DRA's and Proskauer's, "alone cannot establish the market rate for that attorney's services." *Harper v. City of Chicago Heights*, 223 F.3d 593, 604 (7th Cir. 2000).

### 1.    DRA's Full Rates Are a Mirage, as it Routinely Settles for Low Realized Rates.

DRA's claimed rates are an illusion, created by its apparently longstanding practice of settling fee disputes at steep discounts so that its fee petitions—and therefore its rates—are uncontested. DRA's practice (sometimes acting alone, other times with co-counsel like Proskauer), is demonstrated repeatedly in a set of nine out-of-state cases in which it claims a Court approved its high hourly rates. Plaintiffs' Memo at 10; Weisberg Decl. at ¶ 26. Defined herein as ("DRA's Nine Cases") and discussed in detail below, each has several regularly deployed steps. First, in

many cases DRA "no-charges" some of its least defensible billed hours; these hours do not become part of DRA's claimed lodestar, and DRA never receives payment for these hours. Second, DRA states a lodestar, premised on (i) an hours total that may or may not have already been reduced by "no-charge" write-offs and (ii) DRA's full claimed rates, with no reduction. Third, DRA settles with its defendant at a substantial discount, which usually does not specify what is being compromised: hours or rates. Last, where required by law, DRA moves uncontested for Court approval of its settlement, seeking approval of the amount and a finding that its full rates are reasonable. Because the motions are unopposed and no evidence or argument is presented to permit the court to question DRA's full rates, they are perfunctorily deemed reasonable based on declarations like those submitted in this case.

This practice conceals that time after time DRA is ultimately paid "realized" rates far lower than its full rates. Whatever monies DRA receives are the monies that compensate it for <u>all</u> hours invested, regardless of whether those hours are "no charged," dropped from the lodestar, or compromised in settlement. While it is often not possible to disentangle DRA from its co-counsel firms, a simple examination of DRA's Nine Cases shows that <u>the blended, realized rates plaintiffs' counsel ultimately receive average only $287.80</u>, well below DRA's full rates. Specifically:

- In *Bloom v. City of San Diego* ("*Bloom*"), the parties settled the case and an award of attorney fees to plaintiffs' counsel: DRA, Fish & Richardson (which Proskauer claims is comparable firm), and others. No. 17-cv-02324, 2024 WL 4495512, *6 (S.D. Cal. Oct. 14, 2024). Defendant did not oppose plaintiffs' motion for fees or challenge the rates claimed. *Id*. at *7. Plaintiffs' counsel claimed a combined lodestar of 8,819.4 hours at a cost of $6,215,338.30, yet the parties settled for less than half this: only $2,950,000 in total ($2,845,567.06 in fees and $104,432.94 in costs). *Id*. at *6. The Court approved this 53%

fee reduction, but also approved plaintiffs' counsel's full rates. *Id*. at *8. However, dividing the fee portion of the settlement ($2,845,567.06) by the total hours invested (8,819.4) shows that plaintiffs' counsel received a blended, realized rate of only $322.65 per hour.

- In *Senior & Disability Action v. San Francisco Bay Area Rapid Transit Dist.* ("*Senior & Disability*"), plaintiffs' counsel, including DRA and one other firm, spent 2,477 hours on the case, but "no-charged" an incredible 1,434.7 hours before asserting a lodestar. No. 3:17-cv-01876-LB, ECF No. 156, at 6-7 (N.D. Cal. Apr. 18, 2024) (Weisberg Decl., Ex. 1). The lodestar asserted was $1,177,888.86 ($1,161,331 fees and $16,557.86 costs) for 1,043 hours, supporting an illusory blended rate of $1,113.45 per hour. *Id*. at 3. Plaintiffs' counsel then settled for $825,000 in costs and fees, and the court approved the settlement. *Id*. at 1, 4. But simply dividing the fee portion of the settlement ($825,000 - $16,557.86 = $808,442.14) by the total hours invested (2,477) shows that plaintiffs' counsel's combined, blended, realized rate is a mere $326.28 per hour.

- In *McCullough v. Cal. Dep't of Developmental Servs.* ("*McCullough*"), DRA and a second firm moved for an award of fees and costs after settling with defendant, having spent a combined 4,394.9 hours on the case. No. 3:20-cv-2958-SI, ECF No. 123, at 2, 8 (N.D. Cal. Sept. 18, 2023) (Weisberg Decl., Ex. 2). DRA initially incurred 1,961.1 hours, but wrote off 496.1 hours (or 25.8%) before seeking 1,456 hours in its lodestar (the combined lodestar fees was $1,788,305 across both firms). *Id*. at 5, 8. The parties then settled for a combined $1,300,000 in fees ($1,271,765.56, including fees for future monitoring activities) and costs ($28,234.33), a 28.4% reduction in fees (expressed in hours, this would reduce 1,456 to 1,048). *Id*. This means that DRA had to write off 46.55% of its hours in order to settle its claim. Though the settlement does not apportion the fees between firms, plaintiffs'

9

counsel ultimately received (at best, given the obligation to provide future monitoring services without additional payment) a combined, blended, realized rate of $289.37 per hour ($1,271,765.56) / 4,394.9).

- In *Liberty Res., Inc. v. City of Philadelphia* ("*Liberty*"), DRA as sole plaintiffs' counsel first wrote off 1,500 hours, and then claimed a lodestar of $1,627,563 for 3,377 hours. No. 2:19-cv-03846-HB, 2023 WL 3204018, *11-12 (E.D. Pa. May 1, 2023). This lodestar suggests a blended rate of $481.96. The parties then settled, and DRA sought unopposed court approval of $949,178.93 in fees, a 41.7% reduction from the lodestar, suggesting that DRA's blended realized rate was now $281.07 ($949,178.93 / 3,377). *Id*. at *10. Unless the 1,500 hour pre-lodestar write-off is considered, in which case DRA received $949,178.93 for 4,877 hours, a blended realized rate of $194.62 per hour.

