# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND OF METROPOLITAN CHICAGO, ANN BRASH, MAUREEN HENEGHAN, and RAY CAMPBELL, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br>-against-<br><br>CITY OF CHICAGO,<br><br>        Defendant.<br>_____<br><br>UNITED STATES OF AMERICA<br><br>        Plaintiff-Intervenor,<br><br>-against-<br><br>CITY OF CHICAGO,<br><br>        Defendant. | Civil No. 1:19-cv-06322<br><br>Judge LaShonda A. Hunt |

**DECLARATION OF JOHN L. HENDRICKS**

I, John L. Hendricks, declare and state as follows:

1. I am currently Managing Deputy Corporation Counsel for Litigation in the City of Chicago Law Department.

2. I have been with the City's Law Department since 2016 and in this role since 2021.

3. I have been counsel of record for the City of Chicago ("City") on this case since August 19, 2022 (Dkt. 195) and have supervised this action for the City.

4. I was also a direct participant in the settlement negotiations described below.

5. As such, I have relevant experience regarding and personal knowledge of the facts set forth in this Declaration and am competent to testify to these facts.

6. This Declaration is offered in support of Defendant's Response Opposition to Plaintiffs' Motion for Attorney Fees and Costs.

7. Beginning before the United States intervened in this case in April of 2021, I was in communication with counsel for the United States regarding this case.

8. The City did not oppose the intervention of the United States.

9. In June of 2022, I communicated with counsel for the United States by phone and requested that he confer with Plaintiffs' counsel to provide an offer of settlement.

10. Shortly thereafter, on or about June 29, 2022, counsel for the United States orally informed me that after consulting with Plaintiffs concerning the most basic terms of a settlement, their joint demand to settle the case was that APS be added to 100% of the City's intersections in 10 years.

11. While I requested a written settlement proposal from Plaintiffs and the United States, none was received.

12. On February 23, 2023, the City sent a written Settlement Proposal to Plaintiffs and the United States. A true and correct copy of the Settlement Proposal is attached as Exhibit 1 hereto.

13. This document, without limitation, (i) to establish a dedicated APS Program, (ii) to include APS with 70% of the City's signalized intersections within fifteen years, and (iii) setting annual installation targets for the first ten years that are remarkably similar to those in the Court's Remedial Plan Order.

2

14. Specifically, the City proposed the following annual targets for APS installation, to begin in 2024:

    a. Year 1: 70
    b. Year 2: 100
    c. Year 3: 125
    d. Year 4: 150
    e. Year 5: 175
    f. Year 6: 200
    g. Year 7: 200
    h. Year 8: 220
    i. Year 9: 220
    j. Year 10: 220
    k. Year 11: 56
    l. Year 12: 56
    m. Year 13: 56
    n. Year 14: 56
    o. Year 15: 56

15. On March 21, 2023, the parties met for a lengthy negotiation settlement, largely to discuss the City's proposal.

16. CDOT's then-Managing Deputy Commissioner and Chief Engineer Daniel Burke and then-First Deputy Commissioner of CDOT, Thomas Carney appeared to explain the basis for the City's proposal, including the design and construction challenges that make it difficult and often impossible to quickly install APS in many cases.

17. On May 12, 2023, the United States, with Plaintiffs' support, sent a proposed Consent Order to the City, requiring installation of APS at 100% of the City's signalized intersections in only ten years, and listing annual requirements peaking at 375 intersections per year. A true and correct copy of the proposed Consent Order is attached as Exhibit 2 hereto.

18. Plaintiffs also demanded that APS be added contemporaneously with basic, unrelated, and technically simple upgrades like leading pedestrian intervals, and that APS be added during many basic repairs.

19. Plaintiffs also demanded that APS be added in response to unlimited community requests, each in 90 days or less.

20. On June 6, 2024, the parties, again joined by CDOT's Mr. Burke and Mr. Carney, met to discuss settlement, focusing on the proposed Consent Order.

21. Mr. Burke and Mr. Carney explained that many elements of the proposed Consent Order were simply infeasible.

22. The discussion grew contentious when Plaintiffs and the United States refused to disclose what steps, if any, they had taken to ensure that the terms of proposed Consent Order were capable of being met by the City.

23. A representative of the United States claimed that it was not up to Plaintiffs and the United States to consider feasibility.

24. After the June 6th meeting, and throughout the rest of 2023, it is my understanding that Plaintiffs and the United States refused to lessen the demands stated in their proposed Consent Order.

25. Specifically, Plaintiffs and the United States refused to budge from their demand for 100% APS installation in 10 years.

26. At this point the parties proceeded to their respective proposed remedial plans, and there were no further settlement negotiations at this time.

27. The harsh terms of Plaintiffs and the United States proposed Consent Order were repeated in large part in their joint Proposed Remedial Plan.

4

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 17, 2025 in Chicago, Illinois.


      /s/ John L. Hendricks
      John L. Hendricks

# Exhibit 1

City of Chicago / Chicago Department of Transportation

American Council of the Blind of Metropolitan Chicago, et al. v. Chicago

## Settlement Proposal

February 23, 2023

## Overview

The City of Chicago acting through the Chicago Department of Transportation (CDOT) proposes to install Accessible Pedestrian Signals (APS) at 60% of its approximately 2800 signalized intersections with pedestrian signals within ten (10) years and install APS at 10% of the remaining signalized intersections within an additional five (5) years.

