# Exhibit 6

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND OF NEW YORK, INC., MICHAEL GOLFO, AND CHRISTINA CURRY, on behalf of themselves and all others similarly situated,<br><br>                     Plaintiffs,<br><br>-against-<br><br>THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF TRANSPORTATION, BILL DE BLASIO, in his official capacity as Mayor of the City of New York, and POLLY TROTTENBERG, in her official capacity as Commissioner of the New York City Department of Transportation.<br><br>                     Defendants. | No. 18-CV-5792<br><br>**COMPLAINT** |

## INTRODUCTION

1.      This lawsuit seeks to end discrimination and harm committed by the City of New York ("the City"), its Mayor, its Department of Transportation, and that Department's Commissioner (collectively "Defendants") against blind and deaf-blind[1] pedestrians on New York City's streets by the City's failure to install all but a miniscule number of accessible pedestrian signals.

2.      New York City has over 13,000 intersections with pedestrian signals for sighted users. Only 317 of those intersections—2.4%—have signals that convey any information at all

---

[1] Plaintiffs use the terms "blind" and "deaf-blind" to describe individuals who have reduced or no use of vision, or combined vision and hearing, respectively. For purposes of this complaint, the term "blind" should be understood to include people who are either legally blind or totally blind.

to people with visual disabilities, making the City's sidewalks and pedestrian street crossings dramatically less safe and more difficult to navigate for blind and deaf-blind pedestrians.

3. Accessible pedestrian signals ("APS") are devices that convey traffic and warning information that is visually conveyed to sighted pedestrians (Walk/Don't Walk) by making sounds and vibrating.

4. When pedestrian signals do not give blind and deaf-blind pedestrians the same information that sighted pedestrians receive, their safety and independence is at risk. Blind and deaf-blind pedestrians report nearly being hit by cars when they try to cross streets without knowing whether the pedestrian signal tells them to walk or not. They often have to wait to follow other pedestrians when they cross the street, but those pedestrians in many cases are crossing against the light. They may have to ask other pedestrians for help crossing, even if they are uncomfortable about the safety of approaching strangers on the street. At times, other pedestrians physically grab them or shout at them to prevent their crossing against the light. These experiences demean blind and deaf-blind pedestrians by compromising their ability to move about the city as safely and independently as sighted pedestrians.

5. Despite the City's obligations under the Americans with Disabilities Act, currently, the City installs APS in only 75 intersections per year. At that glacial pace, it would take about 170 years—until around the year 2188—to replace all of the City's pedestrian signals with APS. The City upholds this rate regardless of how many other pedestrian signals it installs or replaces for the benefit of sighted pedestrians.

6. New York City's standards for installing APS are pitiful compared to those of many other major American cities.

7.      In comparison, Phoenix has a policy requiring APS in all new pedestrian signal installations. San Antonio, Seattle, and Los Angeles do so for all new pedestrian signals *and* all replacement of old signals.

8.      The City has an extensive plan to replace pedestrian signals and improve safety for pedestrians who can see, but has neglected and endangered people who are blind and deaf-blind. The failure of the City and the Department of Transportation is particularly egregious because there is no city in America where the sidewalks are more critical to daily life than in New York City. Consequently, there is no city where accessible pedestrian signals are more necessary.

9.      Walking is a major form of transport in New York City. Over 2.2 million people who live in New York City commute to their jobs via public transit every day, which usually involves a walk at the beginning and/or end. Hundreds of thousands of people also commute into Manhattan from outside New York City every day and also use the sidewalks. About 10% of commuters use walking as their only means of going to work.

10.     In New York City, walking on sidewalks is essential for employment, education, and access to health care, government and political and social life.

11.     Walking is also a necessary part of the fabric of New York City because it has the highest population density of any major American city. In 2010, New York City was home to about 27,000 inhabitants per square mile; in Manhattan, that number was almost 70,000 inhabitants per square mile.

