IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND OF METROPOLITAN CHICAGO, ANN BRASH, MAUREEN HENEGHAN, and RAY CAMPBELL, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br>-against-<br><br>CITY OF CHICAGO,<br><br>      Defendant.<br><br>―――――――――――――――――<br><br>UNITED STATES OF AMERICA<br><br>      Plaintiff-Intervenor,<br>-against-<br><br>CITY OF CHICAGO,<br><br>      Defendant. | Civil No. 1:19-cv-06322<br><br>Judge LaShonda A. Hunt |

**DEFENDANT CITY OF CHICAGO'S UNOPPOSED MOTION FOR RELIEF FROM
PUBLIC REQUESTS PROVISION OF REMEDIAL PLAN ORDER**

  Defendant City of Chicago (the "City") moves for relief from Section III.A.2.a. of the Court's Remedial Plan Order relating to public requests because 700 public requests have been received under circumstances that suggests they do not serve the purposes of the Plan and the Class, and states as follows:

1. On May 29, 2025, the Court entered its Remedial Plan Order (Dkt. 365), setting forth a plan by which the City would add accessible pedestrian signals ("APS") to signalized intersections with pedestrian signals across Chicago.

2. Section III.A.2.a. of the Remedial Plan Order prioritizes the installation of APS in response to "public requests" for APS installation at specific intersections.

3. The City may seek relief from this requirement in certain circumstances (the "Public Requests Relief Provision"):

> If City of Chicago receives more than twenty-five (25) requests during a calendar year, it may file a motion seeking relief from the requirement to prioritize such requests exceeding twenty-five (25) per calendar year if such prioritization would impair meeting the other targets and goals set in this Remedial Plan Order.

4. As of December 2, 2025, the City has received a total of 749 facially valid[1] public requests for the installation of APS at signalized intersections with pedestrian signals.

5. The City believes that approximately 49 of these public requests were offered in the manner that the Remedial Plan Order intended, by members of the blind community addressing intersections of specific concern to them.

6. Notably, these 49 requests were typically made individually or in small groups, where often accompanied by the requestor's email address if the request was not anonymous, and are dispersed widely across the City.

7. Over and above these apparently legitimate requests, the City has received 700 facially valid requests (the "700 Requests") that were made under circumstances that suggest

---

[1] The City has also received a smaller number of requests that APS be installed at places not covered by the Remedial Plan Order and not addressed in this litigation, such as at intersections governed only by stop signs and without pedestrian signals. These requests are considered not to be valid for remediation under the Remedial Plan Order. For example, 16 of the intersections listed in Exhibit A are not valid for this reason.

they do not support the goals if the Proposed Remedial Plan, were not made by the requestor listed in each request, and were not made by or on behalf of blind pedestrians.

8. For these reasons, the City seeks relief under the Public Requests Relief Provision of the Remedial Plan Order.

9. Plaintiffs and the United States do not oppose this Motion or the relief requested.

**The 700 Requests Show Signs of Not Supporting the Goals of the Remedial Plan Order**

10. Attached to this Motion is a redacted table ("Table") listing all 700 Requests and grouped by requestor, attached as Exhibit A hereto.[2] This table has been redacted to remove the alleged names, phone numbers, and email addresses of each requestor out of privacy concerns and because they may not, in fact, represent the identity(ies) of the actual requestor(s). An unredacted copy has been filed contemporaneously under seal. References in this Motion to the table are made by line number, visible in the left-most column of the Table.

11. The 700 Requests show signs that they were all made by a single requestor or a small number of requestors, despite that they allegedly were made by 42 separate requestors. For example:

    a. Many of the 700 Requests were allegedly made by persons who chose to list their middle names, even though the City does not request a middle name. All requestors <u>not</u> included in the 700 Requests did not volunteer a middle name.

    b. The 700 Requests were made over four weeks from September 17, 2025, and October 15, 2025, and with only a few exceptions targeted largely contiguous sets of signalized intersections starting in the Montclare, Belmont Cragin, and

---

[2] Exhibit A also lists 16 requests that were not valid for reasons discussed in the preceding footnote. They are identified with a "Yes" in the right-most column of Exhibit A, titled "Ineligible." They are included with Exhibit A because they were submitted alongside and by the same person(s) as the 700 Requests.