- In *Navarro v. Mountain View* ("*Navarro*"), DRA and other plaintiff firms settled the case and moved, unopposed, for an agreed-upon fee award of $750,000 ($743,000 in fees and $7,000 in costs). No. 5:21-cv-05381, ECF No. 137, at 2, 8 (N.D. Cal. Feb. 28, 2023) (Weisberg Decl., Ex. 3). Plaintiffs spent 2,100 hours on the case, and claimed a lodestar amount of $1,365,000. *Id*. at 4. The settlement therefore represented an approxamate 45% reduction from the lodestar. *Id*. Dividing the $743,000 in fees received by the 2,100 hours invested, plaintiff's blended realized rate is $353.81 per hour.

- In *Adam X. v. N.J. Dep't of Corr*. ("*Adam X*"), plaintiffs settled the case, and DRA and Proskauer sought $1,730,435.50 in fees for 4,295 hours and $50,526.60 in costs. No. 3:17-cv-00188-FLW- LHG, 2022 WL 621089, *11 (D.N.J. Mar. 3, 2022). They settled for $975,000 in fees and costs. *Id*. at *10 The court noted that this represented 56% of the fees claimed (which assumes plaintiffs' costs were paid in full), and approved DRA and

10

Proskauer's nominal rates. *Id* at *11. Therefore, after costs, DRA and Proskauer were ultimately paid $924,473.40 for 2,404.64 hours, receiving an aggregate blended realized rate of <u>$384.45 per hour</u>.

- In *Roque v. Seattle Hous. Auth.* ("*Roque*"), plaintiffs' counsel, including DRA and a second firm, spent a combined 883.7 hours on the case. No. 2:20-cv-00658-JRC, 2021 WL 9649847, *2 (W.D. Wash. Sept. 28, 2021). Plaintiffs first "no charged" a substantial number of hours (56.1 for DRA, an 18.8% reduction from its total hours) before asserting a combined lodestar amount of $289,464.50. *Id*. This lodestar represents a blended rate of $327.56 per hour ($289,464.50 / 883.7). Unable to full settle the fee amount, the parties asked the court to award between $15,000 and $150,000 in fees to plaintiffs' counsel. *Id*. at *1. Noting that "The amount of time expended by plaintiff's counsel exceeds the amount of time that should have been reasonably spent to prosecute this case[,]" (*Id*. at *2) the Court awarded $135,000 in fees (*Id*. at *3), representing a realized blended rate of only <u>$152.77 per hour</u> ($135,000 / 883.7). Alone among DRA's Nine Cases, this case involves a dispute over fees rather than an unopposed settlement. Yet before submitting to the court's judgment, plaintiffs' counsel stipulated that they should not receive more than just over half of its lodestar ($150,000 vs. $289,464.50).

- In *T.G. v. Kern Cnty.* ("*T.G.*"), plaintiffs' counsel, including DRA and another firm, spent 5,629.2 hours on the case, but voluntarily wrote off 721.4 hours before stating a lodestar. No. 1:18-cv-00257-JLT, 2020 WL 3035199, *21 (E.D. Cal. June 5, 2020). The lodestar asserted $2,316,691 for 4,907.8 hours. *Id*. at *22. Plaintiffs settled the fee dispute with two sets of defendants for a combined $1,725,000. *Id*. Dividing $1,725,000 in settled fees by 5,629.2 hours yields a combined, blended, realized rate of <u>$306.44 per hour</u>.

11

- In *Community Resources for Independent Living v. Mobility Works of California, LLC* ("*Mobility Works*"), plaintiffs' counsel DRA initially claimed a lodestar of $200,208 for 565.8 hours, plus costs of "more than" $3,000. No. 18-cv-06012-JSW, 2020 WL 10505223, *2-3 (N.D. Cal. May 22, 2020). This represents a blended rate of only $353.95, well below DRA's claimed attorney rates of $795 to $395. *Id*. Plaintiffs then settled for $150,000 in combined costs and fees (*i.e.*, $147,000 in fees) after writing off 93 hours of time for a reduced total of 472.6 hours. *Id*. at *2. The Court approved DRA's alleged rates and the settlement as a whole. *Id*. at *2-3. But dividing the $147,000 paid in fees by the 565.8 hours invested shows that DRA only received a blended realized rate of only <u>$259.81 per hour</u>.

The average blended, realized rates plaintiffs' counsel received in DRA's Nine Cases, $287.80 per hour, is especially stark when set alongside DRA's demand in this case. Here, DRA seeks an award of $2,998,885 in fees for 4,208.8 hours, a blended rate of $712.53.[6] Plaintiffs' Memo at 5. <u>The $712.53 per hour DRA now seeks is almost two and a half times the $287.80 it has received in the past</u>. There is nothing wrong with DRA settling cases for deep discounts, but it should not be permitted to pretend that these cases support an award based on DRA's full rates.

Perhaps most revealing is that DRA uses past approvals of its high, alleged rates to support subsequent approvals of its rates, even though the past approvals involved much lower realized rates. Plaintiffs' Memo at 10. This creates an ouroboros, in which the reasonableness of DRA's rates justifies the reasonableness of DRA's rates and further supports the reasonableness of DRA's rates; an argument that has ensnared more than one court cited by DRA. *Liberty Res.*, 2023 WL 3204018 at *11 (looking to *Adam X* to support reasonableness of fees); *McCullough*, Weisberg

---

[6] If the 758.3 hours DRA claims to have cut prior to setting its lodestar (Plaintiffs' Memo at 12) are factored back in, DRA is now seeking a blended realized rate of $603.75 ($2,998,885 / (758.3 + 4,208.8)). This is still well above the realized rates that DRA typically receives.

12

Decl., Ex. 2, at 6–7 (citing *Navarro*, *T.G.*, and *Mobility Works* for the same); *Navarro*, Weisberg Decl., Ex. 3, at p. 6, n. 2 (noting rate approvals in *Roque*, *T.G.*, *Mobility Works*, and others); *Senior & Disability Action*, Weisberg Decl. Ex. 1, at 5 (citing *McCullough*, *Navarro*, *T.G.*, *Mobility Works*, and two other cases for the same).