CDOT proposes to establish a dedicated APS Program which would engage an engineering design consultant and construction contractor to implement the program; prepare implementation standards and guidelines; develop construction bid documents; establish and implement a prioritization methodology; prepare construction shop drawings; and install APS.

The APS Program will kick off in 2023 with preparation of standards, guidelines, processes, and bid documents followed by Construction kick off in 2024.

APS installations will also continue independently as part of CDOT's ongoing capital projects and these will be counted towards the overall APS program goals.

Local funding in the form of Capital Bond or TIF funding will be utilized initially. The City may seek supplementary funding in the form of Federal and State grants available for programs of this nature.

## Prioritization Methodology

Installation prioritization of APS at particular intersections will utilize the criteria set forth in the National Cooperative Highway Research Program (NCHRP*), Accessible Pedestrian Signals: Guide to Best Practices* for APS location selection to focus prioritization of locations based on intersection configuration, signalization phasing, proximity to transit facilities, facilities for the visually impaired and major pedestrian attractions. Working with the Mayor's Office of Peoples with Disabilities, we will solicit and receive feedback from impacted stakeholder groups for the identification of the other priority areas. Equity and addressing the need for APS in historically underserved communities will also be a consideration.

## Implementation Protocol

The APS Program will initially focus on three implementation tracks within prioritized locations – 1. Implementation of low-complexity installations; 2. Development and release of standard guidelines to allow direct design/build by construction contractors of medium-complexity APS installations; 3. In-depth development and release of full construction plan sets for high-complexity APS installations.

CDOT does not possess sufficient in-house staff resource and will rely primarily on professional services and construction contractors to implement the goals of the APS Program. Additional time in the implementation process must be allocated in order to ensure a competitive and transparent procurement process of the necessary design and construction contracts.

Once the necessary implementation contracts are in place, and in order to start on any of the three implementation tracks, an initial prioritization will be conducted to identify the complexity of all potential APS installations.

### Low-Complexity

Upon identification of a sufficient quantity of low-complexity installations, work orders for APS installation will be released to contractors holding existing construction term contracts. Advanced material orders will be placed of basic material needs prior to release to allow the contract to install APS as efficiently as possible.

### Medium-Complexity

This will include locations which require new or relocated pushbutton posts and/or reconfigured curb ramps but can otherwise be installed by contractors using standard construction details to be developed up front by the engineering design consultant.

### High-Complexity

This will include locations with complex grading and geometry; locations with incompatible signal infrastructure and controllers requiring upgrade; and locations on bridges, other structures, or vaulted sidewalks. In addition, up to 180 signalized intersections in Chicago are operating with mechanical controllers and obsolete equipment – these intersections will be reviewed for traffic signal warrants and removed or modernized as needed.

### Implementation Mechanisms

CDOT expects to have flexibility and capacity in existing engineering design contracts and task orders to effectively initialize the APS program while dedicated new task orders are ushered through procurement and brought online to formally start the program.

CDOT further expects to have sufficient capacity in at least one existing signal construction term contract to begin material procurement and begin construction of low-complexity APS installations as they are identified and released.

CDOT has experienced extreme unprecedented delays in material supply in the last 2-3 years. While this is expected to be a continuing problem, CDOT will attempt to alleviate this by placing advance material orders for APS pushbutton units and related material through existing construction term contracts.

## Timeline

CDOT proposes to start preparations for the APS Program immediately. Initial procurement of professional engineering design services is estimated to start in the 3rd Quarter of 2023 with commencement of design work and construction occurring thereafter.

*Design*

Design work consisting of intersection prioritization; preparation of low-complexity installation guidelines; and preparation and processing of contact construction bid documents would start in the 4th Quarter of 2023 and continue thereafter.

The second stage of medium-complexity design would begin in the 2nd Quarter of 2024 with development of a design/build process, standards, and requirements; and preparation of further construction bid documents.

The third stage of high-complexity design would begin in the 1st Quarter of 2025 with site condition data collection; preparation of concept designs, traffic signal requirement plans, and construction plans; and preparation of further construction bid documents.

*Construction*

Construction and the start of the ten-year installation timeline for the APS Program would commence in January 2024 with low-complexity intersections. Medium complexity construction would start in 2025. And high-complexity construction would start in 2027.

*Installation Progress*

CDOT proposes the following annual installation targets:

| | | |
|---|---|---|
| Year 1, 2024: 70 intersections | Year 6, 2029: 200 intersections | Year 11, 2034: 56 intersections |
| Year 2, 2025: 100 intersections | Year 7, 2030: 200 intersections | Year 12, 2035: 56 intersections |
| Year 3, 2026: 125 intersections | Year 8, 2031: 220 intersections | Year 13, 2036: 56 intersections |
| Year 4, 2027: 150 intersections | Year 9, 2032: 220 intersections | Year 14, 2037: 56 intersections |
| Year 5, 2028: 175 intersections | Year 10, 2033: 220 intersections | Year 15, 2038: 56 intersections |

## Program Implementation

The above represents our initial planned program implementation strategy. This strategy will need to evolve with changing technology, market and supply conditions in the pursuit of the overall APS program implementation goals. For example, should an effective wireless technology be developed that is equal to or superior to current APS strategies, this may alter the timing and implementation of the program outlined above.

## Forward Compatibility

CDOT will continue to monitor best practices for accessibility for pedestrians at signalized intersections and look at implementing new types of accommodation as developed depending on future recommendations and requirements of the PROWAG and the MUTCD, which may modify the installation timeline above.