12.     New York's population density combines with its vehicle density and high background noise levels to make pedestrian street crossings extremely challenging for those who

3

receive traffic safety information by ear.  On weekdays, arterial and city streets are clogged 16% of the time, the worst among major U.S. cities.

13.     Blind pedestrians must listen for oncoming traffic in order to avoid it. However, competing sources of noise in New York City are never-ending:  Construction projects, building ventilation systems, garbage collection, music from food trucks and entertainment venues, underground subway trains, commuter trains and subways running on elevated tracks, and the noise of crowds of people and vehicles on the street.

14.     Commuter and delivery bicycles (manual and electric) and hybrid cars pose added danger to the blind pedestrian because they are nearly impossible to hear.

15.     The absence of APS is even more critical and dangerous because of the poor state of the City's curb cuts.  Over seventy percent (70%) of the City's existing pedestrian ramps are dangerous and/or non-ADA-compliant, including missing or deteriorated truncated domes, the tactile surface used to alert blind and deaf-blind pedestrians to a pedestrian street crossing.

16.     The City's consistent failure to provide accessible pedestrian signals to blind and deaf-blind pedestrians violates Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the New York City Human Rights Law.

17.     Plaintiffs sue on behalf of themselves and all blind and deaf-blind people who are being discriminated against and subjected to hazardous conditions on sidewalks due to inaccessible pedestrian signals in New York City.

**JURISDICTION**

18.     This is an action for declaratory and injunctive relief, brought pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

4

19.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504, and supplemental jurisdiction over the NYCHRL claims pursuant to 28 U.S.C. § 1367.

20.     This Court has authority to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

21.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District.  The Defendants are located within this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

22.     Plaintiff American Council of the Blind of New York, Inc. ("ACBNY") is New York's largest consumer organization of and for people who are blind.  ACBNY is the New York State affiliate of the American Council of the Blind.  Its purpose is to support and promote the educational, vocational and social advancement of blind persons.  Many of its members regularly walk the sidewalks of New York City.  They are blind and deaf-blind, and are qualified individuals with disabilities within the meaning of all applicable statutes.

23.     Plaintiff Christina Curry is deaf and is legally blind.  She uses a forearm crutch as a mobility aid.  She is a qualified individual with a disability within the meaning of all applicable statutes.  Ms. Curry is the Executive Director of the Harlem Independent Living Center.  She lives in the Bronx.  She works at an office based in Harlem, and her work takes her to all five boroughs of New York City.  She is a pedestrian in all five boroughs.

24.     Plaintiff Michael Golfo is blind.  He lives in Tarrytown, New York and works in Manhattan.  He is a pedestrian primarily in Manhattan.  He is a qualified individual with a disability within the meaning of all applicable statutes.  He is a member and officer of ACBNY.

5

25. Defendants the City of New York and its Department of Transportation, as defined by the laws of the City of New York, are "public entities" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

26. Defendants the City of New York and its Department of Transportation are also recipients of federal funds, including funds from the federal Department of Transportation, subject to the accessibility requirements of Section 504 of the Rehabilitation Act.

27. Defendants the City of New York and its Department of Transportation are the public entities responsible for installing, repairing, and maintaining all pedestrian rights-of-way along New York City sidewalks and crosswalks.

28. Defendant de Blasio, sued in his official capacity, is the Mayor of the City of New York.

29. Under the New York City Charter, the Mayor is "responsible for the effectiveness and integrity of city government operations and shall establish and maintain such policies and procedures as are necessary and appropriate to accomplish this responsibility including the implementation of effective systems of internal control by each agency and unit under the jurisdiction of the mayor." N.Y.C. Charter § 8(a).

30. Defendant Trottenberg, sued in her official capacity, is the Commissioner of the Department of Transportation.

31. Under the New York City Charter, the Commissioner of the Department of Transportation is charged, *inter alia*, to "establish, determine, control, install and maintain the design, type, size and location of any and all signs, signals, marking, and similar devices indicating the names of the streets and other public places and for guiding, directing or otherwise regulating and controlling vehicular and pedestrian traffic in the streets, squares, parks,

parkways, highways, roads, alleys, marginal streets, bridges and other public ways of the city."
N.Y.C. Charter § 2903(a)(2).