3

      Dunning neighborhoods, and then moving north by northeast across the City's North Side to the lakeshore. Attached as Exhibit B is a map plotting these requests by date.

c. With only a handful of exceptions, the 700 Requests cover all of the City's signalized intersections on or north of North Avenue.

d. All but 5 of the 700 Requests were made by persons who left a phone number, but not an email address. The five exceptions are found at lines 381-85 of the Table. By contrast, only 12 of the 49 requests <u>not</u> included in the 700 Requests listed only a phone number.

e. Many of the 700 Requests were accompanied by "Additional Information" (*see* column by this name in the Table at Exhibit A), in which all or most words are capitalized, and in which certain phrases repeat across many requestors. In some cases, this information is in the "Cross Streets" column instead. For example,

    i. A request that the City "Please Study" one or more things was made 109 times across at least 36 alleged requestors. *See*, *e.g.* Exhibit A, Table, at lines 1, 12, 16, 49, 65, 85, 121, 141, 145, 170, 197, 221, 266, 273, 289, 303, 313, 325, 344, 350, 384, 388, 411, 445, 462, 492, 494, 513, 538, 573, 596, 612, 638, 654, 682, 715 (each representing a different alleged requestor).

    ii. A request beginning with "Also, Please" or "Also Please" was made 97 times across at least 25 alleged requestors. *See*, *e.g.*, *id*. at lines 1, 9, 26, 54, 91, 117, 136, 145, 170, 266, 313, 340, 350, 384, 387, 425, 462, 513,

4

      542, 559, 566, 581, 625, 636, 652 (each representing a different alleged requestor).

    iii. The phrase "for a Possible" is used 102 times across most requestors. *See id*. at *passim*.[3]

  f. Many of the 700 Requests include Additional Information (or sometimes information in the Cross Streets column) suggesting that the requestor is a motorist, and therefore not blind. For example,

    i. An alleged requester seeks the addition of many left turn arrows at the intersection of Fullerton and Grand, stating: "Also Please Install a Left Turn Arrows for Eastbound onto the Bricktown Square & Brickyard Mall Access, Also Install Another Left Turn Arrows for Bricktown Square & Brickyard Mall Exit onto Eastbound Fullerton & Westbound on Grand Only, & Install a Right Turn Arrows for Bricktown Square & Brickyard Mall Exit onto Westbound Grand Only, With THE APS. Please Study This Intersection for a Possible Left & Right Turn Arrows Installation With THE APS, Thank You." Exhibit A, Table, line 9.

    ii. A different requestor asks: "Also, Please Install a Two-Way Left Turn Arrows for Eastbound onto Northbound Laramie & Westbound Onto Southbound Laramie Only With The APS, Please Study This Intersection for a Possible Left Turn Arrows Installation, Thank You." *Id*. at line 266.

---

[3] Please note that for the Court's convenience, Exhibit A is searchable.

    iii. A third asks "Racine & Belmont, Please Install a Two-Way Left Turn Arrows for Eastbound Onto Northbound Racine & Westbound Onto Southbound Racine Only, Also Please Upgrade & Install an LED Lights & Pedestrian Countdown Timer With The APS, Thank You." *Id*. at line 313.

    iv. A fourth asks "Also, I Need You To Study This Intersection for a Possible Left Turn Arrows All Ways & Right Turn Arrows for Northbound onto Eastbound Belmont Only With An APS, With or Without Upgrading a Traffic Signal By Modernizing it." *Id*. at line 407.

    v. Left turn arrows for vehicles are commonly invoked, a total of 238 times. Exhibit A, Table, *passim*.

    vi. Pedestrian signal countdown timers (requested 78 times) and LED lights (requested 109 times), both essentially useless to blind pedestrians, are regularly requested. Exhibit A, Table, *passim*.

    vii. Right turn arrows for vehicles are referenced 25 times by 14 alleged requestors. *See, e.g.*, *id*. at lines 9, 106, 115, 168, 221, 297, 351, 407, 472, 514, 557, 596, 612, 636, (each representing a different alleged requestor).

    viii. A Total Signal Modernization (TSM), in which CDOT replaces all or substantially all of the signal infrastructure at an intersection is referenced 83 times across all requests, even though much of the upgraded equipment does not assist blind pedestrians. *Id*. at *passim*.