### 2. DRA Settled for a Low Realized Rate in the NYC APS Case.

DRA's pattern of massive write-downs and low realized rates is also evidenced by the dog that didn't bark in Plaintiffs' Memo: the NYC APS Case. How did DRA fail to cite that case as precedent, when it has done so repeatedly in the liability and remedial phases? In the NYC APS Case, the parties went through discovery, expert discovery, a fully briefed motion for summary judgment, and many episodic rounds of settlement negotiations, including negotiations around a remedial plan. Memorandum of Law in Support of Plaintiffs' Motion for Reasonable Attorney Fees and Costs ("NYC Fee Memo") (Dkt. 219) at 3-8, attached as Exhibit 3 hereto. On June 9, 2022, plaintiffs' counsel DRA moved for an award of $1,235,951.95 in costs and fees. *Id.* at 2. Before defendants' response was due, the parties settled, and on July 20, 2022, Judge Engelmayer signed and entered a Stipulation of Settlement of Reasonable Attorneys' Fees and Costs ("NYC Fee Stip"), approving the settlement amount of $945,000 in costs and fees. NYC Fee Stip (Dkt. 232), attached as Exhibit 4 hereto. While these documents do not provide perfect clarity, it appears DRA worked 3,082.8 hours prior to the NYC Fee Motion. *Id.* at 9-10. Before setting its lodestar, DRA voluntarily cut 522.9 hours (worth $258,495), a 17% reduction in DRA's hours. *Id.* at 3, 13. The lodestar claimed by DRA in its NYC Fee Motion is $1,192,315.50 for 2,559.9 hours, for a notional blended fee of under $466 per hour. *Id.* at 2, 10. The NYC Fee Stip does not describe how the parties reached their $945,000 settlement, but if it came at the cost of DRA's hours, it represents a further 24.4% reduction. All told, it appears that DRA agreed to be compensated for only about 1,935.3 of its original 3,082.8 hours total, and to receive a blended realized rate of

13

approximately $352 per hour. This is better than DRA usually gets, but still well below its claimed rates in the NYC APS Case, and well below the blended $712.53 DRA seeks here.

### 3. DRA Relies on Out-of-Market Sources to Justify its Rates.

DRA's Nine Cases are also flawed because they are out-of-state cases and thus are not the "next best evidence" of market rates, as they do not relate to the Chicago legal market. *Uphoff*, 176 F.3d at 407; *see also First Midwest Bank v. City of Chicago*, 337 F.Supp.3d 749, 790 (N.D. Ill. 2018); *rev'd on other grounds First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978 (7th Cir. 2021) ("the costs of lawyering are not uniform across the country, which is why market rate comparisons should be made to lawyers of comparable skill, experience, and reputation *in the same community*" (emphasis in original)). Instead, DRA's Nine Cases relate to other, far-off markets. *Bloom*, 2024 WL 4495512 at *6 (addressing the San Diego market); *Senior & Disability*, Weisberg Decl., Ex. 1 at 5-6 (San Francisco); *McCullough*, Weisberg Decl., Ex. 2 at 2, 8 (San Francisco); *Liberty*, 2023 WL 3204018 at *11-12 (Philadelphia); *Navarro*, Weisberg Decl., Ex. 3 at 2, 8 (San Francisco); *Adam X*, 2022 WL 621089 at *11 (northern New Jersey); *Roque*, 2021 WL 9649847 at *2 (Seattle); *T.G.*, 2020 WL 3035199 at *22 (Fresno); *Mobility Works*, 2020 WL 10505223 at *2-3 (San Francisco). DRA identifies no cases in which its rates were found reasonable by a court addressing the Chicago market.

DRA and Proskauer rely on the declaration of Attorney Daniel L. Brown, who has worked extensively with DRA in the courts of New York, but not beyond. Plaintiffs' Memo at 7, 9; Brown Decl. (Dkt. 385-3) at ¶ 14. He does not claim any personal experience of Chicago courts, but instead vaguely opines that he might be paid his full rate for Chicago matters. *Id*. at ¶¶ 18-23. Attorney Brown notes the rates his firm's Chicago office charges but does not state whether these rates are specific to municipal ADA class actions, or whether his Chicago office has ever done such work. *Id*. at ¶¶ 22-23. More importantly, he never states what ultimate hourly rates he and his

14

firm's New York office actually realized from their collaborations with DRA. Section IV.A.1., *supra*. It is utterly irrelevant if Attorney Brown's $1,420 hourly rate is "charged to paying business clients" if the rates he realizes from ADA cases is different. *Id*. at ¶ 21.

Finally, DRA and Proskauer's reliance on the Laffey Matrix is misplaced. *See* Plaintiffs' Memo at 7, 10. The Laffey Matrix is a schedule of attorney rates in the District of Columbia Market, and does not differentiate between different types of litigation. As such it fails to both address the Chicago market and to address the type of work at issue here. *Uphoff*, 176 F.3d at 407. In *Montanez v. Simon*, the Seventh Circuit "expressed some skepticism about applying the Laffey Matrix outside Washington, D.C., and [] left it to trial judges to exercise their discretion in evaluating its usefulness in any particular case." 755 F.3d 547, 554 (7th Cir. 2014). Here, where there is ample evidence of the rates paid for municipal ADA class actions in the Chicago market (Section IV.A.5., *infra*., discussing the City's counsel's rates) there is no reason to rely upon the twice flawed Laffey Matrix. Together, these out-of-state citations amount to little.

### 4. DRA's Chicago Market References Are Unhelpful and Irrelevant.

DRA seeks to bolster its claim of Chicago-market rates with the Declarations of Attorneys Sarah Grady and Laura Feldman and the Real Rate Report. Plaintiffs' Memo at 9-10. None of these references support applying DRA's full "on paper" rates to a municipal ADA class action like this one. Likewise, DRA's argument for inflation adjustments only serves to demonstrate that DRA's full rates have increased ahead of inflation in recent years. *Id*. at 10-11.

Attorney Grady argues that DRA's full rates fit the Chicago market based largely on a single Central District case, *Metcalf v. Burke*, No. 18-cv-3260-SEM, (C.D. Ill. Feb. 19, 2024), in which Grady was awarded fees at a rate of $900 per hour after a favorable jury verdict. Grady Decl. (Dkt. 385-4) at ¶¶ 8-10. However, *Metcalf* was a prisoner's rights case seeking and receiving a large monetary award for a single plaintiff, and not an ADA class action seeking injunctive relief

15

from a municipality. *Id*. at ¶ 8. Nor does Grady claim any experience with the ADA or class actions. Moreover, while the defendant in *Metcalf* disputed the hours claimed by plaintiffs' counsel, it did not dispute Grady's rate and the court did not closely examine the same. Opinion and Order in *Metcalf*, at 4, attached as Exhibit 5 hereto. This unrelated case aside, Grady seems simply to be a friend and admirer of DRA. She also tellingly opines only that DRA's rates accord with Chicago market rates for "complex litigation," without specifying whether that means complex commercial litigation paid by corporate clients or something else. Grady Decl. at ¶ 14.