# Exhibit 2

**EXHIBIT 1**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION
Civil Action No. 1:19-cv-06322

AMERICAN COUNCIL OF THE BLIND OF
METROPOLITAN CHICAGO, ANN BRASH,
MAUREEN HENEGHAN AND RAY
CAMPBELL, on behalf of themselves and all
others similarly situated,

               Plaintiffs,

UNITED STATES OF AMERICA

               Plaintiff-Intervenor,

-against-

THE CITY OF CHICAGO,

               Defendant.

**CONSENT DECREE**

### I.      INTRODUCTION

1. This Consent Decree resolves the above-captioned civil action brought by Plaintiffs American Council of the Blind of Metropolitan Chicago, Ann Brash, Maureen Heneghan, and Ray Campbell, on behalf of themselves and all others similarly situated (Plaintiffs) and Plaintiff-Intervenor United States of America (United States or Plaintiff-Intervenor), against the City of Chicago (Defendant or the City) under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-34, as amended, the Department of Justice's implementing regulations, 28 C.F.R. Part 35, Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794, and relevant implementing regulations for recipients of federal funding from the Department of Transportation, 49 C.F.R. Part 27.

2. The Plaintiffs and United States brought their complaints against Chicago to remedy the City's failure to provide people who are blind, including those who are deaf-blind or

have low vision, equal access to pedestrian safety information at intersection crossings, which the City provides almost exclusively through visual-only pedestrian signals at approximately 2,800 intersections. The Plaintiffs and the United States alleged that, without accessible pedestrian signals (APS), people who are blind are denied access to Chicago's pedestrian signal program and pedestrian grid.

3. On March 4, 2022, the Court granted Plaintiffs' motion to certify a class consisting of "all blind or low vision pedestrians who use City of Chicago's signalized pedestrian street intersections." ECF No. 150.

4. On March 31, 2023, the Court granted Plaintiffs' and the United States' motions for summary judgment on liability under Title II of the ADA and Section 504 of the Rehabilitation Act. ECF. No. 248 at 24. In particular, the Court found that Chicago's: (1) "current APS distribution does not provide plaintiffs and the class 'meaningful access' to its network of pedestrian signals in violation of the ADA and the Rehabilitation Act," *see* 28 C.F.R. § 35.150(a) (program accessibility mandate for existing facilities); (2) "undisputed failure to equip the vast majority of newly constructed pedestrian signals with APS falls short of the structural accessibility requirements of the ADA and the Rehabilitation Act," *see id.* § 35.151(a)(1) (program accessibility mandate for new construction); (3) failure "to equip the vast majority of its pedestrian signals with APS" violated its obligation to provide reasonable accommodations or modifications, *see id.* § 35.130(b)(7) (reasonable modifications mandate); and (4) failure "to ensure its communications with blind pedestrians are as effective as its communications with sighted pedestrians," violated the ADA and Rehabilitation Act, *see id.* § 35.160 (effective communications mandate). ECF No. 248 at 20-24.

5. The Plaintiffs, United States, and Chicago (collectively, the Parties) agree that it is

2

now in the Parties' best interests, and the United States believes that it is in the public interest, to resolve this lawsuit on mutually agreeable terms. Thus, in order to avoid additional cost and the uncertainty of litigation, the Parties agree to the entry of this Consent Decree without trial or further adjudication of any issues of fact or law raised in the Plaintiffs' and United States' complaints.

Accordingly, the Parties enter into this Consent Decree and the Court APPROVES, ENTERS, AND ORDERS the following:

## II.     JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this ADA and Section 504 action under 28 U.S.C. §§ 1331 and 1345. The Parties agree that venue is proper in this district under 28 U.S.C. § 1391(b) because the claims alleged in this lawsuit occurred in the Northern District of Illinois.

7.     The Court may grant the relief sought in this action pursuant to 42 U.S.C. § 12133, 29 U.S.C. § 794a, and 28 U.S.C. §§ 2201 and 2202.

## III.     PARTIES

8.     Plaintiffs are American Council of the Blind of Metropolitan Chicago, Ann Brash, Maureen Heneghan, Ray Campbell, and a 23(b)(2) class consisting of all blind or low vision pedestrians who use the City of Chicago's signalized pedestrian street intersections.

9.     Plaintiff-Intervenor is the United States of America. The United States, through the Department of Justice, is authorized to enforce Title II of the ADA and Section 504.

10.     Defendant City of Chicago is the largest municipality in the state of Illinois and the third largest city, by population, in the United States. It is a "public entity" within the meaning of Title II of the ADA, and a recipient of federal funding from the Department of Transportation, making it subject to Section 504. As of the date of this Consent Decree, Chicago has constructed,

3

operates, and maintains over 2,800 street intersections with pedestrian signals (signalized intersections), __ of which are equipped with APS.

### IV.    **GENERAL RELIEF**

11.    The City of Chicago shall comply with the requirements of Title II of the ADA, 42 U.S.C. §§ 12131-34, its implementing regulation promulgated by the Department of Justice, 28 C.F.R. Part 35, Section 504, 29 U.S.C. 794, and its relevant implementing regulation promulgated by the Department of Transportation, 49 C.F.R. Part 27, with respect to the City's pedestrian signal program and interconnected pedestrian grid (pedestrian signal program).  The City shall not exclude qualified individuals with disabilities from participation in, or deny such individuals the benefits of, its pedestrian signal program.  28 C.F.R. §§ 35.130, 35.149; 49 C.F.R. § 27.7.