## PLAINTIFFS' ALLEGATIONS

### A. APS Technology

32.     APS technology was first mass marketed in the United States in the 1970's. A modern APS unit contains a pedestrian pushbutton with a raised arrow pointing at the pedestrian street crossing it describes. It emits a soft sound every second indicating to pedestrians where it is, so they can find the pushbutton and push it to indicate that they want to cross. When the walk sign is activated, the APS emits a different sound, and the arrow vibrates.

### B. Installation and Control of APS

33.     Since at least 2010, organizations of people with disabilities in New York City, including the American Council of the Blind of New York, Inc., have been requesting that New York City install APS.

34.     The City has an obligation under the ADA to ensure that its sidewalks and signaled pedestrian street crossings are readily accessible to and usable by people with disabilities. It also has a duty to make its communications with people with disabilities as effective as its communications with people without disabilities, and to adopt auxiliary aids and services to make that happen.

35.     Further, the City has a duty to ensure that any time after 1992 when it either creates new facilities, like pedestrian signals, or alters existing ones in ways that affect their usability, those new facilities must be readily accessible to and usable by people with disabilities to the maximum extent feasible.

7

36.     Various federal laws and guidance over the past two decades have recommended the use of APS technology to make intersections more usable by blind and deaf-blind pedestrians.

### C. The City Has Expended Substantial Resources to Install Improved Pedestrian Signals for Sighted New Yorkers While Ignoring Technology Making Those Signals Usable by Blind and Deaf-Blind Pedestrians

37.     Since 2000, the City has adopted several new initiatives to install thousands of new or modified pedestrian signals with the goal of benefiting sighted pedestrians.  With few exceptions, however, the City has chosen not to make those new signals usable by blind and deaf-blind pedestrians.

38.     The City has approximately 110,000 pedestrian signals in 13,000 intersections.

39.     However, the City has installed APS in only 2.4% of its signaled intersections so far.

40.     The City currently installs APS in only 75 intersections annually—less than 0.6% per year.

41.     During the period from 2000 to 2004, the City changed its "Walk" and "Don't Walk" text pedestrian signals to new signals with pictures of a person walking and red-orange hand.  In addition to the visual redesign, the new signals used a light-emitting diode technology expected to be longer-lasting.  The City reportedly replaced 85,000 signals.

42.     The walker/hand signals began to malfunction at the end of their first decade, The Department of Transportation has stated that their life span is seven years.  Accordingly, many of these signals were replaced again.

43.     In 2006, the City began replacing the walker/hand signals with new "countdown clock" signals.  As of November 2017, it had done so for over 7,500 intersections.

8

44.     The City has also introduced leading pedestrian interval signals in at least 2,200 intersections (as of November 1, 2017) to improve safety for sighted pedestrians. These signals show a walk sign to sighted pedestrians before showing a green light to car traffic moving in the same direction, so that pedestrians can start walking before cars can turn into their path. Without APS, blind and deaf-blind pedestrians receive neither an audible nor a tactile indication from a pedestrian signal that they should walk. Blind pedestrians also do not hear the sound of car traffic moving in the direction they want to go, which they would otherwise use to know when to walk. By the time the traffic begins to move, the blind or deaf-blind pedestrian has lost the advantage of the leading pedestrian interval.

45.     Thus, since 2000 the City has replaced most or all of its pedestrian signals, and it has replaced most of them at least twice.

46.     Of these thousands of new installations, only 317 intersections have been made accessible and usable by people who are blind and deaf-blind.

47.     The City does not have a policy of installing APS when it installs pedestrian signals at a new intersection for the first time, or when it replaces an old, existing pedestrian signal.