6

g. Three alleged requestors reference the website "chistreetwork," which CDOT uses to inform the public of planned street improvements and repairs, most of which are primarily relevant to motorists. *See* Exhibit A, Table, at lines 80, 113, 159, 511.

**The City's Attempts to Verify the 700 Requests**

12. The City was concerned that, even if the bulk of the 700 Requests were made without concern for blind pedestrians, some might have been.

13. The City's outside counsel, Fox Rothschild LLP, therefore attempted to contact each of the 42 alleged requestors of the 700 Requests. Specifically, each such person was called by a member of Fox Rothschild's staff twice (unless reached on the first attempt), on November 10, 2025, and again on November 20, 2025. Because a disproportionate number of the 42 alleged requestor names are Hispanic, the staff member making these calls was bi-lingual. Voicemail messages were left where voicemail was reached. The undersigned attorney reached out via email to the one alleged requestor who included an email address on November 10, 2025, and December 1, 2025. *See* Exhibit A, Table, at lines 381-385.

14. Where contact was made, the Fox Rothschild staff member told the person reached that the City was seeking to verify that a request for APS installation had been made. Where the person reached had questions or gave an ambiguous response, the undersigned attorney called them back.

15. In all, 4 of the 42 phone numbers were out of service or calls did not otherwise go through. *See* Exhibit A, Table, alleged requestors first listed at lines 1, 80, 558, 566. An additional 24 alleged requestors were never substantively reached, with calls going to voicemail (and not being returned) or going unanswered. *See* Exhibit A, alleged requestors first listed at lines 9, 51,

7

115, 144, 153, 170, 213, 217, 247, 287, 298, 340, 381, 416, 441, 461, 491, 536, 581, 618, 652, 664, 681, 699.

    16.    Of the remaining 14 alleged requestors, <u>none</u> reported having made any of the 700 Requests. Specifically:

    a.  Several alleged requestors denied making any request for APS, or were believed not to have requested APS by the actual holders of the reported phone numbers. *See* Exhibit A, Table, alleged requestor first listed at lines 16, 195, 305, 631. For example, the holder of one phone number was not the alleged requestor, but his father; his son is in assisted living, is not blind, and is not believed to have made any APS requests. *Id*. at line 272. Another alleged requestor is currently living in Mexico and denies having requested APS. *Id*. at line 320.

    b.  Several alleged requestors were in fact minors, and their phone numbers belonged to their parents. *Id.* at lines 33, 601. One holder of a phone number reported that the alleged requestor is his 9-year-old son. *Id*. at line 494.

    c.  One alleged requestor had made requests of the City, but not for APS. *Id*. at line 386.

    d.  Two alleged requestors initially reported having requested "APS," but when the nature of APS was explained to them, they reported that they had never heard of the device and had not requested it. *Id*. at lines 135, 513.

    e.  One alleged requestor reports that since January of 2025, his identity has been used without his permission to make several claims against the City. *Id*. at line 406.

8

    f. Finally, one alleged requestor reported actually requesting APS… about ten years ago, and not as part of the 700 Requests. *Id*. at line 350.

17. In sum, it appears that the actual requestor(s) used a list of other persons to shield their identity, and there is no sign that the 700 Requests were made for reasons related to helping blind pedestrians. Moreover, it seems likely that the actual requestor(s) lives north of North Avenue and was primarily seeking to improve traffic and pedestrian signal infrastructure in their local area.

### Prioritizing the 700 Requests Would Impair Meeting the Other Targets and Goals in the Remedial Plan Order

18. The Public Requests Relief Provision allows this Court to grant the City relief from the public requests provisions of the Remedial Plan Order if to do otherwise would "impair meeting the other targets and goals set in this Remedial Plan Order." Remedial Plan Order at § III.A.2.a., third paragraph.

19. The 700 Requests impair the targets and goals of the Plan in several ways.

20. First, the 700 Requests, when applied to the Yearly Minimum Requirements set in the Plan, would crowd out all other priorities for more than five full years. Remedial Plan Order at III.B.3. Specifically, these Yearly Minimum Requirements require the addition of APS to 70 intersections in Year 1, 110 in year 2, 135 in year 3, 154 in Year 4, and 185 in Year 5, a total of 654 intersections through five years.