Like Proskauer's Edward Young, Attorney Feldman is an employment attorney. Feldman Decl. at ¶¶ 4, 11. She admires DRA and is a longtime personal friend of DRA's Rachel Weisberg. *Id*. at ¶¶ 18-19. Feldman does not claim any experience or expertise with the ADA or class actions. And like Attorney Grady, she opines only that DRA's rates are in line with Chicago market rates for the broad and undefined area of "complex litigation." *Id*. at ¶ 21.

DRA claims that the Wolters Kluwer "Real Rate Report" for 2022 is probative of its rates. Plaintiffs' Memo at 9-10; Weisberg Decl. at ¶¶ 28-29. The Real Rate Report claims to be based on actual attorney invoices, and reports First Quartile ("1Q"), Median, and Third Quartile ("3Q") rates for attorneys across a number of categories, but provides no guidance as to how to hybridize different rates that could apply to the same attorneys. Real Rate Report at 227.[7]

For example, DRA cites the Third Quartile rates[8] for Chicago Associates and Partners divided into tiers by years of experience (Real Rate Report at 24-25); these rates do not distinguish

---

[7] Plaintiffs have allowed the City to review the Real Rate Report on condition that the City not attach the document to its Response due to copyright concerns. Upon request, Plaintiffs will prove the Court with a copy under seal.

[8] Any claims about the elite nature of DRA's legal practice should be taken with a grain of salt, including its claims to third quartile rates in the Real Report. DRA has "no charged" all hours recorded by 13 timekeepers who billed less than 25 hours. Plaintiffs' Memo at 12. Then DRA claimed fees for ten legal personnel (eight attorneys and two paralegals). *Id*. at 8. Of the ten that DRA seeks fees for, only two attorneys (Attorneys Reichman and Weisberg) and

16

between industries, practice areas, or size of firm. Other rates parse between such categories, but not by market. Many categories have nothing to do with the subject matter of this litigation, but two are instructive. The only category to address civil rights law in any way is the "Employment and Labor: ADA" detailed practice area (p. 48), which pegs Litigation Partners at $446 (1Q), $502 (Median), and $634 (3Q), and Litigation Associates at $340 (1Q), $372 (Median), and $415 (3Q). These rates are substantially lower than those claimed by DRA. Likewise, the Firm Size category, "50 Lawyers or Fewer"[9] table (p. 61) lists Litigation Partners at $265 (1Q), $345 (Median), and $450 (3Q), and Litigation Associates at $195 (1Q), $250 (Median), and $325 (3Q). These Firm Size rates are lower still. In short, the Real Rate Report does not address municipal ADA class actions at all, does not address firms like DRA that are never paid by clients, and suggests that DRA has ignored several lower-value rate categories equally applicable to its work.

DRA claims it should get the benefit of inflation when the Court considers past rates and applies an inflation calculator to four opinions from the Northern District. Plaintiffs' Memo at 10-11. There are two problems with DRA's analysis. First, none of the cited cases are municipal ADA class actions. Second, inflation cuts both ways. Many of the same attorneys for whom DRA seeks an award of fees in this case—Torie Atkinson, Christina Brandt-Young, Michelle Caiola, Jelena Kolic, and Stuart Seaborn—worked on the New York APS case, in which DRA moved for an award of fees based on their alleged full rates in 2022. Ex. 3, NYC Fee Memo, at 15. Applying DRA's own inflation calculator to its 2022 rates shows that its claimed rates have increased at a rate well above inflation. For example, Jelena Kolic claimed to bill $500 per hour when seeking

---

one paralegal (Mr. Trainor) are still with the organization. DRA "Staff and Leadership" Webpage (URL *supra*.). For a crack, specialist organization, DRA appears to suffer a lot of turnover.

[9] DRA currently has 13 Attorneys, two Fellows (also attorneys) and 5 paralegals; 20 legal personnel in all. DRA "Staff and Leadership" webpage, *available at* https://dralegal.org/staff-and-leadership/ (last visited Nov. 11, 2025).

an award in the NYC APS Case in 2022. *Id*. Plaintiffs' inflation calculator yields an inflation-adjusted $550.60 per hour.[10] Yet Plaintiffs seek $785 per hour for Attorney Kolic, a 63% increase in claimed billing rate in just 3 years. Plaintiffs' Memo at 8.

### 5. The City's Outside Counsel Provides the Most Relevant Evidence of Chicago Market Rates for this Type of Litigation.

If DRA is having trouble finding apples-to-apples rate comparisons in the Chicago market, perhaps it is because it claims to be "the <u>only</u> public interest firm in Chicago that specializes exclusively in high-impact disability rights litigation on behalf of persons with all types of disabilities." Weisberg Decl. at ¶ 15 (emphasis added). However, DRA is demonstrably <u>not</u> the only firm in Chicago that handles this type of litigation. The City's outside counsel in this case, Fox Rothschild LLP, charged the City a uniform rate of $295 per hour for all attorneys and $110 per hour for all paralegals. Ex. 1, Payne Decl. at ¶ 13. Through May 29, 2025, Fox Rothschild billed the City for 7,289.30 hours at a total cost of $2,126,733.00 for a blended realized rate of $291.76 per hour, as well as $198,081.76 in costs.[11] *Id*. at ¶ 14.

Fox Rothschild's rates in this case are not an anomaly. The same rates are being changed in two other ADA class actions now pending in this District: *Access Living of Metropolitan Chicago v. City of Chicago*, No. 1:18-cv-03399, and *Lane et al. v. City of Chicago*, No. 1:25-cv-10880. Ex. 1, Payne Decl. at ¶¶ 15-16. Moreover, in other markets, Fox Rothschild has charged rates well below DRA's alleged rates for municipal ADA cases. These include rates of $425 for partners and $250 for associates billed to the City of Pittsburgh through April of 2022 in *Freedom*

---

[10] Applying the Federal Reserve Bank of Minneapolis, Inflation Calculator, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator, as of November 16, 2025.