12.    By December 31, 2033, the City shall retrofit every existing signalized intersection in Chicago with APS, 28 C.F.R. § 35.150.  A "signalized intersection" means any street intersection with one or more pedestrian signals that convey information necessary to ensure safe pedestrian crossing, such as a signal head that contains symbols such as a walking person (or "WALK" message) and upraised hand (or "DON'T WALK" message).

13.    All APS will be installed in accordance with the technical specifications set forth in the Manual on Uniform Traffic Control Devices (MUTCD) and the National Cooperative Highway Research Program (NCHRP), Accessible Pedestrian Signals: A Guide to Best Practice, Appendix: Checklist for APS Installations (available at https://perma.cc/UMH7-BZJH at 26-29), or any succeeding technical specifications from the U.S. Departments of Justice or Transportation in effect at the time of installation.  Regardless of whether the City or its contractors/consultants install the APS, the City is responsible for ensuring correct installation and maintenance of APS that complies with the above technical standards and this Consent Decree.  Chicago shall install a

4

brand of APS that best maintains its functionality in Chicago's environment (e.g., most likely to withstand vandalism).

14.     Effective immediately, the City will designate and publish the names of one employee in the Chicago Department of Transportation (CDOT) and one employee in the Mayor's Office for People with Disabilities to serve as points of contact for the Plaintiffs, United States, Certified Orientation and Mobility (O&M) Expert selected pursuant to Paragraph 29, and members of the public regarding the City's progress in implementing this Consent Decree.

## V.     IMPLEMENTATION

15.     Newly signalized intersections: Effective immediately, Chicago will install APS at each intersection it newly signalizes.

16.     Altered signalized intersections: Effective immediately, Chicago will install APS at each intersection at which it performs an alteration to the existing pedestrian signals. An alteration means any change to the usability of a signalized intersection, and for purposes of this Consent Decree includes, but is not limited to, adding or installing the following features or equipment at a signalized intersection:

    a.  An Exclusive Pedestrian Phase, Leading Pedestrian Interval, or Protected-Turn Phase.

    b.  A countdown clock/timer.

    c.  A new or replaced pole, traffic-signal wiring, traffic controller, curb cuts, or any other additions or replacements that require the digging of ground.

17.     Existing signalized intersections: From the effective date of this Consent Decree through December 31, 2033, Defendant will add APS to the following numbers of signalized intersections per year, at a minimum:

5

a. Pre-Phase I: The remainder of 2023: Chicago will install APS at no less than 57 intersections from January 1, 2023 through December 31, 2023.

b. Phase I: Years 1-5 (APS installed at a minimum of 1,030 intersections):

    i. Year 1, 2024: 70 intersections

    ii. Year 2, 2025: 140 intersections

    iii. Year 3, 2026: 220 intersections

    iv. Year 4, 2027: 300 intersections

    v. Year 5, 2028: 300 intersections

c. Phase II: Years 6-10 (APS installed at a minimum of 1,500 intersections):

    i. Year 6, 2029: 375 intersections

    ii. Year 7, 2030: 375 intersections

    iii. Year 8, 2031: 375 intersections

    iv. Year 9, 2032: 375 intersections

    v. Year 10, 2033: up to 375 intersections, so that all signalized intersections in Chicago are equipped with APS by the end of Year 10.

d. In calculating the numbers of signalized intersections retrofitted with APS in any given year, numbers of APS installations in excess of the required targets in this paragraph can be carried over to cover any shortfall in a future year.

18. Maintenance of APS:

a. Routine Maintenance: The City will routinely perform maintenance inspections of all APS at signalized intersections, such that each APS is inspected quarterly, and it will repair or replace APS that are not functioning as intended by design within 30 days of notice that the APS is not functioning as

intended by design.

b. Requests for Maintenance: Members of the public or City officials or employees may submit to the City a request for maintenance of an APS device by calling 311, using the City's APS webpage described in Paragraph 19, contacting a City Alderman, CDOT, or MOPD, or otherwise informing the City. The City will then ensure the request is logged to a central APS webpage accessible to the public as described in Paragraph 19. When the City receives an APS maintenance request, it will list the request on its APS webpage described in Paragraph 19, including the requested location and date of receipt of the request, and complete the requested maintenance within 30 days of the maintenance request.

19. APS webpage: The City will provide and maintain an accessible APS webpage that conforms with the Web Content Accessibility Guidelines 2.1, Level AA (June 5, 2018), published by the World Wide Web Consortium, available at www.w3.org/TR/WCAG/ ("WCAG 2.1 AA," which incorporates the Level A and Level AA Success Criteria). The webpage will:

a. Provide contact information for one CDOT employee who is responsible for receiving and tracking requests for APS installation.

b. Provide contact information for one CDOT employee who is responsible for overseeing the correct installation and maintenance of APS, consistent with the MUTCD and the NCHRP, Accessible Pedestrian Signals: A Guide to Best Practice, Appendix: Checklist for APS Installations (available at https://perma.cc/UMH7-BZJH at 26-29).

c. Provide the locations of each City intersection that is equipped with accessible

pedestrian signals, and update as needed with information about any construction, outage, or maintenance request.

d. Contain:

  i. A portal through which members of the public may submit one or more requests for APS installation at a specific intersection;

  ii. A portal through which members of the public may submit notification that an APS already installed is not functioning properly and request maintenance; and

  iii. A list of each pending APS installation and maintenance request, including the date the City received the request, the intersection at which APS was requested, and the planned APS repair or installation date, regardless of whether the request was received through the online portal or other means (e.g., via the City's website, 311 line, mail, web-based application, Aldermanic process, written correspondence with the City, or some other way), which list the City will update at least once per month.