**PLAINTIFF FACTS**

**A.  Harm to Plaintiff American Council of the Blind of New York, Inc.**

48.     Plaintiff American Council of the Blind of New York, Inc. is a nonprofit 501(c)(3) organization seeking to promote the independence and dignity of blind persons in New York State. It is a state affiliate of the American Council of the Blind and consists of chapters which focus on either a geographic area, a specific population, or an issue within New York State. It has 200 members, including about 40 members in the Greater New York chapter, which

9

includes New York City.  Its members wish to use New York City streets safely and require APS to do so.

49.     ACBNY members have attempted to use New York City sidewalks  and have encountered pedestrian street crossings without APS.  They have had trouble crossing those streets because of the absence of APS.  One or more members of ACBNY, including Michael Golfo, have been legally injured as a direct result of Defendants' discriminatory actions and failures to act and would have standing to sue in their own right.

50.     ACBNY members have experienced nearly being hit by cars, having to ask other pedestrians for help, having to wait for other pedestrians to arrive, and being grabbed by strangers while trying to cross the street where only inaccessible pedestrian signals are offered.

51.     ACBNY can bring this action on behalf of itself and its members because the interests at stake are germane to ACBNY's mission of ending discrimination against people who are blind and deaf-blind.

52.     ACBNY's claims are limited to injunctive and declaratory relief.

53.     In addition, ACBNY itself has been injured as a direct result of Defendants' failure to provide accessible pedestrian signals.

54.     ACBNY's interests are adversely affected because it must expend resources advocating for its members who are harmed by Defendants' policies and practices that result in barriers to the accessibility of sidewalks and signaled pedestrian street crossings.

55.     ACBNY currently expends time and resources on advocacy work concerning policies and practices that affect access to public services for people with disabilities in New York City.  ACBNY, individually and through its chapters, has long worked to promote the use of accessible pedestrian signals throughout the state and in New York City.  It was one of the

10

original members of the New York City Pedestrians for Accessible and Safe Streets Coalition, the main group advocating for APS with the City.  ACBNY's local Long Island affiliate was a plaintiff in *Scharff. v. County of Nassau.*, Case No. 10-CV-4208, 2014 WL 2454639 (E.D.N.Y. June 2, 2014), a case brought to increase installation of APS in Nassau County, New York.

56.     The persistent denial of APS hinders ACBNY's objectives of ending discrimination against persons with disabilities and promoting the ability of persons with disabilities to live independently in the community.  ACBNY must expend resources to remedy the frustration of its mission.

57.     Such injury would be directly redressed by a favorable decision in this case.

### B.  Harm to Plaintiff Christina Curry

58.     Plaintiff Christina Curry resides in the Bronx, and her workplace is in Harlem. Ms. Curry has multiple disabilities.  She is legally blind.  While she has some usable vision, she cannot see traffic in pedestrian street crossings unless it is very close to her, and she cannot rely on visual street signals to help her cross.  Ms. Curry also has a mobility disability and uses a forearm crutch to help her walk.  She is a person with severe hearing loss.  She requires tactile pedestrian signals.

59.     Ms. Curry has been the Executive Director of the Harlem Independent Living Center since 2001.  In that capacity she is the leader of a team of persons who provide aid and services to persons with disabilities.  Ms. Curry regularly testifies before the New York City Council.  She is an Executive Board member of the New York State Commission for the Blind. As a result, she frequently travels throughout New York City, including as a pedestrian.

60.     There is no accessible pedestrian signal at 165th Street and Grand Concourse in the Bronx near Ms. Curry's home.

11

61. There is no accessible pedestrian signal at 125th Street and Amsterdam Boulevard, which is within a few blocks of Ms. Curry's office in Harlem.

62. There is no accessible pedestrian signal at the Adam Clayton Powell Jr. State Office Building at 163 West 125th Street and Adam Clayton Powell Jr. Boulevard (Seventh Avenue) in Manhattan, where the New York State Commission for the Blind has its Harlem office.