21. As such, the City is simply incapable of addressing this many public requests within the 12-24 month time horizon for responding to public requests contemplated in the Remedial Plan Order. Remedial Plan Order at § III.A.2.a., second paragraph.

9

22. Second, even if the Court intended for the 700 Requests to crowd out all other priorities, there are approximately 74 intersections where the City has already begun design and/or construction work relating to the Remedial Plan Order that are not covered by the 700 Requests.

23. Complying with the 700 Requests without relief would require pausing progress on these intersections, which would impair the City's ability to meet the Yearly Minimum Requirements in Years 1 and 2 of the Plan at least, and would require some design, planning, and contracting work to be repeated later at additional cost.

24. Moreover, some intersections where work has begun are a part of larger projects that cannot be paused, for example, three intersections on Grand Avenue between Damen Avenue and Ogden Avenue will receive APS as part of an overall roadway reconstruction project.

25. Third, honoring the 700 Requests would greatly delay the City's response to subsequent public requests actually made by blind pedestrians. For example, a blind pedestrian <u>today</u> requesting APS at a challenging intersection near their home or work would find their request languishing for years behind all 700 Requests, despite that the 700 Requests do not seem to be motivated by concerns for blind pedestrians.

26. Fourth, honoring the 700 Requests would delay compliance with other categories of "priority" intersections listed in the Remedial Plan Order. *See* § III.A.2.b-e.

27. Fifth, honoring all 700 Requests would effectively cut the APS Community Advisory Committee out of its planned role of assisting the City in prioritizing certain classes of intersections for APS installation, a process that has recently begun. Remedial Plan Order at § III.A.

28. Finally, the 700 Requests are clustered in the area north of North Avenue. To honor all 700 would contradict the Remedial Plan Order's requirement that the City "shall make reasonable efforts to install APS equitably across the city." Remedial Plan Order at § III.A.

29. For all of these reasons, the 700 Requests impair the targets and goals of the Remedial Plan Order.

30. Under the Remedial Plan Order, relief from the public request provisions can be sought where greater than 25 requests have already been received in a year. As noted above, 49 valid requests not included in the 700 Requests have been received to date in Year 1 of the Plan.

**Remedy Sought**

31. The City proposes to remove the 700 Requests from the public requests queue and from consideration as public requests under the Remedial Plan Order, <u>except</u> that any intersection that is subject to both one of the 700 Requests and another apparently legitimate request will stay in the queue as though submitted only by the legitimate, non-700 Requests requestor.

32. The City also proposes that the de-listing of the 700 Requests not otherwise impact the prioritization of each intersection on the basis of other factors under the Proposed Remedial Plan, including without limitation those factors listed in Section III.A.2.b-e.

33. After consultation with Plaintiffs and the United States, they do not oppose this Motion or the relief requested.

WHEREFORE, the City asks this Court to grant its Unopposed Motion for Relief from the Public Requests Provisions of the Remedial Plan Order and remove from the public requests queue all of the 700 Requests that are not the subject of a second request, together with what other relief the Court deems necessary.

Dated: December 5, 2025

| | |
|---|---|
| MARY RICHARDSON-LOWRY,<br>Corporation Counsel for the City of Chicago<br><br>By:   /s/ Matthew Scot Payne<br>      Attorney for Defendant the City of Chicago<br><br>JOHN L. HENDRICKS<br>John.Hendricks@cityofchicago.org<br>Managing Deputy Corporation Counsel Litigation<br>ANDREW WORSECK<br>Andrew.Worseck@cityofchicago.org<br>Deputy Corporation Counsel<br>City of Chicago Law Department<br>121 North LaSalle Street, Suite 600<br>Chicago, IL 60602<br>Phone: (312) 744-6975 / 744-7220 | JOHN C. HANSBERRY<br>(admitted *pro hac vice*)<br>jhansberry@foxrothschild.com<br>MATTHEW SCOT PAYNE<br>mpayne@foxrothschild.com<br>LAURA CAPLIN<br>lcaplin@foxrothschild.com<br>NATHAN MARKETICH<br>(admitted *pro hac vice*)<br>nmarketich@foxrothschild.com<br>Fox Rothschild LLP<br>321 N. Clark Street, Suite 1600<br>Chicago, Illinois 60654<br>Phone (312) 517-9200 |