[11] The City produced its bills to Plaintiffs several months ago in accordance with Local Rule 54.3. However, at that time two monthly bills, those for December of 2019 and March of 2020 could not be found. These were belatedly produced to Plaintiffs on November 12, 2025. To the extent there are minor differences reported in Plaintiffs Memo and this Response, it is likely due to this issue.

*Unlimited, Inc. et al. v. City of Pittsburgh*, No. 2:12-cv-01600 in the Western District of Pennsylvania, and maximum rates of $510 for partners and $355 for associates billed to the City of Los Angeles through August of 2019 in *United States ex rel. Ling et al. v. City of Los Angeles*, No. 2:11-cv-00974 in the Central District of California. *Id*. at ¶¶ 17-18. And in each of these cases, Fox Rothschild's stated rates are the rates it is actually paid. *Id*. at ¶ 19.

In conclusion, the real-world experiences of the City's counsel and Plaintiffs' counsel are remarkably similar in this case. The City's counsel billed 7,289.30 hours and Plaintiffs' counsel seek payment for 7,412.10 hours.[12] *Compare* Ex. 1, Payne Decl. at ¶ 14 *with* Plaintiffs' Memo at 12. The City was charged a blended rate of $291.76, while DRA typically receives a blended realized rate of $287.80. Section IV.A.1., *supra*. The incongruity is that DRA seeks payment at much higher rates; rates that exist only on paper, no one pays, and DRA has not shown it ever receives. For these reasons, DRA should be paid based on the best evidence provided of "the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question," *i.e.*, the rates paid by the City in this case. *Uphoff*, 176 F.3d at 407.

**B.      Proskauer's Claimed Rates Are Unreasonably High, as they Are Based Out-of-State Authorities and Unrelated Practice Areas.**

Proskauer's proposed rates are similarly unreasonable because they are unconnected to the Seventh Circuit's requirement that reasonable rates be based on the community where the litigation occurs and "type of work in question" *Uphoff*, 176 F.3d at 407.

---

[12] For much of the case, the City has had to respond to separate, if similar, briefs filed by Plaintiffs and the United States. For this reason, the City's hours billed should be substantially <u>more</u> than Plaintiffs, and not 122.8 less.

19

Unlike DRA, Proskauer Rose does not have a practice dedicated to ADA lawsuits against municipalities.[13] Proskauer Website, Practices page, *available at* https://www.proskauer.com/services#practices (last visited Nov. 12, 2025). Illinois caselaw supports a distinction between rates for the type of work being performed and rates for unrelated work. *See, e.g.*, *First Midwest Bank*, 337 F.Supp.3d at 790 (holding that relevant frame of reference for fee award rate is civil rights litigation, not commercial litigation); *Fields v. City of Chicago*, No. 10-C-1168, 2018 WL 253716, *3 (N.D.Ill Jan. 1, 2018) ("The Court also declines to rely on an affidavit submitted by Bruce Meckler regarding rates for attorneys in commercial litigation. The relevant frame of reference is civil rights / police misconduct litigation, not commercial litigation."); *Kurgan v. Chiro One Wellness Centers LLC*, No. 10–cv–1899, 2015 WL 1850599, *3 n. 2 (N.D.Ill. April 21, 2015) (stating other factors will be considered where firm submits evidence of regular rates in a different type of lawsuit to support fee award). Instead, this case appears to have been handled under Proskauer's *Pro Bono* Committee, of which lead attorney Edward Young is a member. Young Decl. (Dkt. 385-2) at ¶ 6; Proskauer Website, *Pro Bono* page, *available at* https://www.proskauer.com/for-good/pro-bono (last visited Nov. 12, 2025). Indeed, updates on this case are posted to Proskauer's *pro bono* blog, titled "For Good." Proskauer Website, For Good page at posts dated June 26, 2025, April 28, 2023, March 17, 2022, and Sept. 26, 2019, *available at* https://www.proskauerforgood.com/ (last visited Nov. 12, 2025).

A *pro bono* department might be expected to provide representation without compensation. *See Pro Bono* definition, Black's Law Dictionary (12th ed. 2024) (defining the term to mean "Uncompensated, esp. regarding free legal services performed for the indigent or for a public

---

[13] Proskauer has tacitly admitted its lack of subject matter expertise by seeking Laffey Matrix rates instead of the rates Proskauer attorneys bill and are presumably paid for other work. Plaintiffs' Memo at 7.

20

cause"). Instead, Proskauer seeks $2,054,673 in fees for 3,206.21 hours, with rates pegged to the Laffey Matrix. Plaintiffs' Memo at 5, 7. The limitations of the Laffey Matrix, a compilation of out-of-state rates unrelated to any specific type of work, have been discussed above. Section IV.A.3., *supra*. Proskauer invokes Attorney Brown in support of its claimed rates. Plaintiffs' Memo at 7. His lack of knowledge of municipal ADA class actions in the Chicago market was also discussed above. Section IV.A.3., *supra*. The only other authorities Proskauer cites in its support are two California actions in which the full fees of other firms were approved by courts. Plaintiffs' Memo at 7-8, *citing Bloom* and *Navarro*. However, as discussed above in detail, both of these cases follow DRA's pattern of settling at a deep discount, so that rates are not challenged. Section IV.A.1., *supra*. Indeed, plaintiffs' counsel in *Bloom* received a realized blended rate of $322.65 per hour, while those in *Navarro* received $353.81 per hour. *Id*. Both realized rates are below all of the attorney billing rates sought by Proskauer in this case, which range from $1,141 to $581 per hour. Plaintiffs' Memo at 7.

In short, Proskauer cites nothing to support its claimed rates to address the Seventh Circuit's requirement that claimed rates be linked to those in the community for the same type of work. *Uphoff*, 176 F.3d at 407. As with DRA's claimed rates, the best evidence before the Court are the rates the City has paid its counsel in this case and other municipal ADA class actions. Section IV.A.5., *supra*.