The City will promptly respond to APS webpage requests, with requested APS maintenance or installation to be prioritized and completed on the following schedule: within 30 days for maintenance requests, or within 90 days for installation requests.

## VI.  PRIORITIZATION AND COMMUNITY OUTREACH

20.    Prior to January 1, 2024, the City will continue to install APS on its preexisting APS installation schedule, thereby completing installation of 57 APS throughout the City. Beginning January 1, 2024, the City shall prioritize the following intersections when selecting intersections for APS installation:

a.  Intersections for which there is an outstanding, good-faith request to install APS;

b.  Intersections that make use of Exclusive Pedestrian Phases, Leading Pedestrian Intervals, or a Protected Turn Phase;

c.  Intersections with complex geometry (e.g., six-way intersections, midblock crossings);

d.  Intersections that provide access to transportation services, such as transportation hubs or transit centers; service organizations for people who are blind, such as the Chicago Lighthouse, Second Sense, Friedman Place, Access Living and Equip for Equality; and senior centers;

e.  Intersections underneath or in close proximity to elevated, 'L' train tracks; and

f.  Intersections slated for APS installation under the APS Pilot Project to the extent there are intersections still outstanding for APS installation under that Project.

21.    The intersections listed in Paragraph 20 shall be addressed on the following schedule:

a.  Each intersection addressed under Paragraph 20(a) shall be remediated no later than 90 days from the date of the receipt of the request.  To the extent the City installs APS at no fewer than 50 intersections in response to requests under

9

Paragraph 20(a) in the course of a full calendar year, it may defer any additional outstanding requests to the next calendar year. If the City does defer requests in this manner, it shall fulfill the deferred requests first in the calendar year to which they are deferred. For each calendar year, the City shall not be required to install APS at more than 50 intersections in response to paragraph 20(a).

b.  All intersections under Paragraphs 20(b)-(f) shall be fulfilled no later than December 31, 2028, and before intersections ranked under the Prioritization Tool described in Paragraphs 23 through 25.

c.  In addressing these intersections, the City shall operate consistent with its Equity Statement of Principles, available at https://perma.cc/UHA7-8F9H.

22.  Within 180 days (including the 60-day comment period described in Paragraph 23(c)) of Entry of this Consent Decree, the City shall develop its own Prioritization Tool to be utilized to rank intersections in need of APS installation after the intersections described in Paragraphs 20 and 21 have been equipped with APS.

23.  The Prioritization Tool shall be developed in consultation with the Plaintiffs, United States, and community groups that represent the interests of people who are blind, deaf-blind, and low-vision who use or seek to use Chicago's signalized intersections. This process shall include:

a.  Public outreach by the City that, consistent with the City's Equity Statement of Principles, is provided and accessible to a broad range of stakeholders across a diverse set of communities in Chicago, including communities with disproportionately higher levels of people with vision disabilities;

b.  Public meetings, open to the Plaintiffs, United States, and community groups

10

that represent the interests of people who are blind, deaf-blind, and low-vision who use or seek to use Chicago's signalized intersections, and other interested members of the public, at which the City will solicit the public's views on which intersections should be prioritized for APS installation;

c. A 60-day period in which interested members of the public may submit comments on the City's proposed Prioritization Tool.

24. The City's Prioritization Tool will utilize as a framework the National Cooperative Highway Research Program (NCHRP), Accessible Pedestrian Signals: Guide to Best Practices, Prioritization Tool (Project 3-62; Appendix D) (available at https://perma.cc/E4BA-NQXR). When ranking intersections for APS installation, the City will prioritize intersections consistent with public input received during the development process described in Paragraph 23.

25. When the City has finalized its Prioritization Tool, it will provide notice of that tool to the Plaintiffs, United States, and Certified Orientation and Mobility (O&M) Expert. If Plaintiffs, United States, or Certified O&M Expert believe that the City's Prioritization Tool was not formulated with adequate consideration of the priorities set forth in this Consent Decree, or is otherwise inconsistent with the provisions of this Consent Decree, they may invoke the dispute resolution procedures set forth in Section VIII to seek modification of the Prioritization Tool. The City's Prioritization Tool will remain in effect during the pendency of dispute resolution.

26. If the City determines that it is appropriate to modify its Prioritization Tool while this Consent Decree is in effect, it may do so by repeating the process set forth in Paragraphs 23-25. Until this process has been completed, including any dispute resolution if necessary, the Prioritization Tool previously in effect will remain in effect.

27. If, upon finalization of the Prioritization Tool, the City is unable to install APS at a

11

given intersection in the ranked order, it may request an extension from the Plaintiffs and United States to delay installing APS at that intersection and move forward to installing APS at the next intersection in the ranked order. Any such request by the City must include sufficient detail explaining why the City needs additional time to install APS at the given intersection, what steps the City is taking to expedite APS installation at that intersection, and what mitigating measures the City can take to ensure access and safety for people who are blind at that intersection during the period of delay (e.g., staffing the intersections with crossing guards until APS can be installed). The Plaintiffs and United States will consider any such request by the City on a case-by-case basis.