63. These intersections are heavily used by vehicles and pedestrians (including bus routes). They are noisy and complex in terms of traffic lanes and directions. They are characteristic of intersections throughout the City that Ms. Curry must navigate whenever she walks to her destinations.

a) Grand Concourse at 165th Street in the Bronx consists of nine automobile lanes, including parking, bus, and traffic lanes. Additonally, there are two bike lanes and two medians. 165th Street consists of two traffic lanes, one parking line, and one bike lane in each direction.

b) Adam Clayton Powell Jr. Boulevard at West 125th Street in Harlem consists of a northbound parking/bus lane, two lanes of traffic, a turn lane, and a median, before repeating the whole setup on the southbound side. 125th Street consists of a parking lane and two lanes of traffic in each direction.

c) Amsterdam Avenue does not cross 125th Street in Harlem at a right angle, which can make distances seem unpredictable there. Amsterdam Avenue consists of two traffic lanes and a parking lane in each direction. At this intersection, 125th Street consists of at least a parking/bus lane and two lanes of traffic, and one turning lane in each direction.

12

64. In order to cross streets safely without APS, Ms. Curry uses a number of methods, none of which is satisfactory or equivalent to the experiences of sighted pedestrians. She tries to cross only in packs of people. She has waited as long as twenty minutes for other people to show up so that she could cross with others. Where possible, she sometimes crosses streets by walking downstairs and underground through subway stations instead of on surface streets, even though this takes more time and energy. She takes buses and gets out a stop early or a stop late in order to avoid unsafe intersections, even though this takes more time and can be exhausting. Sometimes she uses taxis and car services to avoid unknown or unsafe pedestrian street crossings, even though this costs more money than walking.

65. Ms. Curry has experienced and continues to experience barriers in attempting to cross streets in New York City without APS because of Defendants' continuous violations of disability access laws.

66. Ms. Curry wants to and intends to continue to use the sidewalks and to cross streets in New York City.

67. These injuries would be directly redressed by a favorable decision in this case.

### C. Harm to Plaintiff Michael Golfo

68. Plaintiff Michael Golfo lives in Tarrytown, New York and works in Manhattan. He regularly walks on New York City sidewalks to commute to his job, to do errands in the area around his workplace, to visit his doctors on the Upper East Side, and to visit friends who live in boroughs other than Manhattan.

69. Mr. Golfo works in the area around Penn Plaza, which is located between 31st and 34th Streets and between Seventh and Eighth Avenues. There is no APS at Seventh Avenue and 31st, 34th, or 37th Streets. There is no APS at 34th Street and Sixth or Seventh Avenues

(although there is one at a pedestrian street crossing in the middle of the block).  There is only one APS on the entire length of York Avenue, where several of his doctors are located.

70.     Many of these intersections are heavily used by both vehicles and pedestrians, including bus routes.  These intersections are also noisy, and complex in terms of traffic lanes and directions.  It can be difficult, and is sometimes impossible, to discern by ear which traffic directions have green lights or which traffic lanes have moving vehicles in them.  For instance, Seventh Avenue contains four lanes of traffic going southbound, while 34th Street consists of a lane of traffic and a bus lane in each direction, for a total of four lanes, as well as considerable pedestrian traffic around the Macy's flagship store.  Sixth Avenue and 34th Street has a similar setup (at the other end of Macy's, with Sixth Avenue going northbound), with the addition of a median with a café area in the middle of the north half of 34th Street.

71.     These intersections are characteristic of intersections throughout the City that Mr. Golfo must navigate whenever he walks to his destinations.

72.     Mr. Golfo uses a guide dog to help him navigate safely.  He tries to listen carefully to traffic, but this sometimes does not work for a safe pedestrian street crossing.  In one terrifying incident several years ago before an APS was installed, Mr. Golfo tried to cross Seventh Avenue at West 32nd Street when he thought he was crossing the light, but was not. Seventh Avenue has four lanes of traffic plus a taxi stand in front of Penn Station.  While in the middle of the street, he felt and heard traffic going by himself and his dog.  He was very frightened.  His only choice was to run across the intersection with his dog and hope that they were not killed.  Mr. Golfo could not avoid the intersection because it was so close to his bus stop.  He has almost been hit by cars several times at other intersections without APS.