C.    Plaintiffs' Claimed Hours are Unreasonable.

District Courts should exclude from fee calculations hours that were not reasonably expended, including "hours that are excessive, redundant, or otherwise unnecessary." *Warfield*, 733 F.Supp.2d at 959 *quoting Hensley*, 461 U.S. at 434. In this case, Plaintiffs incurred unnecessary and duplicative hours by employing two law firms, and by performing work duplicative of Plaintiff-Intervenor the Unites States during the period when it led the case.

21

Plaintiffs also unnecessarily prolonged the litigation beginning in early 2023 by making and sticking to unrealistic settlement demands and by refusing to consider real world APS-related design, engineering, and construction issues.

### 1. Plaintiffs Unreasonably Billed Hours Arising From Their Two Law Firms.

Plaintiffs have made much of DRA's expertise in municipal ADA class actions, but they have done little to explain why a second firm, Proskauer, is involved. From an hours perspective, however, the result is ███████████████████████████████████████. *See, e.g.,* Proskauer Bills (Dkt. 385-3) at lines █████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ Variable and shifting wording in time entries makes it difficult to identify all such interactions, so there are likely many more. This issue inexplicably multiplied when the United States entered the case and Plaintiffs took a secondary role.

### 2. In 2023, 2023, and 2024, Plaintiffs Unreasonably Billed Hours Redundant of the United States' Work.

Plaintiffs' hours were unreasonable from January 5, 2022, through January 20, 2025, when Plaintiffs took a backseat to the United States, yet continued filing redundant briefs, preparing for depositions they did not take, and otherwise billing to the fullest. Plaintiffs should receive payment for only <u>half</u> of their hours claimed during this time, a reduction of 1,398.65 hours as apportioned in the parties' Joint Local Rule 54.3(e) Statement (Dkt. 385-2, Ex. 1 thereto).

Described in detail in Section II. C., *supra.*, for over three years the United States took the lead in prosecuting this action. The United States took the depositions of all nine expert and/or

remedial phase fact witness noticed by Plaintiffs and the United States, with Plaintiffs asking only a few minutes of follow-up questions, or sometimes none at all. Ex. 1, Payne Decl. at ¶¶ 9-11. Moreover, during liability summary judgment and proposed remedial plan briefings, the United States and Plaintiffs pursued materially the same legal theories, asserted the same facts, used shared expert witnesses, and submitted a joint proposed remedial plan, yet Plaintiffs continued to file separate briefs making largely duplicative arguments. *Compare* Plaintiffs' MSJ Memo (Dkt. 190) *with* United States MSJ Memo (Dkt. 187); *see also* United States' and Plaintiffs' [Joint] Remedial Plan (Dkt. 281, 286); *compare also* Plaintiffs' Remedial Memo (Dkt. 283) *with* United States' Remedial Memo (Dkt. 289). This resulted in three separate entities billing where only one was required. In each case, the City was forced to respond, usually separately, to the slight, meaningless variations to the United States' arguments offered by Plaintiffs.

Plaintiffs protest that during summary judgment they uniquely argued and won on an "effective communication" theory. Plaintiffs' Memo at 13; Plaintiffs' MSJ Memo at 23-25 (Dkt. 190). This is the exception that proves the rule. Also, this theory was itself redundant in that it neither sought nor won the class any additional relief. Even if Plaintiffs felt the need to make this argument, they did not need to also repeat the United States' arguments on other grounds. Plaintiffs also misleadingly claim to have taken the lead in many events occurring after the United States intervened on April 14, 2021 (Dkt. 74). Plaintiffs' Memo at 13; Young Decl. at ¶ 13. However, all such events occurred during fact discovery and class certification, before the start of the United States' ascendancy on January 5, 2022, and are irrelevant to the City's argument. Ex. 1, Payne Decl. at ¶ 12. Plaintiffs do not fundamentally dispute the City's position on the period of the United States' ascendancy, as evidenced by Attorney Young's concession that Plaintiffs' role in depositions during this period was secondary. Young Decl. at ¶ 15.

23

During this period, there was no need for Plaintiffs to continue acting—and billing—as though they were the only party pressing the case against the City. Their redundant hours between January 5, 2022, and January 20, 2025, should therefore be collectively halved, and Plaintiffs should only be compensated for the reduced hours totals listed in Section B of the parties' Joint Local Rule 54.3(e) Statement (Dkt. 385-2, Ex. 1), a reduction of 1,398.65 hours.

### 3. Plaintiffs Prolonged the Litigation by Standing on Unachievable Demands and Refusing to Engage with APS Design, Engineering, and Construction.

The City forcefully advocated for its positions when necessary; this is not disputed. However, Plaintiffs' characterization of the City as unjustifiably extending this litigation (Plaintiffs' Memo at 12-13) is not only false, it gets the situation exactly backward. It was Plaintiffs, acting with the United States, who unnecessarily prolonged this litigation by repeatedly insisting on a remedy—adding APS to 100% of the City's intersections in just 10 years—that was unachievable by the City and ultimately rejected by the Court, and by refusing to take seriously APS design, engineering, and construction realities.

First, it should be noted that before this suit was filed, the City had already instituted a policy of including APS with newly signalized intersections and traffic signal modernizations, and had begun a pilot project to jump start APS installations.[14] Section II. A., *supra*. Consequently, the stakes in this litigation were never <u>whether</u> the City would install APS at many of its signalized intersections, but rather <u>how many and how fast</u>.

---

[14] This should be kept in mind when Plaintiffs claim that the costs to the City of implementation of the Remedial Plan Order should be analogized to a massive cash judgment. Plaintiffs' Memo at 14. The Individual Plaintiffs in this case received no damages, and much of the cost of implementing the remedial plan would have been spent by the City anyway, if over more years.

Described in Section II.D., *supra*, in 2023 the parties engaged in settlement negotiations regarding a remedial plan.[15] On February 23rd, the City provided a written Settlement Proposal, proposing a dedicated APS Program, to include APS with 70% of the City's signalized intersections within fifteen years and to meet annual targets for the first ten years that are remarkably similar to those in the Court's Remedial Plan Order. *See* table in Section II.D., *infra*.; Ex. 2, Hendricks Decl. at ¶¶ 12-14. On March 21st, the parties met for a lengthy negotiation settlement, largely to discuss the City's proposal. *Id*. at ¶ 15. Importantly, CDOT's Mr. Burke and Mr. Carney actively participated precisely to explain the bases for the City's proposal, including the design and construction challenges that make it difficult and often impossible to quickly install APS. *Id*. at ¶ 16.