## VII.    REPORTING AND EXPERT ASSISTANCE

28.     Annual Reports by the City: The City will submit annual reports addressing compliance with this Consent Decree by [December 31] to the Plaintiffs c/o class counsel, United States, and Certified O&M Expert selected pursuant to Paragraph 29 including, at a minimum:

a. The number of APS installations conducted in the prior year;

b. Documentation, such as photographs and completed checklists, demonstrating that APS installations were conducted in accordance with the MUTCD and NCHRP, Accessible Pedestrian Signals: A Guide to Best Practice, Appendix: Checklist for APS Installations (available at https://perma.cc/UMH7-BZJH at 26-29);

c. Whether those installations were conducted in accordance with this Consent Decree and the Prioritization Tool;

d. The City's compliance with the APS webpage requirements in Section V;

e. The City's compliance with the APS maintenance requirements in Section V; and

12

f.  Any recommendations for improvement of the implementation of this Consent Decree.

29.  No later than 45 days after entry of this Consent Decree, the Plaintiffs, United States, and the City will jointly select a person or firm to fill the Certified O&M Expert position. If the parties cannot agree on the selection of the Certified O&M Expert, then within 30 days thereafter, and upon notice to the other parties, the Plaintiffs, United States, and the City may each submit to the Court the names and qualifications of up to three proposed Certified O&M Experts. The minimum qualifications will include that the person:

a.  Is a Certified Orientation & Mobility Specialist (COMS) by the Academy for Certification of Vision Rehabilitation & Education Professionals (ACVREP) ;

b.  Has at least five (5) years' experience teaching individuals with visual impairments to travel independently, including teaching street crossings in urban settings;

c.  Has demonstrated experience with and knowledge of (a) the MUTCD's technical standards concerning APS, (b) the NCHRP, Accessible Pedestrian Signals: A Guide to Best Practice, Appendix: Checklist for APS Installations (available at https://perma.cc/UMH7-BZJH at 26-29), and (c) the NCHRP, Accessible Pedestrian Signals: Guide to Best Practices, Prioritization Tool (Project 3-62; Appendix D) (available at https://perma.cc/E4BA-NQXR).

Each party shall have up to three weeks to submit comments to the Court concerning any or all of the proposed candidates, and the Court will thereafter select a Certified O&M Expert from the names provided.

30.  The Certified O&M Expert selected pursuant to Paragraph 29 will assist with

13

implementation of this Consent Decree, and have the following responsibilities:

a. <u>Prioritization Tool</u>: The Certified O&M Expert will review and comment on the Prioritization Tool developed by the City and recommend changes to the Prioritization Tool if its implementation does not adequately serve the needs of people who are blind, deaf-blind, and low-vision who use or seek to use Chicago's signalized intersections. If the City refuses such recommended changes, pursuant to Paragraph 25, the Plaintiffs or United States may invoke the dispute resolution procedures set forth in Section VIII to seek modification of the Prioritization Tool. The City's Prioritization Tool will remain in effect during the pendency of dispute resolution.

b. <u>Reporting by Certified O&M Expert</u>: Within 30 days after the City submits each of its annual reports pursuant to Paragraph 28, the Certified O&M Expert will provide a report to the Parties, covering:

   i. The rate at which the City installs APS, and whether the City is meeting its required benchmarks under this Consent Decree;

   ii. Whether the City's plan for installing and maintaining APS, and its prioritization of intersections for APS installation, are consistent with the City's Prioritization Tool and this Consent Decree; and

   iii. Whether APS are installed and maintained in accordance with MUTCD standards and the NCHRP, Accessible Pedestrian Signals: A Guide to Best Practice, Appendix: Checklist for APS Installations (available at https://perma.cc/UMH7-BZJH at 26-29).

c. If the Certified O&M Expert identifies deficiencies in the City's progress, the

14

Expert may also recommend corrective action for the City to achieve compliance.

31. The Certified O&M Expert shall have access to the City's and the City's contractors' relevant non-privileged information and documents as the Expert deems necessary to complete their duties under this Consent Decree. If the Certified O&M Expert is denied access to requested information, the Expert may inform the Plaintiffs and United States, and any party may invoke the dispute resolution process set forth in Section VIII.

32. The Certified O&M Expert shall be permitted to initiate and receive *ex parte* communications with all Parties.

33. The Certified O&M Expert may engage any experts, consultants, accountants, or other additional qualified staff as is reasonably necessary to fulfill their duties under this Consent Decree without duplication of effort.

34. The Certified O&M Expert shall remain in place for the term of this Consent Decree.

35. The annual budget for the Certified O&M Expert shall be $100,000.00 (one-hundred thousand dollars). All reasonable fees, costs and expenses of the Certified O&M Expert, including the cost of any consultants or staff hired by the Certified O&M Expert, shall be borne by the City up to the amount of this annual budget. The Certified O&M Expert shall provide a monthly accounting justifying the fees, costs and expenses. In no event will the City reimburse the Certified O&M Expert for any fees, costs or expenses that exceed the amount of this annual budget. Provided, however, in the event of significant changes in circumstances that result in the Certified O&M Expert having to spend substantially more time or incur substantial and unforeseen expenses, the Certified O&M Expert may seek approval by the City for an amendment to the

budget and submit a justification for such amendment. Within 30 days, the City may question the need for, or the amount of, such additional unforeseen expenses, may suggest other alternatives to avoid some or all of such expenditures, and may withhold approval of such expenses; provided that approval of the proposed amendment shall not be unreasonably withheld. If any party disputes the reasonableness of fees incurred or estimated in excess of the approved annual budget, that party may invoke the dispute resolution process set forth in Section VIII.

## VIII.   DISPUTE RESOLUTION

36.     If the Plaintiffs or United States believes that the City has not complied in any material respect with this Consent Decree, they shall provide written notice to the City outlining the way they believe the City is in non-compliance. Following notice of potential non-compliance, the Plaintiffs, United States, and the City will confer in good faith for a period of up to 30 days to resolve the dispute.