14

73.     In order to cross streets safely at intersections without APS, Mr. Golfo tries to cross when other people are crossing and will wait several lights in order to make sure that he is crossing at a safe time even though this causes him delay.  He would prefer to take the bus to his doctor's appointments, but because of unsafe pedestrian street crossings between the bus stops and the offices, he uses paratransit instead because it drops him off at the office doors.  This has significant drawbacks, because New York City paratransit must be arranged at least twenty-four hours in advance.  It is also notoriously unreliable and is a ride-sharing program, so the trip consistently takes at least twice as long as it would using the bus.

74.     Mr. Golfo has experienced and continues to experience barriers in attempting to cross streets in New York City without APS because of Defendants' continuous violations of disability access laws.

75.     Mr. Golfo wants to and intends to continue to use the sidewalks and to cross streets in New York City.

76.     These injuries would be directly redressed by a favorable decision in this case.

## CLASS ALLEGATIONS

77.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action, for injunctive and declaratory relief purposes, on their own behalf and on behalf of all persons similarly situated.

78.     The class that Plaintiffs seek to represent includes all persons with disabilities who use or will use New York City pedestrian street crossings and who require APS to receive the information that sighted and/or hearing users get from inaccessible pedestrian signals.

79.     About 200,000 residents of New York City have visual disabilities.  In addition, tens of thousands of persons with visual disabilities visit or commute into the City annually.

15

80. The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court. The class includes all persons with disabilities who use or will use New York City sidewalks and pedestrian street crossings and who require APS to receive the information that sighted and/or hearing users get from inaccessible pedestrian signals.

81. There is a well-defined community of interest in the questions of law and fact affecting the parties to be represented in that they are all being denied, or will be denied, their civil rights and meaningful access to the City's sidewalks and pedestrian street crossings, due to the barriers described herein.

82. Common questions of law and fact predominate, including questions raised by Plaintiffs' allegations that by failing to maintain APS, Defendants have failed to provide meaningful access to their sidewalks and pedestrian street crossings to persons with vision and/or hearing disabilities in violation of Title II of the ADA and Section 504. The common questions raised by Plaintiffs are capable of class-wide resolution.

83. Plaintiffs are adequate class representatives because they and the persons they represent are directly affected by Defendants' failure to provide access to persons with sensory disabilities on their sidewalks. The interests of the Plaintiffs are not antagonistic to, or in conflict with, the interests of the class as a whole. The attorneys representing the class are experienced in representing plaintiffs in civil rights class actions for injunctive relief, including actions challenging barriers to access involving pedestrian rights-of-way.

84. Plaintiffs' claims are typical of the claims of the class as a whole because the Plaintiffs are similarly affected by Defendants' failure to provide meaningful access to their sidewalks and signaled pedestrian street crossings.

16

85.     Defendants have acted and/or failed to act on grounds generally applicable to all class members, thereby making final declaratory and injunctive relief with respect to the class as a whole appropriate.

## CAUSES OF ACTION

### Count I
### Discrimination in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

86.     Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

87.     Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in, or otherwise benefitting from, a program of the public entity, or otherwise discriminating against a person on the basis of disability:  "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

88.     The term "disability" includes physical and mental impairments that substantially limit one or more major life activities.  42 U.S.C. § 12102(2).

89.     A " 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

90.     Plaintiffs are persons with disabilities within the meaning of the statute in that they have impairments which substantially limit the major life activity of seeing.  They are also qualified in that they are located in New York City and thus are eligible to benefit from the

17

City's pedestrian signals. Thus, Plaintiffs and members of the organizational Plaintiff are qualified individuals with disabilities within the meaning of 42 U.S.C. §§ 12102 and 12131 and 28 C.F.R. § 35.104.