Plaintiffs and the United States' joint response on May 12th was an unworkable proposed Consent Order drafted by lawyers, blindly demanding the City to install APS at 100% of the City's intersections in only ten years, with annual targets peaking at 375 per year. Ex. 2, Hendricks Decl.

---

[15] Plaintiffs may object that these settlement negotiations cannot be considered by the Court under Federal Rule of Evidence 408. This is false. Rule 408 only prohibits such evidence "to prove or disprove the validity or amount of a disputed claim[.]" In this case, the settlement negotiations in 2023 related to the underlying issues of this case, and not Plaintiffs' attorney fees.

The Seventh Circuit has ruled that Rule 408 permits "other purpose" uses in collateral proceedings, and that courts must "consider the spirit and purpose of the rule and decide whether the need for the settlement evidence outweighs the potentially chilling effect." *Zurich Am. Ins. Co. v. Watts Indus., Inc*., 417 F.3d 682, 689-91 (7th Cir. 2005) (affirming consideration of a settlement letter from a related dispute for the purpose of showing the existence of an arbitrable disagreement, and not liability). The *Zurich* Court held that admitting settlement communications is especially appropriate when those communications "arise out of a dispute distinct from the one for which the evidence is being offered." *Id.* at 689–90. In this case there is no chilling effect as the relief being negotiated in 2023 was unrelated to Plaintiffs' claimed fees.

Likewise, the Third Circuit holds that courts may consider settlement negotiations when awarding fees as a measure of "degree of success." *Lohman v. Duryea Borough*, 574 F.3d 163, 167–69 (3d Cir. 2009); *see also Benson v. Giant Food Stores*, 2011 WL 6747421, at *5–7 (E.D.Pa. Dec. 22, 2011) (allowing defendant to rely on a "settlement brochure" in litigating a fee request, and concluding that Rule 408 did not bar the evidence when offered to show litigation conduct and bad-faith inflation of claims); *Parallel Iron v. NetApp*, 84 F. Supp. 3d 352, 359–60 (D. Del. 2015) (rejecting a Rule 408 objection where settlement materials were proffered in connection with a fee motion, noting they were not used to prove the amount of the disputed claim).

at ¶ 17. By contrast, the Court's Remedial Plan Order (Dkt. 365) gives the City 15 years and 7 months to do the same. Dkt. 365 at § II.C. Plaintiffs also demanded that APS be added contemporaneously with basic, unrelated, and technically simple upgrades like leading pedestrian intervals, and that APS be added during many basic repairs. Ex. 2, Hendricks Decl. at ¶ 18. The Remedial Plan Order largely does away with such requirements. Plaintiffs further demanded that unlimited APS be added in response to community requests in 90 days or less, a requirement completely at odds with the work needed to install APS. *Id*. at ¶ 19. The Remedial Plan Order gives the City a realistic 12 to 24 months, and possible relief if more than 25 requests are received in a single year. Dkt. 265 at § III.A.2.a. In short, Plaintiffs demanded relief far exceeding what was possible and/or ultimately granted by this Court. In so doing, Plaintiffs revealed that they had no conception of the design, engineering, and construction work involved in APS installation, nor did they care: they never considered the timetables needed to accomplish these things.

On June 6th, the parties, again joined by CDOT's Mr. Burke and Mr. Carney, met to discuss settlement and the proposed Consent Order. Ex. 2, Hendricks Decl. at ¶ 20. Mr. Burke and Mr. Carney again explained that many elements of the proposed Consent Order were simply infeasible. *Id*. at ¶ 21. The discussion grew contentious when Plaintiffs and the United States refused to disclose what steps, if any, they had taken to ensure that its terms were capable of being met by the City. *Id*. at ¶ 22. A representative of the United States claimed that it was not up to Plaintiffs and the United States to consider feasibility. *Id*. at ¶ 23. With Plaintiffs' and the United States unwilling to move off their demands, the case proceeded to remedial phase briefing.

In May of 2022, Plaintiffs produced a traffic engineer, Michael Cynecki, as a rebuttal expert witness regarding APS design and engineering. Expert Rebuttal Report of Michael Cynecki (Dkt. 220-4). Plaintiffs' bills show ████████████████████

██████████████████████. Weisberg Decl., Ex. 6, lines ██████; Young Decl. at Ex. 2, lines ██████. But ██████████████████████████████████████████████████████████████████. Perhaps ████████████████████████ ██████████.

Plaintiffs and the United States submitted a single, joint Proposed Remedial Plan (Dkt. 281, 286), unsurprisingly demanding that the City install APS at 100% of signalized intersections in ten years. This Joint Remedial Plan was unsupported by any witness knowledgeable about APS engineering, design, or installation. Instead, Plaintiffs and the United States' expert witness on the orientation and mobility (O&M) of blind persons, Linda Myers, vaguely and unhelpfully opined without support or qualification that "Chicago needs to take its obligations seriously and tackle remediation with enthusiasm and ambition." Declaration of Linda Myers in Support of Remedial Plan (Dkt. 284, 287) at 24; *see also*, the City's Response in Opposition to Plaintiffs' and the United States' Joint Proposed Remedial Plan (Dkt. 309) at § II.C.2. (titled "Optimism is Not a Plan"). Plaintiffs ██████████████████████████████████████████████████████████. Weisberg Decl., Ex. 6, lines ████████████████. However, Plaintiffs' bills show ████████ ██████████████████████████████████████████████████. Again, ██████████ ████████████████████████████████████████.