37.     If the Parties are unable to resolve a dispute, any party may make a motion to the Court to enforce this Consent Decree. In the event Plaintiffs file such a motion and prevail, they may recover reasonable attorneys' fees, costs, and expenses in connection with any such motion pursuant to the standards set forth in *Christianburg Garment Co. v. E.E.O.C.*, 434 U.S. 412 (1978).

## IX.     ADDITIONAL TERMS

38.     <u>Notification</u>: All documents and communications required to be sent to the Plaintiffs under the terms of this Consent Decree shall be sent to the following individuals by email: Jelena Kolic ([jkolic@dralegal.org](mailto:jkolic@dralegal.org)), Madeleine J. Reichman ([mreichman@dralegal.org](mailto:mreichman@dralegal.org)), Nigel F. Telman ([ntelman@proskauer.com](mailto:ntelman@proskauer.com)), Edward C. Young ([eyoung@proskauer.com](mailto:eyoung@proskauer.com)), Alyssa M. Cook ([acook@proskauer.com](mailto:acook@proskauer.com)), and Dakota Treece ([dtreece@proskauer.com](mailto:dtreece@proskauer.com)), or by overnight courier to Jelena Kolic, Esq., Disability Rights Advocates, 300 South Wacker Drive, Floor 32,

16

Chicago, IL 60603, with a cover letter including the subject line Am. Council of the Blind of Metro. Chicago, et al. v. City of Chicago. All documents and communications required to be sent to the United States under the terms of this Consent Decree shall be sent to the following individuals by email: Patrick Johnson (patrick.johnson2@usdoj.gov), Sarah J. North (sarah.north@usdoj.gov) and Matthew Faiella (matthew.faiella@usdoj.gov), or by overnight courier to Matthew Faiella (202-598-3193), Disability Rights Section/Civil Rights Division, 4 Constitution Square, 150 M Street NE / 9th Floor, Washington, DC 20002, with a cover letter including the subject line Am. Council of the Blind of Metro. Chicago, et al. v. City of Chicago and DJ# 204-23-266.

39. Effective Date and Term: The Effective Date shall be the date that the Court approves and enters the Consent Decree or issues electronic notification that it has done so, whichever date is later. Unless otherwise specified, all time periods designated for an action run from the Effective Date. This Consent Decree shall remain in effect until six (6) months after remediation has been completed, i.e., June 30, 2034. The Court shall retain continuing and exclusive jurisdiction for the duration of the Consent Decree to enforce the terms of the Consent Decree. The Plaintiffs, United States and/or City may apply to the Court for such further orders as may be necessary for, or consistent with, the enforcement of this Consent Decree.

40. Reviewing Compliance: The Plaintiffs and United States may review compliance with this Consent Decree at any time. The City will cooperate fully with the Plaintiffs' and United States' efforts to monitor compliance with this Consent Decree. The City shall make all reasonably requested information available to the Plaintiffs and United States to facilitate their monitoring of the City's compliance with this Consent Decree. This includes information relating to the signalized street intersections, other facilities, policies, records, personnel, and

17

contractors/consultants. Upon request from the Plaintiffs and/or United States, the City shall arrange for the Plaintiffs and/or United States to conduct private telephonic, videophone, or in-person interviews with City personnel or contractors/consultants implementing the provisions of this Consent Decree.

41.     Scope: This Consent Decree does not purport to remedy any violations or potential violations of the ADA, Section 504, or any other federal or state law, other than the violations alleged in above in Paragraphs 1-2, nor does it affect the City's continuing responsibility to comply with all provisions of the ADA and Section 504.

42.     Entire Agreement: This Consent Decree contains the entire agreement between the Plaintiffs, United States, and the City concerning the subject matter described in Paragraphs 1-2, and no other statement, promise, or agreement, either written or oral, made by any party or agent of any party, that is not contained in this Consent Decree, and concerns the subject matter described in Paragraphs 1-2, shall be enforceable.

43.     Interpretation: This agreement shall be deemed to have been jointly drafted by the Parties. Any ambiguous language shall be interpreted as to its fair meaning, and not strictly for or against any party.

44.     Modifications: The time frame for completion of any act required by this Consent Decree may be modified with the mutual written consent of the Parties, except that the termination date may only be extended by Order of the Court. The Plaintiffs or United States will not unreasonably deny requests for deadline extensions, if made by the City in advance of any deadline, and following the City's due diligence to meet such a requirement and explanation for why it cannot do so within the current time frame. The Parties acknowledge that such written

18

agreement may be completed by email so long as the email has specific language designed to bind either Party.

45. <u>Severability</u>: If any provision of this Consent Decree is determined to be invalid, unenforceable, or otherwise contrary to applicable law, the other terms of this Consent Decree shall nonetheless remain in full force and effect.

46. <u>Binding</u>: This Consent Decree shall be binding on the Plaintiffs, United States, and City and its agents, employees, officers, and contractors.

47. <u>Successor Liability</u>: This Consent Decree is binding on the City, including any successor Mayor, Commissioner of the Department of Transportation, and Commissioner of the Mayor's Office for People with Disabilities.

48. <u>Non-Waiver</u>: Failure by the Plaintiffs or United States to seek enforcement of this Consent Decree pursuant to its terms with respect to any instance or provision shall not be construed as a waiver to such enforcement with regard to any instances or provisions.

49. <u>Publicly Available</u>: A copy of this document will be made available to any person by the City on request.