91. A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1). Defendants are public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

92. Congress directed the Department of Justice ("DOJ") to write regulations implementing Title II's prohibition against discrimination. 42 U.S.C. § 12134. Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Title II of the ADA. 28 C.F.R. § 35.101 *et seq.*

93. Title II of the ADA requires public entities, including Defendants, to operate each of their programs, services or activities "so that, when viewed in its entirety, it is readily accessible to and useable by individuals with disabilities." 28 C.F.R. § 35.150; *see also* 28 C.F.R. §§ 35.149, 35.151.

94. Title II of the ADA requires public entities, including Defendants, to design and construct their new facilities, like pedestrian signals, constructed after 1992 so that "[e]ach facility or part of a facility . . . is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)(1).

95. Title II of the ADA requires that where public entities, including Defendants, alter their existing facilities, like pedestrian signals, in a manner that affects or could affect the usability of the facility after 1992, these "shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(b)(1).

18

96. New York City's sidewalks and pedestrian street crossings constitute a program, service or activity under Title II of the ADA.

97. Defendants have failed to provide people who are blind and deaf-blind with meaningful access to pedestrian sidewalks throughout New York City in violation of Title II of the ADA. Defendants have also failed to operate their sidewalks and pedestrian street crossings so that they are readily accessible and usable by blind and deaf-blind people when viewed in their entirety, in violation of Title II of the ADA.

98. Defendants are currently denying qualified individuals with disabilities the opportunity to participate in or benefit from their public sidewalks and pedestrian street crossings; affording individuals with disabilities an opportunity to participate in their public sidewalks and pedestrian street crossings that is not equal to others; and/or providing individuals with disabilities with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result or to gain the same benefit from its public sidewalks and pedestrian street crossings as that provided to others, in violation of 28 C.F.R. § 35.130(b)(1)(i)–(iii).

99. Defendants, directly and/or through contractual or other arrangements, utilize criteria and/or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of their disability and defeat or substantially impair the accomplishment of the objectives of their pedestrian signals with respect to individuals with disabilities, in violation of 28 C.F.R. §35.130(b)(3)(i)–(ii).

100. Defendants have failed to make reasonable modifications in their policies, practices, or procedures necessary to avoid discrimination on the basis of disability, in violation of 28 C.F.R. § 35.130(b)(7).

19

101.    Defendants have failed to maintain the features of all facilities required to be accessible under the ADA.  28 C.F.R. § 35.133.  Facilities required to be accessible include buildings, structures, or sites where the facilities are located.  *See* 28 C.F.R. § 35.104.

102.    Defendants have failed to make their communications via their pedestrian signals as effective for people with sensory disabilities as they have for others, and have failed to provide necessary auxiliary aids and services enabling blind and deaf-blind pedestrians an equal opportunity to participate in, and enjoy the benefits of, their sidewalks and pedestrian street crossings in violation of 28 C.F.R. § 35.160.

103.    As a direct and proximate result of the aforementioned acts, Plaintiffs have been and continue to be injured.

104.    Defendants' conduct constitutes an ongoing and continuous violation of Title II of the ADA and, as a result, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs.

## Count II
### Disability Discrimination in Violation of Section 504 of the Rehabilitation Act

105.    Plaintiffs re-allege and incorporate all previously alleged paragraphs.

106.    Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

107.    An "individual with a disability" is defined under the statute, in pertinent part, as an "individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual."  29 U.S.C. § 705(2)(B) (referencing 42 U.S.C. § 12102).

20

A "qualified" disabled person means a person who meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity. 28 C.F.R. § 39.103.

108. For the reasons set forth above, Plaintiffs are persons with disabilities within the meaning of the statute who are qualified to benefit from the City's pedestrian signals.