After the 2023 settlement negotiations, the City anticipated that Plaintiffs' and the United States' unmeetable demands and failure to engage with APS design, engineering, and construction would be reflected in their proposed remedial plan. The City therefore submitted eight sworn

declarations in support of its Proposed Remedial Plan, including those of CDOT engineers Mr. Burke (Dkt. 278), Anne Zhang (275), Abraham Emmanuel (277), David Gleason (280), and David Miller (288), as well as CDOT funding expert Grant Davis (274), expert O&M witness Robert Wall Emerson (282), and expert witness and Portland, Oregon, APS program head, Peter Koonce (276). Plaintiffs and the United States countered only with O&M expert Ms. Myers (Dkt. 284, 287), and no one knowledgeable about APS design, engineering, or construction.

The City's February 2, 2024, Response in Opposition to Plaintiffs' and the United States' Joint Proposed Remedial Plan (Dkt. 309) was supported by three additional declarations, by Mr. Gleason (310), the head of CDOT's Department of Electrical Operations (responsible for APS repairs and maintenance) Craig Turner (311), and Mr. Davis (312). Plaintiffs and the United States countered with… nothing. Other than nit-picking the City's declarants in their briefs, Plaintiffs and the United States ceded the field on APS design, engineering, and construction. Attorney Young claims that working on this case "required understanding and facility with […] traffic signaling, street construction…" Young Decl. at ¶ 9. This is true; the City provided Plaintiffs' counsel with this "understanding and facility" at great cost. Yet Plaintiffs now ask the City to pay again for their education.

Put simply, had Plaintiffs taken seriously the City's and CDOT's actual capabilities and the design, engineering, and construction challenges involved with APS—matters repeatedly put to them by Mr. Burke, Mr. Carney, and the City's Settlement Proposal in the first half of 2023— Plaintiffs could have engaged in a meaningful and informed way and had a settlement much like the Court's Remedial Plan Order. Inexplicably, they instead set aside Mr. Cynecki, doubled down on unrealistic demands, and racked up millions in attorney fees over a further two years.

28

### D.    Plaintiffs' Counsel's Work in this Case Was Not Novel.

Plaintiffs claim their theories in this case were "novel." Plaintiffs' Memo at 12; Young Decl. at ¶¶ 9, 31. This argument appears to be offered to excuse their unreasonable number of hours billed, as Plaintiffs do not seek to adjust their lodestar based on the alleged novelty of this case. *See, e.g., Spellan v. Board of Educ. for Dist. 111*, 59 F.3d 642, 645 (7th Cir. 1995), *citing Hensley*, 461 U.S. at 430 n. 3 (prevailing party may seek adjustment of its lodestar based on factors including "the novelty and difficulty of the questions"). This claim is false. As the Court knows, DRA has a long history of seeking broad-based relief from municipalities on programmatic access theories, and all parties to this action have constantly operated in the wake of the NYC APS Case.

### 1.    Plaintiffs' Work Was Derivative of Decades of Other System-Wide ADA Cases Brought by DRA.

For decades, DRA has regularly claimed that municipalities are violating the rights of disabled persons based on programmatic access theories. DRA received a favorable judgment from the Ninth Circuit in *Barden v. City of Sacramento* on this point and has been reraising the theory ever since. 292 F.3d 1073, 1076 (9th Cir. 2002) (finding that Sacramento's sidewalks, writ large, are a single "program" under the ADA, and not a series of "facilities"). DRA has sued municipalities repeatedly on this theory, applying it to sidewalks, curb ramps, "pedestrian routes," "pedestrian rights-of-way," and now APS. DRA Website, Cases page, generally, *available at* https://dralegal.org/cases/ (last visited Nov. 12, 2025); Weisberg Decl., at ¶ 16. This theory was the basis of the NYC APS Case, this action, and DRA's new lawsuit against the City, *Lane et al. v. City of Chicago*. Complaint in NYC APS Case (Dkt. 1) at ¶ 96, attached as Exhibit 6 hereto; First Amended Complaint in this action (Dkt. 15) at ¶ 72; Complaint in *Lane* (Dkt. 1) at ¶ 134, attached as Exhibit 7 hereto. Put simply, in this action DRA walks a well-trod path.

29

### 2. Plaintiffs' Work Was Derivative of, and Followed Behind, the NYC APS Case.

Plaintiffs' claim to novelty is rendered completely implausible by the existence of the NYC APS Case. Filed more than a year ahead of this action, that case was based on the same law, the same technology, the same programmatic access theory, and some of the same attorneys. Parties to this case, including DRA and the Court, regularly cited to the NYC APS Case. *See*, *e.g.*, Plaintiffs' MSJ Memo (Dkt. 190) at 4, 20-22; Memorandum Opinion and Order (Dkt. 248) at 11-14, 16-18, 22, 26-27, 35; Plaintiffs' Remedial Memo (Dkt. 283) at 5, 9-10, 17-18, 20, 23, 25.

Most damning is that when seeking fees in the NYC APS Case, DRA argued that its claims in that case were novel. Ex. 3, NYC Fee Memo, at 24-25. Claims of serial novelty may be a lucrative and tempting concept when seeking fee awards, but the Court need not credit them.

### V.    Conclusion.

WHEREFORE, for the grounds stated above, the City respectfully requests that the Court award Plaintiffs $1,711,409.77 in attorney fees ($878,889.50 to Disability Rights Advocates and $832,520.27 to Proskauer Rose LLC) and $247,159.77 in costs (to Proskauer Rose LLP).

30

Dated: November 17, 2025

MARY RICHARDSON-LOWRY,
Corporation Counsel for the City of Chicago


By:     /s/  Matthew Scot Payne
        Attorney for Defendant the City
        of Chicago

JOHN L. HENDRICKS
John.Hendricks@cityofchicago.org
Managing Deputy Corporation Counsel Litigation
ANDREW WORSECK
Andrew.Worseck@cityofchicago.org
Deputy Corporation Counsel
City of Chicago Law Department
121 North LaSalle Street, Suite 600
Chicago, IL 60602
Phone: (312) 744-6975 / 744-7220

JOHN C. HANSBERRY
(admitted *pro hac vice*)
jhansberry@foxrothschild.com
MATTHEW SCOT PAYNE
mpayne@foxrothschild.com
LAURA CAPLIN
lcaplin@foxrothschild.com
NATHAN MARKETICH
(admitted *pro hac vice*)
nmarketich@foxrothschild.com
Fox Rothschild LLP
321 N. Clark Street, Suite 1600
Chicago, Illinois 60654
Phone (312) 517-9200

31