50. <u>Authority</u>: The signatories represent that they have the authority to bind the respective parties identified below to the terms of this Consent Decree.

51. <u>Counterparts</u>: This Consent Decree may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same Consent Decree. Electronic or facsimile signatures are acceptable.

52. <u>Class Settlement</u>:

    a. <u>Preliminary Approval of Settlement Class</u>:

i. Within thirty (30) days after all Parties have executed this Consent Decree, the Parties will jointly move the Court for an order granting preliminary approval of this Consent Decree as a settlement on behalf of the 23(b)(2) class; approving a plan and schedule for providing notice of the Consent Decree to class members; and setting a schedule for the motion for final approval of this Consent Decree and for a hearing on the fairness of this Consent Decree.

b. Class Notice of Settlement:

i. In their motion for preliminary approval, the Parties will jointly request approval of a form of notice and a plan for giving notice to class members consistent with this paragraph. Following the Court's issuance of the preliminary approval order, the Parties will provide notice to class members consistent with the provisions of the preliminary approval order to be issued by that Court.

c. Final Approval of Settlement Class:

i. The Parties agree that, upon final approval, this Consent Decree will become binding on the Parties and the Court will enter a judgment dismissing the instant action with prejudice subject to the Court's continued jurisdiction per Paragraph 39, *supra*. Should the Court deny the Parties' request to enter the judgment or if this Consent Decree does not receive final approval for any reason: (1) this Consent Decree will be null and void and of no force or effect; (2) nothing in this Consent Decree will be deemed to prejudice the position of any Party with

20

respect to any matter; and (3) neither the existence of this Consent Decree, nor its contents, will be admissible in evidence, referred to for any purpose in any litigation or proceeding, or be deemed an admission by any Party as to any matter.

## X.     ATTORNEYS' FEES AND COSTS

53.     Plaintiffs are deemed to be prevailing parties in this litigation and are thus entitled to reasonable attorneys' fees, costs and expenses for work performed in connection with this litigation. If Plaintiffs' counsel and Defendants are unable to negotiate a mutually agreeable resolution as to attorneys' fees, costs and expenses within 30 days of the effective date of this Consent Decree, Plaintiffs' Counsel will move or apply to the Court for an award of attorneys' fees, costs and expenses for the work performed in connection with this litigation. The actual amounts awarded will be determined by the Court to ensure that the amount of attorneys' fees, work costs and expenses awarded are reasonable. The amount awarded shall be in full satisfaction of all fees, costs and expenses incurred, excepting any fees, costs and expenses that may be incurred following the effective date of this consent decree in connection with class counsel's work monitoring Defendants' implementation obligations under this consent decree and any reasonable attorneys' fees, costs and expenses awarded in connection with a motion to enforce the Consent Decree pursuant to Section VIII.

Dated: _____ __, 2023                 Respectfully submitted,

*For Plaintiff-Intervenor United States of America*

MORRIS PASQUAL                 KRISTEN CLARK
Acting United States Attorney       Assistant Attorney General
for the Northern District of         Civil Rights Division
Illinois

                                   REBECCA B. BOND

Chief

By: /s/ Sarah J. North
PATRICK JOHNSON
SARAH J. NORTH
Assistant United States Attorneys
219 South Dearborn Street, 9th Floor
Chicago, Illinois 60604
Phone: (312) 353-5327
Phone: (312) 353-1413
patrick.johnson2@usdoj.gov
sarah.north@usdoj.gov

By: /s/ Matthew Faiella
AMANDA MAISELS
Deputy Chief
MATTHEW FAIELLA
Trial Attorney
U.S. Department of Justice
Civil Rights Division –
Disability Rights Section
950 Pennsylvania Avenue N.W. – 4CON
Washington, D.C. 20530
Phone: (202) 598-3193
matthew.faiella@usdoj.gov

*For Plaintiffs American Council of The*
*Blind of Metropolitan Chicago, Ann Brash,*
*Maureen Heneghan, And Ray Campbell*

By: /s/ XXXXXXXX
JELENA KOLIC
Disability Rights Advocates
10 South LaSalle Street, 18th Floor
Chicago, IL 60613
Phone: (312) 559-4600
Fax: (212) 644-8636

jkolic@dralegal.org

MADELEINE J. REICHMAN
(admitted *pro hac vice*)
Disability Rights Advocates
655 Third Ave, 14th Floor
New York, NY 10017
Phone: (312) 559-4600
Fax: (212) 644-8636
mreichman@dralegal.org

NIGEL F. TELMAN
EDWARD C. YOUNG
ALYSSA M. COOK
DAKOTA D. TREECE
Proskauer Rose LLP

22

23

70 West Madison, Suite 3800
Chicago, Illinois 60602
Phone: (312) 962-3550
Fax: (312) 962-3551
ntelman@proskauer.com
eyoung@proskauer.com
acook@proskauer.com
dtreece@proskauer.com

*For Defendant City of Chicago*


By: /s/_____
[NAME]
[TITLE]
City of Chicago, Department of Transportation
[ADDRESS]
[PHONE]
[EMAIL]


By: /s/_____
Andrew S. Mine
Peter Hardt Cavanaugh
City of Chicago, Law Department
2 North LaSalle Street, Suite 520
Chicago, IL 60602
(312) 744-7220
Email: AMine@cityofchicago.org
Email: Peter.Cavanaugh@cityofchicago.org

**ORDER**

IT IS SO ORDERED this _____ day of _____, 2023.


_____
UNITED STATES DISTRICT COURT JUDGE