109. Defendants' acts and omissions described herein violate the equal access and nondiscrimination provisions of Section 504 and the regulations promulgated thereunder, and have resulted in injury to Plaintiffs.

110. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

111. Plaintiffs are entitled to injunctive relief and reasonable attorneys' fees, expenses, and costs, pursuant to 29 U.S.C § 794(a).

**Count III**
**Disability Discrimination in Violation of the New York City Human Rights Law**

112. Plaintiffs re-allege and incorporate herein all previously alleged paragraphs.

113. The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a) provides, "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . of any person directly or indirectly, to refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation . . . ."

114. The term "person" in the NYCHRL includes "governmental bodies or agencies." N.Y.C. Admin. Code § 8-102(a).

115. The NYCHRL defines the term "place or provider of public accommodation" to include "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kinds are extended, offered, sold or otherwise made available." N.Y.C. Admin. Code § 8-102(9).

116. The City's pedestrian signals are public accommodations within the meaning of the NYCHRL.

117. Through the actions described above, the City has denied to blind and deaf-blind people full and equal enjoyment, on equal terms and conditions, access to its sidewalks and pedestrian street crossings.

118. The NYCHRL additionally requires that any person prohibited from discriminating under Section 8-107 on the basis of disability "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Administrative Code § 8-107(15). The term "covered entity" is defined as a person required to comply with any provision of Section 8-107, which includes Defendants under the N.Y.C. Admin. Code § 8-102(1).

119. APS constitute a reasonable accommodation under the NYCHRL.

120. Defendants have been aware of the need for APS in New York City since at least 2010.

121. Defendants have made inadequate or no reasonable accommodations to allow people who are blind or deaf-blind the opportunity to use pedestrian signals to cross the City's streets.

22

122. Defendants' conduct also violates N.Y.C. Administrative Code § 8-107(17), which states that "an unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

123. Defendants' policy or practice of generally installing pedestrian signals with no signaling accessible to people who are blind or deaf-blind, and installing APS at only 75 of its 13,000 signaled intersections per year, has a disparate negative impact on blind and deaf-blind pedestrians seeking to use the City's sidewalks and pedestrian street crossings.

124. As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiffs have been injured as set forth herein.

125. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

126. Consequently, Plaintiffs are entitled to injunctive relief and reasonable attorneys' fees and costs.

### Count IV
### Declaratory Relief

127. Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

128. Plaintiffs contend that Defendants have failed and are failing to comply with applicable laws prohibiting discrimination against persons with disabilities in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the NYCHRL, N.Y.C. Admin. Code § 8-107 *et seq.*

23

129.    Plaintiffs contend, and are informed and believe, that Defendants deny failing to comply with applicable laws prohibiting discrimination against persons with disabilities.

130.    A judicial declaration is necessary and appropriate at this time in order that the parties may know their respective rights and duties and act accordingly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

131.    Declare that the actions and inactions described herein violate the rights of Plaintiffs under the ADA, Section 504, and the NYCHRL;

132.    Issue an order requiring that Defendants take the necessary steps to remedy the City's pedestrian signals so that its sidewalks and signaled pedestrian street crossings are fully accessible to people who are blind and deaf-blind in compliance with the ADA, Section 504, and the NYCHRL;

133.    Issue an order enjoining Defendants from continuing to engage in the unlawful conduct of installing pedestrian signals not fully accessible for people who are blind or deaf-blind;

134.    Issue an order requiring that Defendants maintain any existing APS so that they continue to provide full accessibility for people who are blind or deaf-blind;

135.    Award reasonable attorneys' fees and costs; and

136.    Grant such other and further relief as the court deems just and proper.

Dated: June 27, 2018
      New York, New York

Respectfully submitted,
DISABILITY RIGHTS ADVOCATES

_____

Christina Brandt-Young
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636
cbrandt-young@dralegal.org


Sid Wolinsky (*pro hac vice* pending)
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, CA 94704
Tel.: (510) 665-8644
Fax: (510) 655-8511
swolinsky@dralegal.org